# 22-0274-cv(L), 22-0402-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

———————————————

EMA FINANCIAL, LLC,

*Plaintiff-Counter-Defendant-Counter-Claimant-Appellee-Cross-Appellant,*

– v. –

JOEY CHANCIS, a Citizen of Florida, RICHARD ROER, a Citizen of Florida,

*Defendants-Counter-Claimants-Counter-Defendants-Appellants-Cross-Appellees,*

RAR BEAUTY, LLC, a Florida Limited Liability Company, LABB, INC., a Florida Corporation, REFLEX PRODUCTIONS, INC., a Florida Corporation, RICHARD CHANCIS, a Citizen of Florida, JOEY NEW YORK, INC., a Nevada Corporation,

*Defendants-Counter-Claimants-Counter-Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-COUNTER-CLAIMANTS-COUNTER-DEFENDANTS-APPELLANTS-CROSS-APPELLEES

MARK R. BASILE
ERIC BENZENBERG
MARJORIE SANTELLI
THE BASILE LAW FIRM P.C.
390 North Broadway, Suite 140
Jericho, New York 11753
(516) 455-1500

*Attorneys for Defendants-Counter-Claimants-Counter-Defendants-Appellants-Cross-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................v

I.  JURISDICTIONAL STATEMENT ...............................................1

II. ISSUES PRESENTED FOR REVIEW ..........................................2

III. STATEMENT OF THE CASE ......................................................3

IV. BACKGROUND ..........................................................................7

    A.  Proceedings Before the Southern District of New York......................8

        1.  The Court's September 2019 Decision and Order Dismissing Joey NY's Usury Defense.......................................9

        2.  The Court's February 1, 2022 Decision and Order .................12

V.  SUMMARY OF THE ARGUMENT ...........................................13

VI. ARGUMENT................................................................................17

    ISSUE ONE

    Whether the District Court erred by rejecting the Joey Defendants' affirmative defense of criminal usury under New York Penal Law 190.40..........................................................17

    I.  THE AGREEMENTS BETWEEN JOEY AND EMA ............17

        A.  The Securities Purchase Agreements .............................19

        B.  The Notes.........................................................................20

            1.  Prepayment.........................................................20

            2.  Conversion...........................................................21

                a)  The "Floating Price" Conversion Option...........................................................21

                b)  Rolling Conversions...................................22

i

4     Default ...............................................................23

5.    Absolutely Payable ...............................................23

C.    The EMA Convertible Notes Contain "Floating Price" Conversion Options Identical in All Material Respects to the Conversion Options in *Adar Bays* ...............................................................23

1.    The Joey Defendants  Argued Before the Southern District of New York that the Note was Criminally Usurious Because of the Value of the Floating-Price Conversion Option ...............................................23

D.    In Rejecting Appellant's Usury Argument, the District Court Used the Same Reasoning and Relied on the Same Cases as the District Court in the (Now Overruled) *Adar Bays* .....................................24

1.    The District Court's Usury Holding is Contrary to the New York Court of Appeals Decision in *Adar Bays* ...........................25

a)    EMA's Waiver Argument ..........................26

ISSUE TWO

Whether the Court erred in holding that an unlicensed broker-dealer could purchase the Convertible Promissory Notes in this case without violating Section 15(a) of the Securities Exchange Act of 1934? ........................................................28

I.    AS DEFINED IN THE SECURITIES EXCHANGE ACT OF 1934, A CONVERTIBLE PROMISSORY NOTE IS A "SECURITY" ........................................................28

A.    A Convertible Promissory Note MUST be a Security to Be Convertible Into Another Security (Such as Common Stock) ...............................................29

B. EMA's Goal of Obtaining Freely Trading Shares at Conversion (via Rule 144) is Possible ONLY if it Purchased a Security in the Original Transaction ...................................................................31

    1. "Tacking" Under Rule 144 Enables the Holder to Obtain Freely Trading Stock Immediately Upon Conversion .............................32

II. THE SECURITIES AGREEMENTS BETWEEN JOEY NY AND EMA CONTEMPLATE, AND EFFECT, A TRANSACTION IN SECURITIES ....................33

A. THE NOTES (ARE SECURITIES) ...............................35

III. UNDER SECTION 29(B) OF THE ACT, ALL CONTRACTS IN VIOLATION OF ANY PROVISION IN THE ACT "SHALL BE VOID ....................35

A. The Plain Language of Section 29(b) States that Contracts are Voidable if (1) "Made in Violation" of the Act or (2) Where Performance of the Contract Involves a Violation of the Act .............38

B. Supreme Court Precedent Applies Section 29(b) to Contracts "Made in Violation" of the Act..................38

C. Most § 29(b) Rescission Cases Based On Violation of the Broker-Dealer Statute (§ 15(a)) Involve "Performance" That Violates § 15(a) of the Act...........................................................................40

D. *Eastside Church*: The Fifth Circuit Holds the Securities Purchase Void under § 29(b) Where Formation Violated Section 15(a) of the Act ................42

IV. THE DISTRICT COURT'S HOLDING IN THIS CASE IS INCORRECT ...........................................................43

A.  The Holding that a Violation of §15(a) Cannot
    be Shown Without "A Provision in the
    Agreement Requiring Plaintiff to Register as a
    Broker-Dealer" Is Contrary to the Plain
    Language of §29(b) and Contrary to Supreme
    Court Precedent ............................................................43

B.  The District Court's Holding is Incorrect
    Because the Securities Purchase Agreement
    Obligates EMA (An Unlicensed Securities
    Dealer) to Violate § 15(a) By Purchasing a
    Security ........................................................................44

C.  The District Court's Insistence on Language in
    the Contract Requiring Unlawful "Performance"
    Ignores the Plain Language of Section 29(b) and
    Supreme Court Precedent ..............................................45

D.  *LG Capital* and *Vystar* Both Fail to Recognize
    that a Convertible Promissory Note is a Security...........46

E.  Vystar is Incorrect Because its Analysis is
    Premised on the Failure to Recognize that A
    Convertible Promissory Note is a Security ....................47

    1.  "Conversion" is a transaction in securities
        as a matter of law ................................................49

VII. CONCLUSION..............................................................................52

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
   37 N.Y.3d 320, 179 N.E.3d 612 (Oct. 14, 2021) ........................................ *passim*

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
   28 F.4th 379 ( 2d Cir. 2022) ................................................................6

*Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp.*,
   422 B.R. 423 (S.D.N.Y. 2009) ................................................................50

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723, (1975) ................................................................39

*Chris-Craft Indus. v. Piper Aircraft Corp.*,
   480 F.2d 341 (2d Cir. 1973) ................................................................39

*Eastside Church of Christ v. National Plan, Inc.*,
   391 F.3d (5th Cir. 1968) ........................................................ 42, 43, 48

*EMA Fin., LLC v. Joey N.Y., Inc.*,
   2019 WL 4600863 (S.D.N.Y. Sept. 22, 2019) ........................................... *passim*

*EMA Fin., LLC v. Joey N.Y., Inc.*,
   2021 U.S. Dist. LEXIS 108189 (S.D.N.Y. June 9, 2021) ....................................11

*EMA Fin., LLC v. Joey N.Y. Inc.*,
   2022 U.S. Dist. LEXIS 19258 (S.D.N.Y. Feb. 1, 2022) ....................................44

*EMA Fin., LLC v. Joey N.Y., Inc.*,
   2022 WL 292920 (S.D.N.Y. Feb. 1, 2022) ................................................. *passim*

*EMA Fin., LLC v. NFusz, Inc.*,
   509 F. Supp. 3d 18 (S.D.N.Y. 2020) ....................................................46

*Ema Fin., LLC v. Vystar Corp.*,
   336 F.R.D. 75 (S.D.N.Y. 2020)................................................................. *passim*

*Isquith v. Caremark Int'l*,
   1997 U.S. Dist. LEXIS 3715, at n.2  (N.D. Ill. Mar. 26, 1997) ..........................51

v

*Jianhu Yi v. GTV Media Grp. Media Inc.*,
    2021 U.S. Dist. LEXIS 115218 (S.D.N.Y. June 18, 2021) ..................................46

*Kaiser-Frazer v. Otis & Co.*,
    195 F. 2d 838 (2d. Cir 1952) ..............................................................37

*LG Capital Funding, LLC v. Accelera Innovations, LLC*,
    2018 U.S. Dist. LEXIS 137490 (E.D.N.Y. Aug. 10, 2018) ......................... 18, 30

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.*,
    2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018) ...................................... 16, 46, 47

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) .................................................................... 38, 39

*Omega Overseas, Ltd. v. Griffith*,
    2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014) .................................37

*Pearlstein v. Scudder & German*,
    429 F.2d 1136 (2d Cir. 1970) ...................................................... 37, 40

*Reeves v. Ernst & Young*,
    494 U.S. 56 (1990) .......................................................................29

*Regional Props., Inc. v. Fin. & Real Estate Consulting Co.*,
    678 F.2d 552 (5th Cir. 1982) .......................................... 40, 41, 42, 45

*SEC v. Almagarby*,
    479 F. Supp. 3d 1266 (S.D. Fla. 2020) ....................................................4

*SEC v. Fierro*,
    2020 WL 7481773 (D.N.J. Dec. 18, 2020) ................................................4

*SEC v. Fife*,
    2021 WL 5998525 (N.D. Ill. Dec. 20, 2021) ..............................................4

*SEC v. GPL Ventures, LLC*,
    No. 21-CV-6814 (S.D.N.Y. Aug. 13, 2021) ...............................................4

*SEC v. Keener*,
    2020 WL 4736205 (S.D. Fla. Aug. 14, 2020) .............................................4

*SEC v. River N. Equity LLC*,
    415 F. Supp. 3d 853 (N.D. Ill. 2019) ......................................................4

*Tcherepnin v. Knight*,
   389 U.S. 332, (1967) .............................................................51

*Transamerica Mortgage Advisors v. Lewis*,
   444 U.S. 11 (1979) ...............................................................39

*Union Capital, LLC v. Vape Holdings, Inc.*,
   2017 U.S. Dist. LEXIS 60455 (S.D.N.Y. 2017) ...................24

*Union Nat'l Bank v. Farmers Bank, Hamburg*,
   786 F.2d 881 (8th Cir. 1986) ..............................................51

**Statutes & Other Authorities:**

15 U.S.C. § 77(b)(3) ...............................................................51

15 U.S.C. § 77d .......................................................................31

15 U.S.C. § 77e .......................................................................31

15 U.S.C. § 78c(1)(13) ............................................................51

15 U.S.C. § 78c(a)(10) ...................................................... 28, 30

15 U.S.C. § 78cc ............................................................... 35, 36

15 U.S.C. § 78cc(13) ...............................................................51

15 U.S.C. § 78cc(b) ...................................................... 4, 14, 36, 39

15 U.S.C. § 78o ............................................................ 14, 41, 49

15 U.S.C. § 78o(a)(1) ..............................................................41

28 U.S.C. § 1291 .......................................................................1

17 C.F.R. § 230.144 ................................................................31

17 C.F.R. § 230.144(d)(3)(ii) ............................................ 21, 32

*Black's Law Dictionary* 1535 (8th ed. 1999)...........................50

D.C.L. § 273 ............................................................................10

D.C.L. § 275 ............................................................................10

D.C.L. § 276....................................................................................10

*Dictionary of Finance and Investment Terms* (10th Ed. 2018) ..............................30

Eugene F. Brigham & Joel F. Houston, *Fundamentals of Financial Management* (9th Ed. (Instructor's) 1999)........................................................ 18, 30

McMillan, Lawrence G., *Options as a Strategic Investment* (5th Ed. 2012) .........30

New York Penal Law 190.40................................................... 2, 13, 17, 24

*Release General Rules and Regulations SecuritiesAct of 1933*, 37 Fed. Reg. 591 (Jan. 14, 1972)..........................................................32

Samuel H. Gruenbaum & Marc I. Steinberg, Section 29(b): *A Viable Remedy Awakened*, 8 Geo. Wash. L. Rev. 1 (1979) .........................................................38

Sharpe, William F., *et al.*, *Investments*, 5th Ed. (1995)................................... 18, 30

*Webster's College Dictionary* 1415 (1991) ................................................................

# I.    <u>JURISDICTIONAL STATEMENT</u>

This Court has jurisdiction under 28 U.S.C. § 1291.  The United States Court for the Southern District of New York issued an Opinion and Order granting summary judgment in favor of EMA Financial, LLC's breach of contract and breach of guaranty claims on September 22, 2019, *EMA Fin., LLC v. Joey N.Y., Inc.*, 2019 WL 4600863 (S.D.N.Y. Sept. 22, 2019) and issued an Opinion and Order on February 1, 2022 that awarded damages to EMA Financial, LLC, and granted summary judgment for its claim against the Appellants for constructive fraudulent conveyance.  *EMA Fin., LLC v. Joey N.Y., Inc.*, 2022 WL 292920 (S.D.N.Y. Feb. 1, 2022).  The district court entered judgment on February 2, 2022.  Appellants filed a timely notice of appeal on February 9, 2022.

## II.   ISSUES PRESENTED FOR REVIEW

(1)   Whether the District Court erred by rejecting Defendants' affirmative defense of criminal usury under New York Penal Law 190.40.

(2)   Whether the Court erred in holding that an unlicensed securities dealer could purchase the Convertible Promissory Notes in this case without violating Section 15(a) of the Securities Exchange Act of 1934?

2

### III.     STATEMENT OF THE CASE

A "floating price" convertible promissory note is a lending instrument often used by publicly traded companies, where the lender is given an option to take repayment of the debt in company stock instead of cash.  However, instead of the fixed strike price that is used in a typical option, the lender is given the right to acquire stock at a *fixed discount* to the market price, anywhere from 35 to 50% of the market price at the time of conversion.

The use of these "fixed discount" or "floating price" convertible notes frequently has devastating effects on the company, its shareholders, and the stock price, from which it may be impossible to recover.  The United States Securities and Exchange Commission ("SEC") has issued warnings about these securities, stating:

> Because a market price based conversion formula can lead to dramatic stock price reductions and corresponding negative effects on both the company and its shareholders, convertible security financings with market price based conversion ratios have colloquially been called "floorless", "toxic," "death spiral," and "ratchet" convertibles.

*SEC Investor Glossary*, https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities (last accessed on May 22, 2022).

In the last few years, the SEC has commenced civil enforcement actions against several purveyors of toxic convertible securities (known as "toxic lenders")

3

for operating as unregistered securities dealers, in violation of Section 15(a) of the Securities Exchange Act of 1934. Thus far, the courts have unanimously agreed[1] that the toxic lenders prosecuted by the SEC thus far are operating in violation of section 15(a) of the Act, which makes it unlawful for any unregistered securities dealer "to effect a transaction in securities."

Section 29(b): Rescission of Contracts that Violate the Act

Since toxic lenders are operating as unregistered securities dealers in violation of the Act, the small companies who have fallen victim to toxic loans should have a defense to enforcement based on that violation. Section 29(b) of the Act provides that any contract "made in violation of the Act" or where performance involves a violation of the act, "shall be void." 15 U.S.C. § 78cc(b). Hence, before the district court, Appellants argued as an affirmative defense that EMA's convertible note agreements are void under section 29(b), because EMA, as an unregistered securities dealer, could not purchase the convertible notes (effecting a transaction in securities) without violating section 15(a).

---

[1] *See, e.g.*, *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. GPL Ventures, LLC*, No. 21-CV-6814 (S.D.N.Y. Aug. 13, 2021); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife,* 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021).

4

Unfortunately, in the context of Securities Purchase Agreements and accompanying convertible promissory notes, the Southern District of New York has fashioned its own interpretation of section 29(b): To succeed on a rescission claim, the party seeking rescission *must show that performance of the agreement* would violate the Act. The problem: The SDNY formulation arbitrarily excises half of the statutory language providing that voids contracts – not just where performance would violate the act, but also those contracts **made in violation of the Act**. An analysis that looks to performance only, to the exclusion of formation, is contrary to the plain language of the statute and contrary to precedent of the United States Supreme Court.

The Court's Decision on the Usury Claim Must be Remanded in Light of *Adar Bays*.

The district court issued its Opinion and Order on the Joey Defendants' usury claim on September 22, 2019. On October 14, 2021, the reasoning and conclusions of that decision was essentially overruled by the New York Court of Appeals decision in *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 179 N.E.3d 612 (Oct. 14, 2021). Other than the amounts loaned and the stated interest, the convertible promissory notes at issue in this case are identical in every material respect to the Notes under scrutiny in *Adar Bays*. Accordingly, just as with that case,

5

this Court must vacate the district court's decision on the usury question and remand the matter to the district court for a determination of the actual interest rate pursuant to the directive of the New York Court of Appeals and this Court in *Adar Bays, LLC v. GeneSYS ID, Inc.*, 28 F.4th 379 ( 2d Cir. 2022).

# IV.    BACKGROUND

This action concerns two one-year convertible promissory notes issued by Appellant Joey New York, Inc. ("Joey NY") in exchange for cash loans from Appellee EMA Financial, LLC, ("EMA"). Except for the dates and amounts loaned, the loan agreements are substantially the same. The terms of the agreements are each set forth in two documents: the convertible promissory note ("Note") and a securities purchase agreement ("SPA") the latter of which sets out the terms for EMA's purchase of the Note, with various other terms.

EMA purchased the first Note (in the amount of $90,000) on February 1, 2017 ("Note 1"). On May 3, 2017 EMA purchased a second Note from Joey NY in the amount of $151,600.00 ("Note 2"). Both Notes had no stated interest (but required up-front fees) and set a maturity date of one year after issuance. *See* Appx. at A-75, A-119.

**EMA Takes Partial Repayment of Note 1.** Exactly 189 days after the execution of Note 1, EMA commenced 'conversion' of the debt into shares of Joey NY stock. Between August 9, 2017, and September 28, 2017, EMA executed 35 conversions under Note 1, and sold 750,000 shares of Joey NY stock, generating $182,515.84 in net sales proceeds. Sp. Appx. SPA 13-14. *EMA Fin., LLC v. Joey*

7

*N.Y., Inc.*, 2022 WL 292920 (S.D.N.Y. Feb. 1, 2022) ("EMA II").

On October 20, 2017, EMA submitted a Notice of Conversion to Joey NY, but the shares were never delivered; EMA submitted a Notice of Default to Joey NY on October 31, 2017. EMA submitted another Notice of Conversion on November 14, 2017, but no stock was delivered.

## A. **Proceedings Before the Southern District of New York**

EMA initiated suit in the district court on December 11, 2017, alleging breach of contract against corporate defendant Joey NY, breach of guaranty against corporate defendants RAR, LaBB and Reflex,[2] and fraudulent inducement against (an Appellant in this case) CEO Joey Chancis ("Chancis") (collectively "Joey Defendants").

In response to EMA's complaint, the Joey Defendants claimed sixteen affirmative defenses including a claim that the EMA Notes were void because they charged an interest rate in excess of the legal maximum permitted under New York law. The Joey Defendants argued that the Notes contained hidden interest charges, such as that imposed by the 35% conversion discount, which caused the actual

---

[2] Corporate defendants RAR Beauty, LLC, LaBB, INC., and Reflex Productions, Inc., were named as guarantors but were insolvent by the time of suit.

8

interest rate to exceed the 25% rate permitted under the New York criminal usury statute.  A- 42.

On March 3, 2018, EMA moved for summary judgment on its breach of contract and guaranty claims, and moved for dismissal of the Joey Defendants' affirmative defenses, including the usury defense.

### 1.    The Court's September 2019 Decision and Order Dismissing Joey NY's Usury Defense.

On September 22, 2019, the Court granted summary judgment in favor of EMA, finding Joey NY liable for breach of contract and the entities RAR, Labb and Reflex liable for breach of guaranty.  The court rejected the Joey Defendant's usury defense, stating:

> Here, as in *Union Capital*, Plaintiff merely held an option to convert shares at a discount. Because Plaintiff could have elected to obtain repayment of the principal in cash at an interest rate that Defendants do not assert would exceed twenty-five percent,[7] the Agreements were not usurious on their face, and Defendants' argument that they are unenforceable fails.

*EMA Fin., LLC v. Joey N.Y., Inc.*, 2019 WL 4600863 (S.D.N.Y. Sept. 22, 2019) ("*EMA I*") A-296.  The court did not reach EMA's claim for fraudulent inducement against Chancis.

**EMA Joins Additional Defendants and Claims for Fraudulent Conveyance.** In March 2020, EMA Amended its Complaint to add defendants Richard Roer ("Roer") (Appellant's father and co-Appellant in this appeal) who had served as president of Joey NY and Richard Chancis, who had directed financial affairs of Joey NY. *EMA II,* Sp.A. at 9-10. EMA asserted that all three defendants "are named herein as a result of their rampant looting of the company, fraudulent conveyances, and disregard of the corporate form." *See* Amended Complaint, A-313. Against the three individual defendants, EMA claimed (1) fraudulent inducement (2) constructive fraudulent conveyance under NY Debtor and Creditor Law ("DCL") sections 273 and 275; (3) actual fraudulent conveyance under DCL section 276; and (4) sought to pierce the corporate veil. A-313.

**The Corporate Defendants Default.** In December 2020 counsel for the Joey Defendants withdrew from the case. The individual defendants were unable to afford counsel and represented themselves pro se. The corporate defendants were given several months to procure representation, but were unable to do so, ultimately leading to an entry of default as to the corporate defendants. A-471.

**Individuals Chancis and Roer Assert that EMA Unlawfully Operates as an Unregistered Securities Dealer**. On April 7, 2021, Chancis and Roer informed

the court that unregistered securities dealers using EMA's business model were being prosecuted by the SEC for violations of §15(a) of the Securities Exchange Act of 1934 (the "Act" or "'34 Act").[3] Chancis and Roer sought to add a claim for rescission of the Notes for 15(a) violations, which, if successful, would leave EMA with no cognizable claim against them. A- 485. In a response letter, EMA argued that Chancis had waived the broker-dealer defense by failing to raise it previously. A-497. On June 1, 2021, EMA filed a motion in limine that more formally addressed the broker-dealer argument for rescission, why it failed, and why Chancis had waived it. A-585.

**Court Order On Motion in Limine (June 9, 2021).** The district court denied EMA's request to bar Chancis' presentation of the section 29(b) rescission claim, noting that EMA "has demonstrated on several occasions that it is prepared to present its case as to why Defendants' argument is wrong, and that there was "essentially no risk of prejudice" in allowing Chancis claim to proceed. *EMA Fin., LLC v. Joey N.Y., Inc.*, 2021 U.S. Dist. LEXIS 108189, at *7-8 (S.D.N.Y. June 9, 2021). A-604. In June 2021 the court held a bench trial, with final post-trial briefing submitted in September 2021.

---

[3] *See* cases listed in footnote 1.

### 2. **The Court's February 1, 2022 Decision and Order.**

In its February 2022 decision, the court rejected Chancis and Roer's unlicensed dealer claim for rescission under § 29(b).   In rejecting the  §29(b) claim, the court stated:

> This argument is unconvincing in light of recent and very clear case law from this District on this precise issue, which holds that absent language in the agreements requiring Plaintiff to register as a broker-dealer, this affirmative defense cannot succeed . . . Put simply, to succeed on this affirmative defense "[i]n this District," it is "essential" to identify a provision in the agreement requiring Plaintiff to register as a broker-dealer.

*EMA II,* Sp. A. 39-40.  The court ordered judgment in favor of EMA as to breach of contract, breach of guaranty, and constructive fraudulent conveyance against all three individual defendants, but denied EMA the ability to pierce the corporate veil. In finding liability for constructive fraudulent conveyance, the court awarded EMA no damages because it had failed to establish a damage amount at trial.  The court awarded EMA damages in the amount of $151,418.50, plus prejudgment interest accruing at 24% per year from July 26, 2017. *Id*. The clerk entered final judgment in the case on February 2, 2022.

12

## V.    **SUMMARY OF THE ARGUMENT**

**Issue One:** Whether the District Court erred by rejecting Defendants' affirmative defense of criminal usury under New York Penal Law 190.40.

The district court's error is clear in light of intervening precedent.  In its September 22, 2019 Opinion and Order, the district court rejected the Joey Defendants' usury defense, holding, inter alia, that:

> Here, as in *Union Capital*, Plaintiff merely held an option to convert shares at a discount. Because Plaintiff could have elected to obtain repayment of the principal in cash at an interest rate that Defendants do not assert would exceed twenty-five percent,[7] the Agreements were not usurious on their face, and Defendants' argument that they are unenforceable fails.

*EMA I*, A-296.    After the issuance of the *Adar Bays* case, there can be little debate that the district court's rejection is contrary to the clear directives for analysis of floating-price conversion options like the ones associated with the convertible notes in this case.

13

**Issue Two:** Whether the Court erred in holding that an unlicensed broker-dealer could purchase the Convertible Promissory Notes in this case without violating Section 15(a) of the Securities Exchange Act of 1934?

Under Section 15(a) of the Exchange Act, it is unlawful for any unregistered broker or dealer "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security." 15 U.S.C. § 78o.

In the case below, Appellants Joey Chancis and Richard Roer asserted that, as contemplated under the statute, plaintiff-Appellee EMA is an unregistered securities dealer, and that EMA therefore violated section 15(a) of the Act when it purchased the convertible promissory note—which is *indisputably* a security. That is to say, EMA "effected a transaction in securities" when it purchased the security known as a convertible promissory note.

Because section 15(a) does not provide an independent cause of action (though it may be sufficient for a defense) Appellants brought a claim for rescission of the Agreements pursuant to section 29(b) of the Act, 15 U.S.C. § 78cc (b). Section 29(b) provides that any contract "made in violation" of the Act, or where "performance involves a violation" of the Act, "shall be void . . ."

Unfortunately for the Appellants, the district court held

14

> This argument is unconvincing in light of recent and very clear case law from this District on this precise issue, which holds that absent language in the agreements requiring Plaintiff to register as a broker-dealer, this affirmative defense cannot succeed . . . Put simply, to succeed on this affirmative defense "[i]n this District," it is "essential" to identify a provision in the agreement requiring Plaintiff to register as a broker-dealer. **ERRORS 1, 2.**

*EMA II*, Sp.A - 39-41. The above excerpt contains two errors. Error 1: First, assuming that "language in the agreements" refers to contracts where "performance involves a violation", the court's holding ignores half of the plain language of Section 29(b), which allows for rescission of contracts where violations occur *in the formation* of the contract. Error 1 is addressed in sections III.A (Issue Two).

Error 2: Second, the district court's requirement that Appellant "identify a provision in the agreement ***requiring [EMA] to register as a broker-dealer*** is not the test for violations of section 15(a): section 15(a) specifies that it is unlawful "***to effect a transaction in securities' or to sell, or attempt to sell***" a security. Error 2 is addressed in Section IV. The district court then states:

> However, given that there have been at least four decisions issued in this District in fewer than three years on this very issue, I would need an extraordinary reason to depart from the law of this District, and I find none here . . .

Sp.A- 39-41 (citations omitted). **Error 3**: Error three is not contained in the text of the decision, but in the court's reliance on decisions that, as demonstrated below, are obviously wrong. The two primary decisions upon which the court relied are *Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75 (S.D.N.Y. 2020) and *LG Capital Funding, LLC v. ExeLED Holdings, Inc.,* 2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018). *Vystar* and *ExeLED* are wrongly decided because neither case accounts for the fact that convertible promissory notes are themselves securities. Error 3 is discussed in Sections IV D and E.

## VI.   ARGUMENT

**ISSUE ONE**

**Whether the District Court erred by rejecting the Joey Defendants' affirmative defense of criminal usury under New York Penal Law 190.40.**

Short Answer: Yes.  The District Court's ruling is contrary to the clear guidance subsequently issued by the New York Court of Appeals.

The precedential opinion issued by this Court and the New York Court of Appeals in *Adar Bays* was issued after the district courts September 22, 2019 ruling on this question.  *Adar Bays is* directly on point and controlling in this issue on appeal.  Except for the amounts loaned and the stated interest charged, the convertible promissory notes at issue in this case are identical in every material respect to the conversion option and promissory note addressed by the NYCA in *Adar Bays*.  Accordingly, the clear directive set forth by the NYCA requires that the Court vacate the district court's opinion under challenge in this appeal, and remand the matter for further proceedings consistent with the clear directives with *Adar Bays,* 37 N.Y.3d 320.

### I.   THE AGREEMENTS BETWEEN JOEY AND EMA

EMA and Joey NY executed two promissory note agreements, each consisting of a Securities Purchase Agreement ("SPA") and a Convertible Promissory Note

17

("Note"). Broadly speaking, the SPA provided the terms under which the EMA purchased the Note, while the Note contained the terms pertaining specifically to the Note. Both the Notes and the SPAs designated governance under New York Law.

**Convertible Notes.** Broadly speaking, a "convertible promissory note," is a lending instrument used for publicly-traded companies in which the lender acquires an option to take repayment of the debt in company stock.[4] This repayment, or "conversion" feature is the defining characteristic of the convertible note: in addition to the interest payments or "commitment fees" due under the Note, it gives the holder the right to use the accrued debt to pay the exercise price of a call option on company stock.

Conspicuously, neither of the Notes contained provisions designated as "interest;" however, both SPA's charged various added fees. The vast majority of EMA's gains under the Notes were from the "floating price" conversion options. As

---

[4] A convertible note is essentially a debt instrument with a call option. *See* Eugene F. Brigham & Joel F. Houston, *Fundamentals of Financial Management*, 891 (9th Ed. (Instructor's) 1999); Sharpe, William F., *et al.*, *Investments*, 5th Ed. at 716-17 (1995) ("A convertible bond is, for practical purposes, a bond with a nondetachable warrant plus the restriction that only the bond is usable [] to pay the exercise price."); *LG Capital Funding, LLC v. Accelera Innovations, LLC*, 2018 U.S. Dist. LEXIS 137490, at *17 (E.D.N.Y. Aug. 10, 2018).

set forth below, the guaranteed 35% discount accorded to EMA at conversion is the both the source of EMA's gains and the impetus for the usury claim.

The first agreement was executed on February 1, 2017, and the second on May 3, 2017. Except for the dates and dollar amounts, the agreements were essentially identical. The relevant portions of SPA and Notes are described below.

### A.    The Securities Purchase Agreements

The **First SPA** set forth the terms under which EMA would purchase from Joey New York a one-year Convertible Promissory Note in the amount of $90,000 (Note 1) for a purchase price of $85,000.00. The First SPA also required Joey NY to deliver 25,000 shares ("Commitment Shares") of restricted Joey NY common stock as up-front consideration for the loan. SPA at 1(a). The SPA also required Joey NY to reimburse EMA $6,500.00 for due diligence, costs and transaction fees. SPA at 10(e). A- 95.

The **Second SPA** (A-139) sets forth the terms for EMA's purchase of a one-year Convertible Promissory Note in the amount of $151,600 ("Note 2") for a purchase price of $146,600. Like the First SPA, the Second SPA required payment of a "commitment fee" for EMA to purchase Note 2, in the form of 50,000 shares of restricted common stock, and a stock purchase warrant for 78,325 shares of common

stock. Second SPA at 1.(a). A- 139.  Section 10(e) of the Second SPA required Joey

to reimburse EMA via a flat fee of $9,100.00 for its costs, due diligence and

transactional expenses.

### B. The Notes

> **FOR VALUE RECEIVED, JOEY NEW YORK, INC.,** a
> Nevada corporation ("Borrower" or "Company"), hereby promises to
> pay to the order of **EMA FINANCIAL, LLC,** a Delaware limited
> liability company, or its registered assigns (the "Holder"), on February
> 1, 2018, (subject to extension as set forth below, the "Maturity Date"),
> the sum of $90,000.00 as set forth herein . . .

Note 1 at 1. A-75.  Paragraph 1 of the Note 1 (shown in part, above) defines the

amount due under the Note as ($90,000 for Note 1 and for Note 2) with no stated

interest and a "maturity date" (the date that repayment is due) as one year after

execution.  Note 2 appears to be identical in all respects to Note 1, except for the

amount  of principal ($151,600.00).  Note 2 was issued on May 3, 2017 and also

contained a one-year maturity date of May 3, 2018.

### 1. Prepayment.  Paragraph 1.8 of the Notes provides that the borrower may

repay the loan early (up to 180 days after closing) but with added penalties

depending on the repayment date.  Notes at 1.8  A-84 , A- 128).  Prepayment after

day 180 is not permitted. *Id*.  Under SEC regulations, any shares EMA received

through conversion would not be freely trading until 180 days after the closing date. *See* Rule 144, 17 C.F.R. § 230.144(d)(3)(ii).

**2. Conversion.**

> 1.1. Conversion Right. The Holder shall have the right, in its sole and absolute discretion, at any time from time to time, to convert all or any part of the outstanding amount due under this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the conversion price (the "Conversion Price") determined as provided herein (a "Conversion");

. . .

Notes at 1.1, A- 75, A-119.

As explained above, "conversion" simply refers to the process by which EMA exercises the option to exchange the debt under the Notes for company stock. At conversion, EMA exercises the option but instead of paying the strike price in cash, it uses (a portion of) the debt. With each conversion, a portion of the loan is repaid as to the amount converted, until the loan is fully repaid.

### a) The "Floating Price" Conversion Option.

The price for such conversion is the "lower of: (i) the closing sale price of the Common Stock on the Principal Market on the Trading Day immediately preceding the Closing Date, and (ii) 65% of the average of the lowest two (2) sale prices for the Common Stock on the Principal Market during the twenty (20)

21

consecutive Trading Days immediately preceding the Conversion Date or the closing bid price." (*Id.* ¶ 11.)

Unlike a typical *fixed-price* option, the conversion option attached to EMA's Notes carried no fixed strike price; instead, conversion carried a substantial, 35% *fixed discount*, often referred to as a "floating price" discount. This type of conversion option guaranteed EMA a strike price pegged at 35% below the market price at the time of exercise. In practical terms, this meant the Note guaranteed that for every $100 of debt converted, EMA could "purchase" $154 worth of Joey NY company stock --which it immediately sold into the public market. Unlike traditional fixed-price call options, whose value rises and falls along with stock price, the "floating price" fixed-discount conversion option used by EMA guaranteed the same minimum value -- *regardless of the market price.*

### b) *Rolling Conversions.*

The right to "convert all or any amount" of the debt at any given time is one of the most important provisions in the Note. EMA's ability to convert the debt in tranches allows the lender to convert (and sell the stock acquired) as small or as large of a portion of the loan that the market can bear. This insulates the lender from

22

illiquidity issues and price depressions that might result if it had to convert the entire debt all at once and sell a large quantity of stock into the market.

**4. Default**. Article III of the Notes sets forth sixteen events of default, including failure to pay principal or interest (3.1) Failure to issue shares of common stock (3.2); failure to remove the restrictive legend (3.2); breach of any covenant in the Note, SPA or other collateral documents.  A-75, A-119.

**5. Absolutely Payable**.  Section 4.6 of the Notes made clear that the Note "shall be deemed an absolute and unconditional obligation of Borrower for the payment of money" and similarly, section 1.4(e) of the Notes maintained that, upon delivery of a Notice of Conversion, "Borrower's obligation to issue and deliver the certificates for Common Stock shall be absolute and unconditional." A- 75, A-119.

**C.** **The EMA Convertible Notes Contain "Floating Price" Conversion Options Identical in All Material Respects to the Conversion Options in *Adar Bays*.**

**1.** **The Joey Defendants  Argued Before the Southern District of New York that the Note was Criminally Usurious Because of the Value of the Floating-Price Conversion Option.**

Joey New York's initial affirmative defenses against EMA's suit for breach of contract include a claim  that the EMA Notes were criminally usurious and therefore void and unenforceable as a matter of law.  Like the borrower-defendant

23

in *Adar Bays*, the Joey Defendants argued that the value imparted to the lender by the fixed 35% conversion discount put the interest rate well beyond the 25% criminal usury cap set forth in section 190.40 of the New York Penal Laws.

### D.    In Rejecting Appellant's Usury Argument, the District Court Used the Same Reasoning and Relied on the Same Cases as the District Court in the (Now Overruled) *Adar Bays*.

In rejecting the Joey Defendants' usury defense, the district court found that the Agreements did not violate New York usury laws, relying on the following quoted passage from *Union Capital, LLC v. Vape Holdings, Inc.,* 2017 U.S. Dist. LEXIS 60455 (S.D.N.Y. 2017):

> [The borrower] argues that, in considering the effective interest rate, the Court should also include the potential profit [the lender] might reap by converting shares at a 42% discount. The Court disagrees. [The lender] simply held an option to convert shares, and it could have elected to obtain repayment in cash, which would clearly not have been usurious. Moreover, even if [the lender] chose to convert the loan principal into shares, any potential profit [the lender] might realize would still be dependent on the market price at the time of conversion and so, therefore, would be too uncertain to incorporate into an interest rate calculation. Furthermore, even if the discount rate could be considered[,] a usury defense could no longer be applied against the loan once the Note principal was converted into equity in [the borrower]. *Id.* at *5 (internal citations omitted).

*EMA I* , A-296.  As with *Union Capital*, the district court likewise held that because EMA "merely held an option to convert shares at a discount," and could have elected

to be repaid in cash at a non- usurious rate. Accordingly, the district court held that "the Agreements were not usurious on their face, and Defendants' argument that they are unenforceable fails." *Id.*

### 1. The District Court's Usury Holding is Contrary to the New York Court of Appeals Decision in *Adar Bays.*

On October 14, 2021, the New York Court of Appeals ("NYCA") issued a decision addressing two certified questions issued by this Court, on the application New York usury laws and the proper calculation of interest for convertible promissory notes. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 179 N.E.3d 612 (Oct. 14, 2021). In *Adar Bays*, the Court of Appeals specifically rejected the basis of the district court's holding above, that 'EMA merely held an option to convert shares at a discount' that might never be exercised. The NYCA held instead that "[b]ecause floating-price conversion options have intrinsic value that is bargained for in these loans, they should be treated as a component of interest. This remains true even though it is possible that the conversion right may never be exercised . . ." *Adar Bays*, 179 N.E.3d 338. The *Adar Bays* court then concluded that the precise value of such an option was a finding of fact best left to a determination by the lower court, stating:

New York law requires that the value of the conversion option, like all other property exchanged in consideration for the loan, should be included in determining the loan's interest rate for purposes of the usury statutes, to the extent such value, when measured at the time of contracting, can be reasonably determined. The hypothetical possibility that a future exercise of a floating-price conversion option may result in a return exceeding 25% does not render a loan usurious on its face. Rather, the value of such an option is a question of fact, and the burden to prove that value is on the borrower.

*Adar Bays,* 37 N.Y. 3d at 334. In response to the NYCA decision, this Court issued an opinion in directing vacatur and remand of the *Adar Bays* matter to the district court for proceedings consistent with the NYCA ruling. The same result must obtain in this case.

### a) *EMA's Waiver Argument*

In October 2021, Appellant's Chancis and Roer submitted to the court a letter pertaining to the *Adar Bays* decision, which had just been issued. In the letter the Appellants urged the court to reconsider its September 2019 ruling on the usury question. A- 1081. EMA submitted a letter in opposition, stating that the corporate defendant's default constituted waiver of the issue. A-1083. The court did not respond.

26

Whether the corporate defendant waived its ability to appeal the order or move for reconsideration is not relevant. All of the Joey Defendants raised the usury claim, including the individual Joey Chancis, one of the Appellants in this appeal.

Finally, because the district court may conclude on remand that the value of the conversion discount does not render the Note usurious, the Court must also resolve Issue Two, presented below.

**ISSUE TWO**

**Whether the Court erred in holding that an unlicensed broker-dealer could purchase the Convertible Promissory Notes in this case without violating Section 15(a) of the Securities Exchange Act of 1934?**

**I.    AS DEFINED IN THE SECURITIES EXCHANGE ACT OF 1934, A CONVERTIBLE PROMISSORY NOTE IS A "SECURITY"**

Pursuant to the definitions provided in Section 3(a)10 of the Act, a promissory note is a security.  That section provides:

> (10) The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture … but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10).[5] With "note" listed as the first item under the statutory definition of security, there can be little dispute that a promissory note—particularly

---

[5] 15 U.S.C. § 78c(a)(10) The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant

28

with a one-year maturity date, is a security. "The test begins with the language of the statute; because the Securities Acts define 'security' to include 'any note,' we begin with a presumption that every note is a security." *Reeves v. Ernst & Young*, 494 U.S. 56, 64-65 (1990).

## A. A Convertible Promissory Note MUST be a Security to Be Convertible Into Another Security (Such as Common Stock)

Lengthy analysis on whether the convertible note in this case qualifies as a security is unnecessary. In the context of securities law, "conversion" can only occur between two securities. That is, by definition, any "convertible security" is a security—usually a bond, preferred stock, or note—that by its terms can be converted into a different security, such as shares of the company's common stock.[6] "Conversion" refers to the actual process where the holder (who may be exercising its right to convert) exchanges the convertible for a different security, such as shares

---

or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

[6] *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities (last accessed on May 22, 2022).

of common stock. *Dictionary of Finance and Investment Terms*, 149 (10th Ed. 2018).

"Convertible" promissory notes like the notes in this case are promissory notes that may be 'converted' into shares of company stock. By the textbook definition, a convertible note "is the equivalent of a bond with an option,[7]" both of which are designated as securities under the Act. 15 U.S.C. § 78c(a)(10). The conversion feature gives the holder the right to exchange the debt under the Note for newly-issued shares of company stock as repayment for the loan. When the holder exercises the conversion right, no cash changes hands because the lender uses the debt instead of cash to pay the exercise price. *LG Capital Funding, LLC v. Accelera Innovations, LLC*, 2018 U.S. Dist. LEXIS 137490, at *17 (E.D.N.Y. Aug. 10, 2018)

---

[7] Eugene F. Brigham & Joel F. Houston, *Fundamentals of Financial Management*, 891 (9th Ed. (Instructor's) 1999); Sharpe, William F., Alexander, Gordon J., Bailey, Jeffery V., *Investments*, 5th Ed. at 716-17 (1995) ("A convertible bond is, for practical purposes, a bond with a nondetachable warrant plus the restriction that only the bond is usable [] to pay the exercise price."). A *call option* gives the owner (or holder) the right to buy the underlying security at a particular price for a certain period of time. McMillan, Lawrence G., *Options as a Strategic Investment*, 4-5 (5th Ed. 2012).

17 (observing that with a convertible note, the lender "pre-paid" the exercise price "when it funded the note.").

### B. EMA's Goal of Obtaining Freely Trading Shares at Conversion (via Rule 144) is Possible ONLY if it Purchased a Security in the Original Transaction

Newly issued securities (that are not issued as part of a registration statement filed with and approved by the SEC)—such as stock newly issued by a publicly traded company, are "unregistered" securities, and therefore cannot be sold in the public markets unless they meet an exemption specified by law, which always includes at least a six-month holding period. *See* 17 C.F.R. § 230.144. Under Section 5 of the Securities Act of 1933 ("Securities Act" or "'33 Act") (15 U.S.C. § 77e), all securities sold in the United States public market must be registered with the SEC. For example, the 25,000 "commitment shares" of Joey NY stock that EMA is designated to receive as up front consideration (First SPA at 1(a)) have no 'tacking' period to utilize; due to the restriction period, EMA must simply hold the shares for six months.

However, Section 4(a) of the Securities Act (15 U.S.C. § 77d) provides that unregistered securities may be sold under certain exemptions, currently set forth in SEC Rule 144 (17 CFR § 230.144). The primary requirement for Rule 144 resale is

that the holder must hold the restricted securities for a specified period of time: six months for reporting companies and one year for non-reporting companies.[8] After the holding period, the restriction is removed and the security may be freely sold in the public market.

### 1. "Tacking" Under Rule 144 Enables the Holder to Obtain Freely Trading Stock Immediately Upon Conversion.

Under the tacking provisions in Rule 144(d)(3)(ii), lenders like EMA can immediately sell the shares acquired from conversion—as long as it held the Note for at least six months. The tacking period allows the holding period under the Note to stand in for the holding period normally required for the stock. Rule 144(d)(3)(ii), which expressly addresses "conversion", provides that when convertible securities are converted into stock, the "securities acquired solely in exchange for other securities of the same issuer" are to be deemed to have been acquired at the same time as the securities surrendered for conversion…" 17 C.F.R. § 230.144(d)(3)(ii).

---

[8] As observed by the SEC, "a holding period prior to resale helps to ensure that a holder who claims an exemption under Section 4(a)(1) has assumed the full economic risks of investment and, therefore, is not acting as a conduit, directly or indirectly, on behalf of the issuer for the sale of unregistered securities to the public.. From Fed Reg. rule 144. *See Release General Rules and Regulations Securities Act of 1933* 37 Fed. Reg. 591, 597 (Jan. 14, 1972).

Every share EMA acquired from conversion related back to the date of the original securities purchase date, which was the purchase of the convertible note.

## II. THE SECURITIES AGREEMENTS BETWEEN JOEY NY AND EMA CONTEMPLATE, AND EFFECT, A TRANSACTION IN SECURITIES

EMA and Joey NY executed two promissory note agreements, each comprised of a Securities Purchase Agreement, which broadly governed the terms under which the Note was sold, and the Convertible Promissory Note itself, which contained additional terms regarding the specifics of the Note. Both the Notes and the SPA's designated governance under New York Law.

Relevant portions of the First SPA described below.[9] Page one of the First SPA is shown as:

### SECURITIES PURCHASE AGREEMENT

\* \* \*

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act" or "1933 Act"), and Rule 506 promulgated thereunder by the United States Securities and Exchange Commission (the "SEC"), **the Company desires to issue and sell to the Purchaser, and the Purchaser desires to purchase from the Company a Convertible Note of the Company**, in the form attached hereto as Exhibit A, in the principal amount of $90,000.00  . . .

---

[9] The excerpts and description below adds to the description of the Agreements set forth in Issue One. Except for the dates and dollar amounts, the agreements were essentially identical, so only the First SPA will be discussed.

33

convertible into shares ("Conversion Shares") of common stock, $0.001 par value per share (the "Common Stock"), of the Company, upon the terms and subject to the limitations and conditions set forth in such Note.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and the Purchaser agree as follows:

<u>1. Purchase and Sale of Note.</u>

a) Purchase of Note. On the Closing Date (as defined below), the Company shall issue and sell to the Purchaser, and the Purchaser agrees to purchase from the Company, the Note for an aggregate purchase price of $85,000.00 ("Purchase Price"). In connection with the issuance of the Note, prior to the Closing Date (as defined below) the Company shall issue 25,000 shares of restricted common stock to Purchaser as a commitment fee (the "Commitment Shares").

First SPA at 1.    Other provisions in the SPAs demonstrate that EMA had full knowledge of the multiple securities transactions contemplated therein, and highlight EMA's intent to protect the value of its right to convert the note into freely trading securities- (which only happens because the Note itself is deemed a security under the Act).  See SPA at 1.2(a) (Investment Purpose); SPA at 1.2(d), (f) (Transfer or Re-sale) SPA at 10(b) (Obligation to Remove restrictive legends); SPA at 7 (Obligation to deliver "Unlegended Shares").  A-95, A-139.

34

### A.    THE NOTES (ARE SECURITIES)

In regard to the status of the Notes as securities, only the single item on page

one of the Notes is necessary to reproduce:

> **NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.**

Notes, A-75, A-119.

### III.    UNDER SECTION 29(B) OF THE ACT, ALL CONTRACTS IN VIOLATION OF ANY PROVISION IN THE ACT "SHALL BE VOID."

Section 29 of the Act (15 U.S.C. § 78cc) is entitled "**§ 29 Validity of**

**Contracts**," of which subsection (b) provides aggrieved parties the right to rescind

contracts where the formation or performance violates the act or any rule or regulation thereunder. Section 29(b) provides:

> (b) Contract provisions in violation of chapter
>
> **Every contract made in violation of any provision of this chapter** or of any rule or regulation thereunder, **and every contract** (including any contract for listing a security on an exchange) heretofore or hereafter made, **the performance of which involves the violation of**, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, **shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract…**

Securities Exchange Act of 1934 at § 29(b) (codified as 15 U.S.C. § 78cc(b)) (emphasis added)[10]. As the plain language of the statute provides, contracts "formed

_____

[10] 15 U.S.C. § 78cc **Validity of Contracts**
(b) **Contract provisions in violation of chapter**
Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation: *Provided*, (A) That no contract shall be void by reason of this subsection because of any violation of any rule or regulation prescribed pursuant to paragraph (3) of subsection (c) of section 78o of this title, and (B) that no contract shall be deemed to be void by reason of this subsection in any

36

or performed" in violation of any provision of the Act are deemed "void" as to the rights of violating parties.   This provision is viewed by many jurors as simply codifying the common law principles of illegal contract, *see e.g.*, *Kaiser-Frazer v. Otis & Co.,* 195 F. 2d 838, 845 (2d. Cir 1952) (refusing to enforce stock purchase contract where prospectus contained misleading statements, noting "it is clear that a contract which violates the laws of the United States and contravenes the public policy as expressed in those laws is unenforceable.").  As Judge Friendly observed, section 29(b) appeared to be "a legislative direction to apply common-law principles of illegal bargain." *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970) (*quoted in Omega Overseas, Ltd. v. Griffith*, 2014 U.S. Dist. LEXIS 109781, at *13 (S.D.N.Y. Aug. 7, 2014)).

---

action maintained in reliance upon this subsection, by any person to or for whom any broker or dealer sells, or from or for whom any broker or dealer purchases, a security in violation of any rule or regulation prescribed pursuant to paragraph (1) or (2) of subsection (c) of section 78o of this title, unless such action is brought within one year after the discovery that such sale or purchase involves such violation and within three years after such violation. The Commission may, in a rule or regulation prescribed pursuant to such paragraph (2) of such section 78o(c) of this title, designate such rule or regulation, or portion thereof, as a rule or regulation, or portion thereof, a contract in violation of which shall not be void by reason of this subsection.

**A.    The Plain Language of Section 29(b) States that Contracts are Voidable if (1) "Made in Violation" of the Act or (2) Where Performance of the Contract Involves a Violation of the Act**

*In drafting Section 29(b), Congress could not have  been clearer.*  Section 29(b) requires the court to scrutinize both whether the "making" of the contract was unlawful,  or whether the "performance" of the contract "involved a violation" of the Act.  "Thus, the express terms of a contract could be perfectly lawful, yet the 'making' of the contract might involve a violation of the Act or its rules or regulations."[11]

**B.    Supreme Court Precedent Applies Section 29(b) to Contracts "Made in Violation" of the Act**

Claims for contract rescission under section 29(b) are fairly infrequent and have not generated a large body of caselaw.  The most well-known example of 29(b) rescission claim, which was based on a violation in the "making" of a contract, is found in *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970).  In *Mills*, certain shareholders sought to rescind a merger contract using section 29(b).  The shareholders alleged that the proxy-soliciting materials that the Auto-Lite managers

---

[11] Samuel H. Gruenbaum & Marc I. Steinberg, *Section 29(b): A Viable Remedy Awakened*, 8 Geo. Wash. L. Rev. 1, 21 (1979).

sent out to the shareholders to gain their approval of the merger contained material misstatements and nondisclosures, in violation of section 14(a) of the Act and SEC Rule 14a-9. The Court agreed, holding that because the violating proxy solicitation was an "essential link in the accomplishment of the transaction," the linkage was sufficient to invoke the voidability provision of section 29(b). *Mills*, 396 U.S. at 385.

The Supreme Court has approved the use of section 29(b) in many similar situations where the contract itself contained no provision obligating performance that would violate the Act, but where a violation of the Act occurred during the formation of the contract, similar to *Mills*. *See Chris-Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 391 (2d Cir. 1973) (observing that "a defrauded shareholder also can bring suit for rescission and restitution under § 10b of the 1934 Act, or under § 29(b) of the 1934 Act.") (citation omitted); *see also Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 16-17 (1979) (observing that "contracts whose *formation or performance* would violate the Act 'shall be void'") (emphasis added); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 735, (1975) (stating that "[o]ne of the justifications advanced for implication of a cause of action under § 10 (b) lies in § 29 (b) of the 1934 Act, 15 U.S.C. § 78cc (b), providing that a contract

39

*made in violation* of any provision of the 1934 Act is voidable at the option of the deceived party") (emphasis added).

One of the few 29(b) cases before the Second Circuit Court of Appeals is the *Pearlstein* case. There, this Court upheld a 29(b) claim for rescission of a bond purchase allegedly made in violation of Regulation T of the Act, because the broker had permitted the customer to take out a bank loan to finance the purchase, which is prohibited under the Act. *Pearlstein,* 429 F. 2d at 1140-41.

**C.** **Most § 29(b) Rescission Cases Based On Violation of the Broker-Dealer Statute (§ 15(a)) Involve "Performance" That Violates § 15(a) of the Act.**

Although section 29(b) is not widely used for rescission of contracts, a substantial number of claims are seeking rescission of a contract requiring performance that would obligate a party to violate the Act. The classic example is a customer seeking rescission of a brokerage contract where the customer learns (typically after the broker screws up) that the broker is not registered with the SEC. Such was the case in *Regional Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir. 1982). In *Regional Properties*, the § 29(b) rescission claim was, similar to this case, based on a violation of § 15(a) of the Act. Section 15(a) provides:

40

> **It shall be unlawful** for any broker or dealer … to make use of the mails or any means or instrumentality of interstate commerce **to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security** (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

Securities Exchange Act of 1934 at § 15(a)(1) (codified as 15 U.S.C. § 78o(a)(1)) (emphasis added)[12].

In *Regional Properties*, the contract itself set forth obligations for the broker to market, sell or attempt to sell, interests in a limited partnership. When the contracting parties learned that the broker was not a registered broker (and was in fact a disbarred lawyer) the parties brought suit seeking rescission of the contract under § 29(b) on the ground that the broker had violated Section 15(a)(1) of the

---

[12] **§ 78o. Registration and regulation of brokers and dealers**

**(a) Registration of all persons utilizing exchange facilities to effect transactions; exemptions** (1) It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

41

Exchange Act by contracting to sell, (and indeed selling) limited partnership interests for them without having registered with the SEC as a broker-dealer. *Reg'l Props.,* 678 F.2d. at 556. The court concluded that rescission was proper because the unlicensed broker in Regional Properties could not carry out his obligations under the agreements without violating section 15(a).

### D. *Eastside Church*: The Fifth Circuit Holds the Securities Purchase Void under § 29(b) Where Formation Violated Section 15(a) of the Act

The primary example of a § 29(b) claim for rescission based on a violation (of §15(a)) in the *formation* of a contract is found in *Eastside Church of Christ v. National Plan, Inc*., 391 F.3d 357 (5th Cir. 1968). Although it is only a single case, it has the blessing of the Fifth Circuit Court of Appeals, and is on point in every respect to the case here on appeal.

In *Eastside Church*, the plaintiff church brought a § 29(b) action for rescission of certain bonds (securities) that it had issued to the bond purchaser-defendant National Plan. The church alleged that because National Plan was an unregistered broker dealer, National's purchase of the bonds was unlawful under § 15(a)(1). After review of the evidence, the Fifth Circuit agreed that National was indeed "a broker and a dealer within the meaning of the Act," and hence, because it was not registered, it could not lawfully effect the bond transactions in that case. The court held:

> Under § 15(a)(1), National was prohibited from effecting the transactions here involved and thus **violated the Act by entering into those transactions**. Under the voiding provision of § 29(b), it is

42

sufficient to show merely that the prohibited transactions occurred and that appellants were in the protected class.

*Eastside Church*, 391 F.3d at 362 (citations omitted).  Accordingly, the Fifth Circuit held the contract to be void and unenforceable.

## IV.  THE DISTRICT COURT'S HOLDING IN THIS CASE IS INCORRECT

**A.**    **The Holding that a Violation of §15(a) Cannot be Shown Without "A Provision in the Agreement Requiring Plaintiff to Register as a Broker-Dealer" Is Contrary to the Plain Language of §29(b) and Contrary to Supreme Court Precedent.**

The district court's analysis in this case was very different from the analysis performed in *Eastside Church*.  Rather than an analysis as to whether section 15(a) was violated at formation (by entering into the agreements) or whether performance of the agreement "involved a violation" the district court required only that the Appellant "identify a provision in the agreement requiring [EMA] to register as a broker dealer."  The court stated:

> This argument is unconvincing in light of recent and very clear case law from this District on this precise issue, which holds that absent language in the agreements requiring Plaintiff to register as a broker-dealer, this affirmative defense cannot succeed… Put simply, to succeed on this affirmative defense "[i]n this District," it is "essential" to identify a provision in the agreement requiring Plaintiff to register as a broker-dealer.

43

Unable to identify a provision in any of the agreements between the parties that requires Plaintiff to register as a broker-dealer, Defendants instead argue that I should ignore the clearly established law in this District and adopt the approach taken by other circuits or district courts in this Circuit. However, given that there have been at least four decisions issued in this District in fewer than three years on this very issue, I would need an extraordinary reason to depart from the law of this District, and I find none here. Therefore, I reject Defendants' broker-dealer affirmative defense.

*Ema Fin., LLC v. Joey N.Y. Inc.*, 2022 U.S. Dist. LEXIS 19258, at *60-62 (S.D.N.Y. Feb. 1, 2022) (citations omitted). Special Appx at 39-41. As shown above, the district court rejected Appellant's claim because she was "unable to identify a provision in any of the agreements between the parties that requires Plaintiff to register as a broker-dealer." *Id*. This statement is erroneous. As a holding, the statement overlooks EMA's basic obligations under the First and Second SPA's, and seems to apply a version of §§ 29(b) and 15(a) that is barely recognizable.

**B.** **The District Court's Holding is Incorrect Because the Securities Purchase Agreement Obligates EMA (An Unlicensed Securities Dealer) to Violate § 15(a) By Purchasing a Security**

Contrary to the district court's holding, the SPA obligates EMA to effect a transaction in securities. As shown above, the First and Second SPA both set forth that EMA's primary obligation under the agreement is to *purchase a convertible promissory note*. SPA at 1(a) ("the Company shall issue and sell to the Purchaser,

44

and the Purchaser agrees to purchase from the Company, the Note for an aggregate purchase price of $85,000.00.").    Because section 15(a) prohibits an unregistered securities dealer from "effecting a transaction in securities," EMA (presuming it is deemed an unregistered dealer under the Act) cannot perform the obligation in the SPA without violating the Act.

## C.    The District Court's Insistence on Language in the Contract Requiring Unlawful "Performance" Ignores the Plain Language of Section 29(b) and Supreme Court Precedent

The district court's fundamental error is that it applies the analysis for the "performance" violation from *Regional Properties* (where the contract at issue was simply a contract for services) to a case where the defendant is alleging that the *formation* of the contract violated section 15(a), where the contract *effected a transaction in securities*.

As the district court noted above, its rejection of Joey's argument was based on "four decisions issued in this District in three years on this very issue." Two of those decisions contain the origins of this error, *EMA Fin., LLC v. Vystar Corp.*, 336

45

F.R.D. 75, 81 (S.D.N.Y. 2020) and *LG Capital Funding*, 2018 U.S. Dist. LEXIS

202540 and are clearly wrong.[13]

**D.** ***LG Capital* and *Vystar* Both Fail to Recognize that a Convertible Promissory Note is a Security**

In *LG Capital,*[14] the parties executed a securities purchase agreement and a

convertible promissory note similar to this case. *LG Capital* appears to be one of

the first convertible-promissory-note cases where the defendant alleged a right to §

29(b) rescission of the note based on the lender's violation of § 15(a) as an

unregistered securities dealer. The court rejected the claim, stating:

> Although it is an open question on this record whether LG should have
> registered as a "dealer" with the SEC… the Court concludes that even
> if LG should have registered, nothing in the Note or the SPA indicates
> that those contracts "could not have been legally performed" because
> LG failed to do so. It is unlawful for an unregistered broker to "effect
> any transactions in, or to induce or attempt to induce the purchase or

---

[13] The other two decisions cited by the court do not actually support the analysis. *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020) contains no analysis of the section 15(a) violation alleged in that case. The claim for 29(b) rescission was presented in the context of a motion to amend, which was rejected as untimely. The court stated expressly that it made no decision on the merits of the § 29(b) claim, with the quoted observation in regard to *Vystar* simply contained in a footnote.

*Jianhu Yi v. GTV Media Grp. Media Inc.*, 2021 U.S. Dist. LEXIS 115218 (S.D.N.Y. June 18, 2021) simply does not contain enough factual information or analysis of the § 15(a) claim to be considered support, but the case quotes *Vystar* approvingly in a footnote.

[14] LG Capital Funding, LLC is an entity similar to EMA.

46

sale of, any security." But neither the Note nor the SPA require LG to take any action that would violate this statute.

*ExeLED* at *15-16 (citations omitted). The above quoted analysis from *ExeLED* (as well as the record itself) reveals that the *ExeLED* court was never informed that the contracts in that case (a convertible redeemable promissory note and a securities purchase agreement) *were themselves securities as defined in the Act.* Accordingly, the court's examination of the securities contracts that LG has entered into for language "requiring LG to take any action that would violate the statute," (*i.e.*, to effect a transaction in securities) is somewhat of an absurdity, because LG had already effected a transaction in securities when it purchased the convertible note, and that act had violated the statute.

**E.    Vystar is Incorrect Because its Analysis is Premised on the Failure to Recognize that A Convertible Promissory Note is a Security.**

Just as in the *ExeLED* case, neither the parties nor the court in *EMA v. Vystar* seem to notice that the contracts that the defendant sought to rescind (convertible note and Securities Purchase Agreement) were themselves *securities*, and that an unregistered securities dealer would have been prohibited under section 15(a) of the Act from purchasing the Note to begin with. The *Vystar* court held:

Vystar claims that "the underlying agreements [were] illegal when made as well as when performed" because Ema, as an unregistered

47

> broker-dealer, "could not have performed the contract with the share conversions and sales without violating the terms of the Exchange Act." Def. Mem. at 10. In essence, Vystar contends that in entering and performing the contracts — in particular, the act of converting shares at a below-market rate and subsequently selling the shares — Ema acted as a broker-dealer and because Ema is not registered as a broker-*dealer, Ema has violated the Exchange Act.*

*Vystar,* 336 F.R.D at 81. As the above-quoted passage demonstrates, the flaw in the *Vystar* court's analysis stems from the Vystar defendant's somewhat vague assertions regarding the nature of the violation, as well as a total failure to argue, (or to inform the court) that the "underlying agreements"—being convertible notes drafted by the same lender in this appeal—were *securities*. As observed above, "conversion" into freely-trading shares of stock can only occur when the original instrument is itself a security. *See* Rule 144. Accordingly, any unregistered securities dealer that purchased the convertible note would be "effecting a transaction in securities," in violation of section 15(a)(1) of the Act. *See Eastside Church.* The *Vystar* court further observes:

> The flaw in Vystar's argument, however, is that it does not identify a provision in the contracts that obligates Ema to act as a broker-dealer. Certainly, Vystar contends that Ema has acted as a broker-dealer by converting the shares at a below-market rate and selling the shares. But Vystar does not explain why the act of converting shares violates the broker-dealer provision of the Exchange Act. And assuming *arguendo* that the selling of converted shares made Ema a broker-dealer, the selling of those shares was not required by the

48

contract. Thus, "[a]t the time the parties entered into the Agreement, the Agreement could be performed without violating provisions of the securities laws."

*Vystar*, 336 F.R.D. at 81-82. The court's observation that defendant in Vystar "does not identify a provision in the contracts that obligates EMA to act as a broker-dealer" is either poorly stated, or applies an incorrect standard. That is, in view of section 15(a), it is not necessarily unlawful for an unlicensed securities broker-dealer "to act as a broker-dealer," although is it precisely clear what that phrase actually means. The prohibited conduct under section 15(a) is "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security." 15 U.S.C. §78o (§15(a) of the Act).

### 1. "Conversion" is a transaction in securities as a matter of law.

The court then complains that "Vystar does not explain why the act of converting shares violates the broker-dealer provision of the Exchange Act." Appellant can provide an explanation where the Vystar defendant failed: By nearly every metric, "Conversion" of a convertible note into common stock is a "transaction in securities". In fact, most courts that have analyzed the question have concluded that *conversion* is not just a transaction in securities, but a *purchase and sale* of securities. This conclusion is affirmed in countless cases, and the statute itself.

49

Exercise of a conversion right is expressly included in the definition of "sale" under the Securities Act, which provides that "the issue or transfer of such other security upon the **exercise of such right of conversion** [] shall be deemed a **sale** of such other security." Given that the conversion right under the Note is essentially a call option where the holder uses the debt to pay the exercise price to acquire stock, it follows that conversion is considered a "sale"[151] under the broad definitions set forth

---

15    1 A "transaction in securities" is regarded as broader than simply a purchase or sale.  As discussed in *Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recove Corp.)*, 422 B.R. 423, 436 (S.D.N.Y. 2009):

> Both Webster's and Black's define the word "transaction" in extremely broad terms.  Black's Law Dictionary explains that a "transaction" is: "The act or instance of conducting business or other dealings"; "Something performed or carried out; a business agreement or exchange"; and even more broadly as "Any activity involving two or more persons." *Black's Law Dictionary* 1535 (8th ed. 1999).  Likewise, Webster's states that a "transaction" is, in relevant part, "something that is transacted, esp. a business agreement," and further defines "transact" as "to carry on or conduct (business negotiations, etc.) to a conclusion or settlement." *Webster's College Dictionary* 1415 (1991).  Neither dictionary confines the term (used, as here, in its business sense) to business dealings that involve purchases and sales.  The redemption of debt is a "transaction" (as that term is commonly used) in which the debtor pays what he owes and the holder of the evidence of the debt tenders that evidence back.  If, as was the case here, the evidence of indebtedness is a security, it would seem beyond cavil that the redemption of the debt was carried out by means of a "transaction" in a security.

in Act and the 1933 Securities Act, pursuant to which "sale" "includes any contract

to buy, purchase, or otherwise acquire."  15 U.S.C  78cc(13). [16] [17]

---

[16]     The definitions in the two federal acts have been held to be virtually identical. *Tcherepnin v. Knight*, 389 U.S. 332, (1967); *Union Nat'l Bank v. Farmers Bank, Hamburg*, 786 F.2d 881, 885 n.5 (8th Cir. 1986); However, "sale" is defined broadly in both securities acts. The 1933 Act defines "sale" to include "every contract of sale or disposition of a security or interest in a security **for value."** 15 U.S.C. § 77(b)(3). Similarly, the 1934 Act defines "sale" to include "any contract to sell or otherwise dispose of" a security. 15 U.S.C. 78c(1)(13). *Isquith v. Caremark Int'l*, 1997 U.S. Dist. LEXIS 3715, at n.2  (N.D. Ill. Mar. 26, 1997)

[17]     The '33 Act regulates the original distribution/ new issuance of securities, whereas the Act (of 1934) regulates the trading of securities subsequent to original distribution.  Accordingly, as made evident by various provisions in the Securities Contract, the transactions in this case are governed by both the 1933 and 1934 Acts.

# VII.   <u>CONCLUSION</u>

For the reasons discussed herein, Appellants Joey Chancis and Richard Roer

respectfully request that the Court rule in their favor as to both issues presented.

May 23, 2022

Respectfully Submitted,

<u>/s/ Marjorie Santelli</u>
Marjorie Santelli, Esq.
<u>/s/  Mark R. Basile</u>
Mark R. Basile, Esq.
<u>/s/  Eric Benzenberg</u>
Eric Benzenberg, Esq.

**THE BASILE LAW FIRM P.C.**
390 N. Broadway, Ste. 140
Jericho, New York 11753
Te. 516.455.1500
Fax. 631.498.0478
*marjorie@thebasilelawfirm.com*
*mark@thebasilelawfirm.com*
*eric@thebasilelawfirm.com*

## <u>CERTIFICATE OF COMPLIANCE</u>

This Opening Brief by Joey Chancis and Richard Roer has been prepared in accordance with Fed. R. App. 32(a)(7)(B) and Local R. 32.1 using: Microsoft Word, Times New Roman, 14 Point Type, with a total word count of 11,287, exclusive of the Table of Contents, Table of Authorities, signature block, and Certificate of Compliance.

# Special Appendix

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Opinion and Order, dated February 1, 2022 .............. SPA-1

Judgment, dated February 2, 2022 ........................... SPA-46

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                                         :
EMA FINANCIAL, LLC,                                      :
                                                         :
                                      Plaintiff,         :
                                                         :        17-CV-9706 (VSB)
                    - against -                          :
                                                         :        **OPINION & ORDER**
                                                         :
JOEY NEW YORK INC., et al.,                              :
                                                         :
                                      Defendants.        :
                                                         :
---------------------------------------------------------X

Appearances:

Jeffrey Fleischmann
Law Office of Jeffrey Fleischmann, P.C.
New York, NY
*Counsel for Plaintiff*

Joey Chancis
Fort Lauderdale, FL

Richard Roer
Aventura, FL

Richard Chancis
Aventura, FL

*Pro Se Defendants*

VERNON S. BRODERICK, United States District Judge:

      Plaintiff EMA Financial, LLC ("EMA" or "Plaintiff") brings this action against seven

defendants ("Defendants"): Joey Chancis, Richard Roer ("Roer"), Richard Chancis, (together,

the "Individual Defendants"), Joey New York, Inc., RAR Beauty, LLC ("RAR"), Labb, Inc.

("Labb"), and Reflex Productions, Inc. ("Reflex") (together, the "Corporate Defendants") for

breach of contract, breach of guaranty, fraudulent inducement, fraudulent conveyance, piercing

SPA-2

the corporate veil, specific performance, and compensatory and punitive damages. Default judgment has already been entered as to liability against the Corporate Defendants.

With regard to the Individual Defendants, I granted Plaintiff's motion for summary judgment as to liability for breach of contract, breach of guaranty, and attorneys' fees; granted Plaintiff's motion to dismiss the counterclaim for fraudulent inducement; and denied Plaintiff's motion to dismiss the affirmative defenses. I held a six-day bench trial on Plaintiff's remedies against the Individual Defendants and on the Individual Defendants' affirmative defenses. With regard to the Individual Defendants, I find that judgment be granted in favor of Plaintiff as to breach of contract, breach of guaranty, and constructive fraudulent conveyance. I further find that judgment is denied as to fraudulent inducement and actual fraudulent conveyance, and Plaintiff is not permitted to pierce the corporate veil.

With regard to damages, I find that Plaintiff is entitled to an award of $151,418.50 in compensatory damages, plus prejudgment interest accruing at 24% per year from July 26, 2017. However, Plaintiff is not entitled to punitive damages or specific performance.

## I.   **Procedural Background**

Plaintiff filed this lawsuit against Joey Chancis and the Corporate Defendants on December 11, 2017. (Doc. 1.) On January 23, 2018, Joey Chancis and the Corporate Defendants filed their answer, which included a counterclaim for fraudulent inducement, (Doc. 18); they amended that answer and counterclaim on February 11, 2018, (Doc. 21). On May 5, 2018, Plaintiff filed a motion and supporting documents for summary judgment on the causes of action for breach of contract, breach of guaranty, and attorneys' fees, and to dismiss the counterclaim and affirmative defenses raised by Joey Chancis and the Corporate Defendants. (Docs. 23–26.) Joey Chancis and the Corporate Defendants filed their response in opposition on

SPA-3

April 2, 2018, (Docs. 29–31), and Plaintiff filed its reply memorandum of law and supporting

documents on April 16, 2018, (Docs. 34–36).  On September 22, 2019, I granted Plaintiff's

motion for summary judgment as to liability for breach of contract, breach of guaranty, and

attorneys' fees; granted Plaintiff's motion to dismiss the counterclaim for fraudulent inducement;

and denied Plaintiff's motion to dismiss the affirmative defenses.  *EMA Fin., LLC v. Joey N.Y.,*

*Inc.*, No. 17-CV-9706 (VSB), 2019 WL 4600863 (S.D.N.Y. Sept. 22, 2019); (*see also* Doc. 38).

　　Plaintiff filed its First Amended Complaint on March 5, 2020.  (Doc. 48.)  In this

amended complaint, Plaintiff added Roer and Richard Chancis as Defendants.  (*Id.*)  Defendants

filed their answer to the amended complaint on April 20, 2020, (Doc. 55), which they amended

on May 22, 2020, (Doc. 57).  On August 17, 2020, the parties submitted their proposed joint

pretrial order and proposed findings of fact and conclusions of law, (Docs. 60–61), in

anticipation of a five-day bench trial that was subsequently scheduled for December 7, 2020,

(Doc. 65).  I held a final pre-trial conference with the parties on November 17, 2020.  (Doc. 66.)

On the eve of trial, Defendants' counsel Erica K. Doran ("Doran") filed a motion to withdraw,

which I granted; I further adjourned the upcoming bench trial and stayed all deadlines in the case

for about a month to allow for Defendants to seek new counsel.  (Doc. 75.)

　　Since that time, the Individual Defendants have each represented themselves pro se.  I

denied the motions of Joey Chancis and Richard Roer to (1) file a motion to dismiss against

Plaintiff, (Doc. 128), (2) file an amended counterclaim against Plaintiff, (*id.*), and (3) subpoena

witnesses and re-open discovery, (Doc. 143).  On May 24, 2021, in light of the fact that no

attorney entered a notice of appearance on their behalf months after Doran withdrew from the

case, I granted default judgment as to liability against the four Corporate Defendants.  (Doc.

152.)  On June 9, 2021, I granted Plaintiff's motion in limine to exclude Stephanie Cspeke from

SPA-4

being called as a witness for Defendants, and to exclude 80 exhibits annexed to Joey Chancis's

and Richard Roer's amended pretrial statement from being used as trial exhibits. (Doc. 164.)  In

that order, I denied Plaintiff's motion in limine to prevent Defendants from asserting—at trial

and in post-trial briefing—an affirmative defense that the agreements at issue in this case should

be voided because Plaintiff was required to register as a broker-dealer. (*Id.*)

I held five days of a bench trial in this case from June 14 to June 18, 2021.  The witnesses

were (1) Felicia Preston ("Preston"), Director of EMA, (2) Roer, (3) Joey Chancis, and (4)

Richard Chancis.  At the end of the trial day on June 18, 2021, I noted that I would keep the trial

record open to allow for the parties to submit certain materials and to allow for additional

testimony from Roer regarding some of these documents, as well as for closing arguments.  (Tr.

753:1-757:10.)[1]  On June 21, 2021, I directed the parties to produce various materials in advance

of the last trial day.  (Doc. 168.)  I held a sixth and final trial day on August 17, 2021.  (*See* Doc.

189.)  Joey Chancis and Roer, (Doc. 214), and Plaintiff, (Docs. 215–16), timely filed their post-

trial briefing on September 10, 2021.  Richard Chancis did not submit a post-trial brief or request

an extension of time to file such a brief.

## II.   Findings of Fact

### A.   *The Lead-Up to the Agreements*

Joey Chancis founded the private company Joey New York in 1993 with her late mother

Arlyne Roer.  (Tr. 269:23-270:2, 353:23-354:1.)  The company began as a creator and distributor

of skin care and cosmetic products.  (Tr. 269:23-270:2.)  The private company was profitable

within its first three years.  (Tr. 468:14-16.)  Around 2008 or 2009, Joey New York temporarily

---

[1] "Tr." refers to the transcripts from the bench trial conducted on July 14 through July 18, 2021 and August 17,
2021.  (Docs. 170, 172, 174, 176, 178, 198.)

ceased operations, though Joey Chancis and Roer—Joey Chancis's father—retained the company's intellectual property. (Tr. 258:5-24, 353:5-354:1, 468:15-21.) In 2010, Arlene and Richard Roer founded RAR, a similar company that manufactured and distributed beauty and skin care products. (Tr. 188:12-189:11.) Roer served as president of RAR until the Individual Defendants took their company public as Joey New York, Inc. (Tr. 189:13-190:1.) Roer was also co-president of Reflex, a division of RAR. (Tr. 192:1-20.) Until these companies went public, they were involved only in skin care and cosmetic and beauty products. (Tr. 259:18-21.)

Around 2014, Joey New York went public under the name Joey New York, Inc. (Tr. 537:21-538:16.) Once the company went public, its business model changed to focus more on Botox procedures and other injectables. (Tr: 259:22-260:3.) On August 31, 2016, Joey New York, Inc. acquired 100% interest in two other companies: RAR and The Labb. (Doc. 209-1, at 9–10.) Prior to this time, Reflex held a 51% interest in The Labb. (*Id.* at 10.) All of these companies and/or divisions of the companies were run out of Roer's apartment. (Tr. 195:15-196:7.) Around the time that the company went public, Richard Chancis, who was married to Joey Chancis, began working as a consultant for the public company, Joey New York, Inc. (Tr. 538:17-14.)

Richard Chancis had previously pleaded guilty to one count of criminal conspiracy to commit securities fraud, mail fraud, and wire fraud, and was barred by Administrative Law Judge Robert G. Mahony from association with any broker or dealer under Sections 15(b) and 19(h) of the Securities Exchange Act of 1934. (Doc. 60-19.) It was Richard Chancis's idea to take the company public, and his core role was to help raise funds to expand the business. (Tr. 190:23-191:5.) Specifically, the purpose of taking the company public was to "raise money to acquire small beauty companies" and "[t]o open more Botox labs throughout the United States,"

goals that made it necessary for the company to raise money.  (*See* Tr: 210:21-25, 260:4-8,

471:16-473:16, 571:14-572:5.)  After Joey New York, Inc. acquired RAR and The Labb in 2016,

Joey New York, Inc. served as the parent company for RAR, which handled skin care products,

and for Reflex, which handled the injectables and Botox cosmetics labs.  (Tr. 676:17-677:6.)

 In the lead-up to the Securities Purchase Agreements of February 1, 2017 (Doc. 60-1, the

"First SPA") and May 3, 2017 (Doc. 60-4, the "Second SPA"), (together, "the SPAs"), Preston

negotiated the business terms only with David Frommer ("Frommer") and Richard Chancis.  (Tr.

103:9-14, 104:11-17.)  Before signing the SPAs, Preston and Richard Chancis had several

conversations about the transactions at issue and the Corporate Defendants' business model.

(*See* Tr. 89:20-90:6, 129:15-130:7, 133:9-13.)  At some point during these conversations,

Richard Chancis provided Preston with a PowerPoint deck related to the businesses.  (Tr.

677:12-21.)  Preston subsequently learned about Chancis's felony conviction, (Tr. 115:20-

116:18), and had a conversation with him about it, (Tr. 117:1).  Preston and Richard Chancis

disagree as to whether Richard Chancis voluntarily told her about his felony conviction before

she discovered that information, (*compare* Tr. 116:23-117:4, *with* Tr. 671:21-672:14), but

Richard Chancis testified that Preston knew about his felony conviction before the parties

entered into the agreements, (Tr. 671:24-672:14).

 During her conversations with Richard Chancis, Preston became aware that Joey New

York, Inc. did not have a positive cash flow.  (Tr. 681:4-9.)  Preston and Plaintiff also gathered

due diligence materials related to the Corporate and Individual Defendants before entering into

the agreements.  (*See* Doc. 180-19; *see also* Tr. 102:2-18.)  These due diligence materials

indicated that Joey New York, Inc. had received a similar loan for $385,000 from Peak One on

December 21, 2016—fewer than three months before the first Convertible Redeemable

Promissory Note at issue in this case. (*See* Doc. 180-19, at 5.)  Preston also reviewed the public

filings of Joey New York, Inc. as part of the due diligence.  (Tr. 115:13-19, 113:17-25, 117:17-

118:14.)  Joey New York, Inc.'s 10Q public filing submitted on January 17, 2017—less than a

month before the parties signed the first Convertible Redeemable Promissory Note—showed that

The Labb, RAR, and Joey New York, Inc. were operating at a combined net loss of $285,752 for

the three-month period ending on November 30, 2016, and a combined net loss of $539,505 for

the six-month period ending on November 30, 2016.  (Doc. 209-1, at 11.)  The 10Q filing also

stated that on May 12, 2014, Joey New York, Inc. issued two promissory notes payable to Roer

and Joey Chancis for $1,500,000 each at an interest rate of 5%.  (*Id.* at 9.)  The 10Q filing further

stated that the promissory note was renewed at the same interest rate with a maturity date of May

12, 2017.  (*Id.*)

> **B.**     *The Agreements*

Plaintiff and Joey New York, Inc. entered into Securities Purchase Agreements on

February 1, 2017 (Doc. 60-1, the "First SPA") and on May 3, 2017 (Doc. 60-4, the "Second

SPA").  The First SPA provided for the purchase of a Convertible Redeemable Promissory Note

from Joey New York to Plaintiff for $90,000 (Doc. 60-1, the "First Note"), and the Second SPA

provided for the purchase of a Convertible Redeemable Promissory Note from Joey New York to

Plaintiff for $151,600 (Doc. 60-3, the "Second Note," and together with the First Note, the

"Notes").  The First Note was issued on February 1, 2017, (*see* Doc. 60-1), and the Second Note

was issued on May 3, 2017, (*see* Doc. 60-3).  All of these documents were executed to provide

Joey New York, Inc. with more capital to expand its in-store Botox and beauty treatment

business.

Other than the dollar figures, the relevant terms of the Notes are essentially identical.

Section 1.1 of the Notes provides:

> The Holder shall have the right, in its sole and absolute discretion, at any time from time to time, to convert all or any part of the outstanding amount due under this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the conversion price (the "Conversion Price") determined as provided herein (a "Conversion").

(Doc. 60-1 ¶ 1.1; Doc. 60-3 ¶ 1.1.)

The price for such conversion is the "lower of: (i) the closing sale price of the Common Stock on the Principal Market on the Trading Day immediately preceding the Closing Date, and (ii) 65% of the average of the lowest two (2) sale prices for the Common Stock on the Principal Market during the twenty (20) consecutive Trading Days immediately preceding the Conversion Date or the closing bid price." (Doc. 60-1 ¶ 1.2(a); Doc. 60-3 ¶ 1.2(a).) If the borrower fails to deliver stock "issuable upon conversion of this Note . . . by the Deadline (as defined below) the Borrower shall pay to the Holder $1,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such" stock. (Doc. 60-1 ¶ 1.2(c); Doc. 60-3 ¶ 1.2(c).) "Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder, shall be added to the principal amount of this Note, in which event interest shall accrue thereon. . . ." (Doc. 60-1 ¶ 1.4(g); Doc. 60-3 ¶ 1.4(g).) Section 1.4(g) of the Notes state that "[t]he damages resulting from a failure [to convert] . . . are difficult if not impossible to quantify. Accordingly, the parties acknowledge that the liquidated damages provision contained in this Section 1.4(g) are justified." (*Id.*)

Article 3 of the Notes describes several events that would constitute events of default of the Notes. (Doc. 60-1 ¶ 3; Doc. 60-3 ¶ 3.) The Notes state that one of those default events is "[f]ailure to comply with the Exchange Act." (Doc. 60-1 ¶ 3.9; Doc. 60-3 ¶ 3.9.) Specifically,

SPA-9

the Notes provide, in part, that Defendants are in default if they "fail to comply in any material

respect with the reporting requirements of the Exchange Act." (*Id.*)

Article 3.16 describes the actions and procedures that are set in motion after a default

event has occurred.  In the event of a default, the parties' obligations are also laid out in Article

3.16.  The Notes provide that "upon the occurrence of an Event of Default" as set forth in Article

3 of the contract—including failure to comply with the Exchange Act as set out at Article 3.9—

other than mere failure to pay the principal as set out in Article 3.1:

> the Note shall become immediately due and payable and the Borrower shall pay to
> the Holder . . . an amount equal to the greater of (i) 150% times the sum of (w) the
> then outstanding principal amount of this Note plus (x) accrued and unpaid interest
> on the unpaid principal amount of this Note to the date of payment . . . plus (y)
> Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z)
> any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof.

(Doc. 60-1 ¶ 3.16; Doc. 60-3 ¶ 3.16.)  Article 3.16 also states that "[i]f the Borrower fails to pay

the Default Amount within five (5) business days of written notice that such amount is due and

payable," Plaintiff has "the right at any time, so long as the Borrower remains in default . . . to

require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount,

the number of shares of Common Stock of the Borrower equal to the Default Amount divided by

the Conversion Price then in effect." (*Id.*)  The Notes give Plaintiff the right to "convert any

amounts due . . . until such time as the Note has been repaid in full." (*Id.*)  The Notes each have

a default interest rate of 24% per year.  (Doc. 60-1, at 1; Doc. 60-3, at 1.)  The Notes further

provide that if Defendants default, they "shall pay the Holder hereof costs of collection,

including reasonable attorneys' fees." (Doc. 60-1 ¶ 4.5; Doc. 60-3 ¶ 4.5.)

### C.     *Defendants' Conduct After Entering into the Agreements*

When Joey New York, Inc. went public, Roer served as president and Joey Chancis

served as CEO, while Richard Chancis did not hold an executive level position.  (Tr. 254:2-10.)

SPA-10

With the passage of time, Richard Chancis took on increasing responsibility for the public company, "running the financial end" of it and making decisions related to the company's day-to-day business, payroll, and hiring. (Tr. 253:9-14, 254:11-25.) Roer resigned from Joey New York, Inc. in March 2019. (Tr. 291:23-292:7.)

 None of the Individual Defendants received a salary after the company went public, (Tr. 327:23-328:21 (Joey Chancis testifying that she never received a salary once Joey New York, Inc. went public); Tr. 529:6-7 (Richard Chancis testifying that none of the three Individual Defendants received a salary); 538:23-539:1 (similar); 545:7-10 (similar)), even though Roer and Joey Chancis had each previously invested $1.5 million of their personal funds into Joey New York, Inc. and Richard Chancis invested more than $1 million into the company, (*see* Doc. 209-1, at 9; Tr. 204:12-15, 545:12-20, 776:10-15). Richard Chancis made the decision for the principals to forego salaries. (Tr. 253:12-14.) Joey New York, Inc. was never able to pay any portion of the Notes to Plaintiff, (Tr. 741:2-5), and it never turned a profit while a public company, (Tr. 204:10-15).

 The parties have stipulated as to hundreds of withdrawals, transfers, and other financial transactions that the Individual Defendants made from various corporate accounts since Plaintiff made its first loan to Defendants. (*See* Doc. 60 ¶¶ 56–619.) These transactions roughly fall into five categories. First, there are instances where the Individual Defendants transferred money from the corporate accounts to their personal accounts in an effort to reimburse themselves after using the funds in the personal accounts for business expenses. (*See* Tr. 206:14-19 (Roer testifying that Joey New York, Inc. may have paid for his personal expenses used for work-related issues "one or two times"); Tr. 220:25-221:12 (Roer testifying that he withdrew $5,000 from a corporate account to "pay [his] personal credit cards, which were used for company

10

SPA-11

business"); Tr. 225:25-226:16 (Roer testifying that he transferred a combined $55,000 from a

corporate account to his personal account "[t]o pay off my credit cards, which were used to move

the company along and pay off the credit card debts of the company, albeit in my name"); Tr.

227:25-228:7 (Roer testifying that he transferred a total of $7,500 from a corporate account to his

personal account on May 17, 2017); Tr. 626:13-628:20 (Richard Chancis testifying that in March

2018 he made transfers of a combined $34,500 from one of the corporate accounts to his

personal account likely to serve as "reimbursements" for business expenses he made from his

personal credit card); Tr. 640:13-641:19 (Richard Chancis testifying that he transferred more

than $28,000 to his personal accounts on June 13, 2018, likely to reimburse for a business

expense).)  To this end, Defendants testified that they commonly used their personal accounts to

pay for significant expenses on behalf of the corporate entities and would reimburse those

personal accounts, often when the spending limits on those personal accounts had been reached.

(*See* Tr. 221:4-12 (Roer testifying that some personal transfers were because his "personal credit

cards . . . became maxed out after he used [them] for company business"); Tr. 282:10-283:9

(similar); Tr. 223:17-23, 226:3-16 (Roer testifying that he opened and possessed two corporate

credit cards in his name which he used for business expenses); Tr. 726:9-17 (Richard Chancis

testifying that he saw firsthand that Roer spent thousands of dollars on business expenses using

his personal card); Tr. 782:21-783:18 (Roer testifying that he was not repaid the money that he

lent to the company).)

       The second category of stipulated transactions involve instances where the Individual

Defendants transferred money between the various corporate accounts.  (*See, e.g.*, Tr. 206:23-

210:13 (Roer testifying that a combined $67,000, (*see* Doc. 60-16, at 2), was transferred from

Joey New York, Inc. to Reflex in early February 2018 to help expand the business); Tr. 221:17-

11

SPA-12

24 (Roer testifying as to another $40,000 transfer from Joey New York, Inc. to Reflex); Tr.

223:10-234:20 (Roer testifying about more transfers from Joey New York, Inc. to Reflex); Tr.

234:21-235:20 (Roer testifying about transfers from the Reflex account to the Joey New York,

Inc. account).)

  Third, there were instances where the Individual Defendants withdrew money from the

various corporate accounts for what appear to be legitimate business purposes.  (*See, e.g.*, Tr.

401:18-402:9 (Joey Chancis testifying about a $94.45 charge at a vitamin store that was used to

procure last-minute topicals needed for patients pre- and post-procedure); Tr. 415:23-416:13

(Joey Chancis testifying about a $195 charge for Botox and filler needed for last-minute

procedures); Tr. 604:21-605:7 (Richard Chancis testifying about buying more than $7,000 in

inventory).)

  Fourth, there were instances where the Individual Defendants withdrew money from the

various corporate accounts for purposes that, at the very least, seem unusual for business

expenses[2] and perhaps skirted the line between business and personal.  (*See, e.g.*, Tr. 379:10-

381:23 (Joey Chancis testifying that she spent nearly $300 from a corporate account to pay for

movie tickets and clothes for her assistant, who at the time was not adequately compensated); Tr.

391:17-392:20, 400:5-401:14 (Joey Chancis testifying that she spent a combined $139 on a

corporate card on multiple foot massages with a client over the span of a week); Tr. 420:12-

421:3 (Joey Chancis testifying that they withdrew nearly $280 in corporate monies for a dinner

to celebrate the business making an "It List" in a magazine); Tr. 402:10-403:7, 409:17-25,

415:11-21, 453:2-17, 457:14-22 (Joey Chancis testifying about spending hundreds of dollars in

---

[2] However, I note that certain of these expenses could be consistent with a business—like the Botox labs operated by
Defendants—based on providing individuals with services with the promise of improving their appearance.

corporate monies toward getting her and her other employees' hair done in advance of public events or marketing opportunities for the companies).)

Fifth, there were instances where the Individual Defendants made transfers or withdrawals for which they testified they do not know the purpose.  (*See, e.g.*, Tr. 227:10-13, 241:17-21, 246:11-18 (Roer testifying that he cannot identify the purpose of any and all transfers from corporate accounts to a Barclays credit card); Tr. 418:13-419:6 (Joey Chancis testifying that she does not know the purpose of a $159.43 Apple Store charge on a corporate account); Tr. 635:5-636:16 (Richard Chancis testifying that he could not specifically account for nearly $12,000 in payments to his personal account in April 2018).)  Defendants provided few receipts indicating contemporaneous corroboration of the purpose of these transactions.  The Individual Defendants testified that they submitted receipts to Stephanie Cspeke, who was employed by the accounting firm that served as the SEC accountant for the corporate entities, (*see* Tr. 275:14-276:11; Tr. 682:12-684:15), but Defendants did not submit robust documentation to corroborate this process.

Joey New York, Inc. failed to submit Form 8(k) to the Securities and Exchange Commission ("SEC") on July 25, 2017, *EMA Fin., LLC*, 2019 WL 4600863, at *2, triggering the default provision in Article 3.9, (*see* Doc. 60-1 ¶ 3.9; Doc. 60-3 ¶ 3.9; *see also* (Doc. 180-2 (Plaintiff setting the "Default Date" for both Notes as July 25, 2017))).  On October 20, 2017 and on November 14, 2017, Plaintiff submitted Notices of Conversion to Joey New York.  *EMA Fin., LLC*, 2019 WL 4600863, at *2.  Joey New York, Inc. did not deliver the shares.  *Id.*

### D. *Plaintiff's Conversions*

From August 9, 2017—approximately two weeks after the Default Date—to September 28, 2017, Plaintiff executed 35 conversions of Joey New York, Inc. stock, and sold 750,000

SPA-14

shares of the stock generating $182,515.84 in net sales proceeds.  (Doc. 207-1.)  From June 29,

2020 to February 12, 2021, Plaintiff made an additional 15 conversions of Joey New York, Inc.

stock, and sold 10,860,000 shares of the stock generating a net amount of $24,534.43.  (*Id.*)

Finally, from June 10, 2021 to July 7, 2021, Plaintiff made another 15 conversions of Joey New

York, Inc. stock, and sold 8,250,000 shares of the stock generating a net amount of $93,973.

(*Id.*)  In total, since the parties entered into the agreements, Plaintiff has sold 19,860,000 in

shares of Joey New York, Inc. stock, generating net proceeds of $301,023.27.  (*Id.*)  The amount

for these conversions, as determined by Article 1.2 of the Notes, was $82,507.50 for the first

Note and $7,674 for the second Note.  (Doc. 180-2.)

### III.     Conclusions of Law

I note as a preliminary matter that the Notes provide that they "shall be governed by and

construed in accordance with the laws of the State of New York."  (Doc. 60-1 ¶ 4.6; Doc. 60-3 ¶

4.6.)  Both parties apply New York law in their post-trial briefing, and no party indicates in their

post-trial briefing that New York law should not apply.  "Contractual choice of law provisions

are generally enforceable under both New York law and federal common law."  *Arnone v. Aetna

Life Ins. Co.*, 860 F.3d 97, 108 (2d Cir. 2017).  As such, I apply New York law with regard to the

claims in this action.

#### A.     *Breach of Contract and Breach of Guaranty*

On September 22, 2019, I granted summary judgment as to liability against the Corporate

Defendants and Joey Chancis on Plaintiff's claims for both breach of contract and breach of

guaranty.  *EMA Fin., LLC*, 2019 WL 4600863, at \*7.  Roer signed the Second Note, (*see* Doc.

60-3, at 18), and held an executive position for the corporate entities at all relevant times.

Richard Chancis took on increasing responsibility for the public company, "running the financial

14

end" of it and making decisions related to the company's day-to-day business, payroll, and

hiring.  (Tr. 253:9-14, 254:11-25.)  In 2019, Richard took over as president and CEO of the

company after Joey Chancis and Roer resigned.  (Tr. 15:11-13.)  Neither Roer nor Richard

Chancis argue that they should not be held liable for the contractual violations.[3]  As such, I enter

judgment for Plaintiff as to liability against Defendants on these two counts.

       **B.**    ***Fraudulent Conveyance***

      Plaintiff brings claims for constructive fraudulent conveyance under Debtor and Creditor

Law ("DCL") sections 273 and 275, and actual fraudulent conveyance under DCL section 276.[4]

I will discuss each theory of liability in turn below.

        **1.  Constructive Fraudulent Conveyance**

          a.  <u>Applicable Law</u>

      There are "several situations . . . in which a transfer made without fair consideration

constitutes a fraudulent conveyance, regardless of the intent of the transferor."  *HBE Leasing*

*Corp. v. Frank*, 48, F.3d 623, 633 (2d Cir. 1995).  "Under the DCL, a conveyance by a debtor is

---

[3] I assume that, because Richard Chancis does not dispute he was contractually liable under the Notes, Plaintiff operates under the theory that he assumed the contractual obligations as the successor to Joey Chancis and Roer in his role of CEO and vice president.  *See TOT Payments, LLC v. First Data Corp.*, 9 N.Y.S.3d 44, 44 (2015) (successors took over the contractual obligations of the original signatories and were proper parties to the contract claims); *Golden Mountain Income, LLC v. Spencer Gifts, LLC*, 83 N.Y.S.3d 507, 509 (2018) (whether successor is liable for breach of contract of predecessor's contractual obligations is a question of fact).  This is also consistent with Richard Chancis's agreement to indemnify Joey Chancis and Roer for any damages stemming from this case.  (*See* Tr. 734:20-735:20 (Richard Chancis testifying about his agreement to indemnify Joey Chancis and Roer and explaining that he "was going to take on the financial responsibility if  [] either one of them was sued personally and were the subject of a personal lawsuit and personal damages were [] put on them"); 480:3-6 (Joey Chancis testifying about the marital settlement agreement in which Richard Chancis "agreed to indemnify myself and my father from any legal issues resulting from this business"); 490:25-491:5 (Joey Chancis testifying about Richard Chancis's agreement to indemnify Joey and Roer); 515:5-13 (same).)

[4] New York has amended these relevant portions of the DCL as they pertain to fraudulent conveyance since the commencement of this action.  2019 N.Y. AB 5622.  However, the statute provides that "[t]his act shall take effect one hundred twenty days after it shall have become a law," and that the new provision "shall not apply to a transfer made or obligation incurred before such effective date, nor shall it apply to a right of action that has accrued before such effective date."  *Id.*  Because the legislation became effective on April 4, 2020, and all the transfers at issue here occurred before that date, "the transfer at issue is governed by the prior provisions of the DCL."  *Bank Leumi USA v. GM Diamonds, Inc.*, No. 150474/2015, 2020 N.Y. Misc. LEXIS 4965, at *10 (N.Y. Sup. Ct. Aug. 26, 2020).

SPA-16

deemed constructively fraudulent if it is made without fair consideration and . . . if one of the following conditions is met:  (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275."  *In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005).

As the standard set out in *In re Sharp* makes clear, "[l]ack of fair consideration is an essential element of a claim pursuant to DCL §§ 273 and 275."  *Ray v. Ray*, No. 18 Civ. 7035 (GBD), 2019 WL 1649981, at *6 (S.D.N.Y. Mar. 28, 2019) (internal quotation marks omitted), *aff'd* 799 F. App'x 29 (2d Cir. 2020).  To establish "fair consideration," "(1). . . the recipient of the debtor's property must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a fair equivalent of the property received; and (3) such exchange must be in good faith."  *In re Sharp*, 403 F.3d at 53 (internal quotation marks omitted).  While the "antecedent debt" refers to that of the debtor and not of the creditor, a debtor's "transfer to an affiliate or insider in satisfaction of an antecedent debt lacks good faith."  *Citibank, N.A. v. Benedict*, No. 97 Civ. 9541 AGS, 2000 WL 322785, at *13 (S.D.N.Y. Mar. 28, 2000) (internal quotation marks omitted).  In general, "the party challenging the conveyance" has "the burden of proving the lack of fair consideration."  *United States v. McCombs*, 30 F.3d 310, 324 (2d Cir. 1994) (internal quotation marks and alterations omitted).

b.  Application

I find that Defendants made some transactions at issue in this litigation without fair consideration.  At minimum, Defendants made many withdrawals and/or transfers from corporate accounts to their personal accounts, without any property exchanged in return.  (*See,*

16

*e.g.*, Tr. 220:25-221:12, 225:25-226:16, 640:13-641:19.)  The trial record also contains examples

of the Individual Defendants using corporate monies to pay for massages with potential clients,

(Tr. 391:17-392:20, 400:5-401:14), movies and shopping for their personal assistant, (*see* Tr.

379:10-381:23), dinner to celebrate a professional accomplishment, (*see* Tr. 420:12-421-6), and

hair appointments for public relations purposes, (*see* Tr. 402:10-403:7, 409:17-25, 415:11-21,

453:2-17, 457:14-22).

Defendants argue that "all transfers of monies at issue in this case were for fair

consideration, specifically good faith purchases for (or reimbursement for purchases for) the

business of expanding the aforementioned beauty clinics and/or discharges of antecedent debts."

(Doc. 214, at 34 (noting also that the Individual Defendants are owed "large sums of money . . .

for unpaid salary as well as equity").)  Defendants misunderstand the concept of "fair

consideration."  The question is not whether the Individual Defendants had fair consideration for

these transactions based on their own dealings with Joey New York, Inc., but rather whether Joey

New York, Inc. had fair consideration for the relevant transfers and withdrawals based on the

public company's outstanding debts to Plaintiff.  At trial, (1) Plaintiff established that money was

transferred out of the corporate accounts and into the Individual Defendants' personal accounts,

and (2) the Individual Defendants confirmed that these transactions were not for anything of

value or to discharge any antecedent debts of Joey New York, Inc.  To the extent that Defendants

argue that these transfers of corporate monies were used to pay off the company's debts owed to

the Individual Defendants, this argument must fail because this would constitute "transfer[s] to

an affiliate or insider in satisfaction of an antecedent debt," which are impermissible to satisfy

fair consideration. *Citibank*, 2000 WL 322785, at *13.[5]  If I adopted Defendants' interpretation

---

[5] This argument would also fly in the face of the Individual Defendants' own testimony that they have not been

SPA-18

of fair consideration, the Individual Defendants would have free rein to use Plaintiff's money

merely because they as insiders were purportedly owed money from Joey New York, Inc.  Such

an interpretation would render useless the legal concept of fair consideration.

"For purposes of the DCL, a person is insolvent when the present fair salable value of his

assets is less than the amount that will be required to pay his probable liability on his existing

debts as they become absolute and matured."  *In re Nine West LBO Sec. Litig.*, 505 F. Supp. 3d

292, 319 (S.D.N.Y. 2020) (internal quotation marks omitted).  "The operative reference point for

determining insolvency is the time at which the transfer took place."  *Kim v. Yoo*, 311 F. Supp.

3d 598, 612 (S.D.N.Y. 2018), *aff'd*, 776 F. App'x 16 (2d Cir. 2019).  Defendants concede that

they were insolvent at the time they entered into the agreements and for months after they

entered into those agreements.  (Doc. 214, at 40–41.)  This conclusion is also borne out in the

trial record.  (*See* Tr. 204:10-15 (noting that the public company never earned a profit); 681:4-9

(noting that all parties knew that the public company did not have a positive cash flow); Doc.

209-1, at 11 (Joey New York, Inc.'s January 2017 10Q filing showing that the company was

operating at a significant net loss).)

Given that Defendants were insolvent at all relevant times, and they conducted

transactions without fair consideration, I award judgment to Plaintiff for its constructive

fraudulent conveyance claim.  However, I note that Plaintiff—despite having stipulated with

Defendants with regard to the bank records showing the flow of funds among the various

corporate and personal account of Defendants—does not identify which of the hundreds of

transactions at issue it believes are constructive fraudulent conveyances.  Given that it is

Plaintiff's burden to prove its fraudulent conveyance claim by submitting evidence regarding the

---

repaid for any of their personal loans to, or investments in, the corporate entities.  (*See* Tr. 777:5-7, 782:21-783:18.)

18

fraudulent transactions, I decline to identify a list of the transactions that constitute constructive

fraudulent conveyance. *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376 (S.D.N.Y.

2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (to assert a constructive fraud claim, plaintiff must

prove, by a preponderance of the evidence, "(1) a conveyance (2) without fair consideration (3)

by a person who is insolvent or who becomes insolvent as a consequence of the transfer");

*Palmerone v. Staples*, 150 N.Y.S.3d 723, 726 (2d Dep't 2021) (summary judgment on fraudulent

conveyance claim granted to plaintiffs who presented evidence identifying the specific

fraudulent property involved in the transactions); *Med. Arts-Huntington Realty, LLC v. Meltzer

Rosenberg Dev., LLC*, 52 N.Y.S.3d 382, 384–85 (2d Dep't 2017) (same).

### 2. Actual Fraudulent Conveyance

#### a. Applicable Law

DCL section 276, unlike sections 273 and 275, "addresses actual fraud, as opposed to

constructive fraud, and does not require proof of unfair consideration or insolvency." *Wall Street

Associates v. Brodsky,* 684 N.Y.S.2d 244, 247 (1st Dep't 1999). "Due to the difficulty of

proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on

'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent

transfers that their presence gives rise to an inference of intent." *Id.* (internal quotation marks

omitted). "Badges of fraud may include, *inter alia,* 'a close relationship between the parties to

the alleged fraudulent transaction; a questionable transfer not in the usual course of business;

inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the

inability to pay it; and retention of control of the property by the transferor after the

conveyance.'" *Ray*, 799 F. App'x at 32 (quoting *Brodsky,* 684 N.Y.S.2d at 248).

#### b. Application

SPA-20

Plaintiff is correct that some of these badges of fraud exist here, (*see* Doc. 215, at 101–102), including a close relationship between the parties and inadequate capitalization at the time of the transfers.  However, badges of fraud are insufficient where, as here, Defendants have "presented evidence suggesting [their] actual intent was not to deceive present or future creditors."  *Field Home-Holy Comforter v. Warns*, No. 12 CV 9285(VB), 2014 WL 7398904, at *5 (S.D.N.Y. Dec. 13, 2014).  It is telling that Plaintiff relies only on badges of fraud and fails to point to any trial testimony indicating that any Defendants actually intended to defraud Plaintiff.  As discussed in greater detail in the sections on fraudulent inducement and piercing the corporate veil, the record evidence and testimony—which Plaintiff failed to contradict with any specific evidence of its own—show that Individual Defendants never received any salary, (Tr. 529:6-7), each invested more than $1 million in the company, (Doc. 209-1, at 9; Tr. 204:12-15, 545:12-20), and overwhelmingly made these transfers and withdrawals in order to pay company expenses.  Even where the Individual Defendants transferred money from the corporate account to their personal accounts, they did so to reimburse those personal accounts after they were used for business expenses.  (*See, e.g.*, Tr. 220:25-221:12, 225:25-226:16, 626:13-628:20.)  There is simply nothing in the trial record to support Plaintiff's theory:  that Defendants withdrew money from the corporate accounts in an attempt to prevent Plaintiff from recovering on its loans.  Absent any evidence to this effect, Plaintiff's actual fraudulent conveyance claim clearly fails.

## C.    *Fraudulent Inducement*

### 1.  Applicable Law

"[I]t is well-settled in New York that where a party is fraudulently induced to enter into a contract, the contract is voidable at the instance of the defrauded party."  *Compunnel Software Grp., Inc. v. Gupta*, No. 14-CV-4790 (RA), 2018 WL 4757941, at *8 (S.D.N.Y. Sept. 30, 2018)

(internal quotation marks omitted).  "To state a claim for fraudulent inducement under New York

law, a plaintiff must allege:  '(1) a representation of material fact, (2) which was untrue, (3)

which was known to be untrue or made with reckless disregard for the truth, (4) which was

offered to deceive another or induce him to act, and (5) which that other party relied on to its

injury.'"  *Kainz v. Bernstein*, 841 F. App'x 249, 251 (2d Cir. 2020) (summary order) (quoting

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 580 (2d Cir. 2005)).  In

determining whether a plaintiff reasonably relied, courts consider "the entire context of the

transaction, including factors such as its complexity and magnitude, the sophistication of the

parties, and the content of any agreements between them."  *Emergent Capital Inv. Mgmt., LLC v.*

*Stonepath Grp. Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

### 2. Application

Plaintiff appears to argue that Defendants made two types of fraudulent representations.

Neither argument is remotely convincing.  First, Plaintiff argues that Defendants "falsely

represent[ed] to [Plaintiff] that [Joey Chancis] intended to use the funds obtained from EMA to

finance [her] expansion of storefront Botox and beauty clinics throughout the State of Florida,

New York, and California."  (Doc. 215 ¶ 611.)  In its briefing, Plaintiff provides no evidence,

from the trial record or otherwise, that these representations were untrue when Defendants made

them.  By contrast, Defendants provided consistent, unrefuted testimony at trial that they

intended, albeit unsuccessfully, to expand Joey New York, Inc. and open stores around the

country, including in those states.  (*See, e.g.*, Tr. 210:21-25 (Roer testifying that "[t]he reasons

that monies were borrowed from EMA was to expand the Joey New York company, expand it by

opening more locations, more Botox locations throughout the United States.  That's the reason

why the money was borrowed.");  Tr. 260:4-8 (Roer testifying that they went public "[t]o open

21

SPA-22

more Botox labs throughout the United States and also to think about franchising the name and have other company-owned locations," and that they "needed more funding" to do so); Tr. 471:16-473:16 (Joey Chancis testifying that the initial "purpose" for the company going public was, in part, "to raise money to acquire small beauty companies," and that upon receiving funding, they planned to open multiple Botox labs in southern Florida and Los Angeles); Tr. 571:14-572:5 (Richard Chancis testifying that they intended to expand Joey New York, Inc., and as a result they "decided to tap the capital markets to fuel [the] expansion" in part because they anticipated that the expansion would cost "millions of dollars").) The fact that Defendants may have "failed to open a single additional store since [they] obtained financing from [Plaintiff]" is irrelevant; Plaintiff provides no basis for its leap that somehow this fact means "Defendants never intended to use the funds for this purpose." (Doc. 215, at 105.)

Second, Plaintiff argues that Defendants "pretended that [Joey] Chancis and Roer were running the Corporate Defendants" as opposed to Richard Chancis, under the theory that "[Plaintiff] and other investors would not invest in a publicly traded company that was run by a felon who had been convicted of securities fraud." (*Id.* at 104.) It is remarkable that Plaintiff would continue to make this argument in light of the trial testimony. Contrary to Plaintiff's suggestion that Defendants hid the involvement of Richard Chancis in the company, Preston herself testified that she engaged in several direct conversations with Richard Chancis in connection with the transactions at issue here, (Tr. 89:20-90:6), that she believed that she negotiated the business terms of the Notes only with Frommer and Richard Chancis, (Tr. 103:12-104-1), that she discussed Joey New York, Inc.'s business model with Richard Chancis on multiple occasions, (Tr. 129:15-130:7), and that Richard Chancis informed her that the three Individual Defendants were putting their own money into the company, (Tr. 133:9-13). Further,

22

SPA-23

Preston testified that, in doing her due diligence, she found that "there was something on Richard Chancis' record" and that, "at some point in time, it was brought to our awareness that there was an investigation of some kind of disciplinary action against Richard Chancis," though she did not recall whether she became aware of that before or after entering into the agreements with Defendants. (Tr. 115:20-116:18.)  Although Preston and Richard Chancis disagreed as to whether the latter voluntarily disclosed the information about his felony conviction, (*compare* Tr. 116:23-117:4, *with* Tr. 671:21-672:14), Preston acknowledged that she "had a conversation" with Richard Chancis after she found out about his felony conviction, (Tr. 117:1).  Preston further testified that she was under the impression that Richard Chancis was "running the Florida location and helping with the expansion." (Tr. 130:10-12.)  In other words, Preston admitted that she had extensive discussions with Richard Chancis before entering into the agreements, that she was aware that he played a prominent role with the company's operations and proposed expansion, and that she spoke with him directly about his felony conviction.  Finally, Plaintiff and Preston do not meaningfully contest Richard Chancis's testimony that he "completely disclosed" his felony status to Preston before they entered into their agreements, and that "[s]he was quite clear that she knew" about his felony conviction before they entered into the agreements. (Tr. 671:21-672:14.)

In addition, the trial testimony does not establish that Richard Chancis "ran" the company, as opposed to Joey Chancis and/or Roer.  The unrebutted testimony shows that, until he stepped down in March 2019, Roer ran "operations on the business side," which meant "executing everything and anything that needed to be done," while Joey Chancis handled marketing, promotion, and supervising several locations. (Tr. 470:17-22, 472:7-473:6.)  Although it is true that Richard Chancis made significant decisions related to the company's

SPA-24

finances, the trial testimony does not support the idea that he ran the company while Joey Chancis and Roer were mere figureheads or underlings.  Rather, the trial testimony makes clear that the three principals were each responsible for running different aspects of the business.

Plaintiff elicited no testimony at trial to support either theory that Defendants made false representations in an effort to induce Plaintiff into entering into the agreements.  Moreover, Plaintiff's argument that it deserves punitive damages on this claim because Defendants' conduct was "intentional, egregious, wanton, malicious, fraudulent, [and] shocking to the conscience" is plainly at odds with the record in this case and entirely without merit.  *See infra*.

### D.   *Piercing the Corporate Veil*

#### 1.   Applicable Law

"New York law establishes two requirements to pierce a corporate veil and to hold an individual liable for corporate action:  (1) the person must dominate the corporation, effectively dictating its action, . . . and (2) the person must use that control to abuse the privilege of doing business in the corporate form by perpetrating a wrong or injustice against the plaintiff such that a court in equity will intervene."  *Badian v. Elliott*, 165 F. App'x 886, 889 (2d Cir. 2006) (summary order) (citations and internal quotation marks omitted).  "Although a showing of complete domination is the key to piercing the corporate veil, the party seeking to pierce the corporate veil must also fulfill the second requirement by demonstrating:  1) the existence of a wrongful or unjust act toward that party, and 2) that the act caused that party's harm."  *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461, 465 (S.D.N.Y. 2005) (internal quotation marks omitted).  In assessing the first factor—that the Defendants dominate the corporation—courts consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel;

SPA-25

(5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997).

### 2. Application

Plaintiff clearly has satisfied the first element of the piercing the corporate veil analysis. The public company was inadequately capitalized—it never earned a profit, (Tr. 204:10-15), and the Individual Defendants made clear that they struggled to find funding, (*see* Tr. 572:23-573:17), and were so cash-strapped that they at times did not have the money to pay some of their employees, (*see* Tr. 379:15-20), and often scrambled to make last-minute payments just to pay for daily supplies, (*see* Tr. 401:18-402:9, 415:23-416:13, 604:21-605:7). All the corporate entities had essentially the same principals and were run out of Roer's apartment. (Tr. 195:15-196:7.) Most importantly, this is almost a textbook case of corporate entities disregarding corporate formalities and intermingling funds. As noted *supra*, the trial record is replete with evidence that Defendants: (1) made, at minimum, hundreds of withdrawals, transfers, and other financial transactions from their corporate accounts for which they have provided barely any documentation, (2) transferred large sums of money between their various corporate entities whenever they felt it necessary, (*see, e.g.*, Tr. 206:23-210:13, 221:17-24, 223:10-234:20, 234:21-235:20), and (3) transferred large sums of money to their personal accounts to pay off personal credit cards, (*see, e.g.*, Tr. 221:4-12, 282:10-283:9, 626:13-628:20, 726:9-17). For example, Roer testified that he was the company's "personal line of credit." (Tr. 221:4-12.) The Individual Defendants, in other words, freely mixed personal and corporate monies on a near-daily basis. Therefore, I find that the Individual Defendants dominated Joey New York, Inc.

SPA-26

Nevertheless, Plaintiff failed to establish that Defendants perpetrated a wrong or injustice in violation of the second element.  "[T]hose seeking to pierce a corporate veil bear a heavy burden."  *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 235 (N.Y. 2011) (citation omitted); *see also Am. Federated Title Corp. v. GFI Mgmt. Servs.*, 126 F. Supp. 3d 388, 402 (S.D.N.Y. 2015) ("New York courts have made clear that the veil-piercing standard is demanding.").  "[O]nly intentionally deceptive or intentional and unjust acts justify piercing the corporate veil."  *Am Federated Title Corp.*, 126 F. Supp. 3d at 403 (internal quotation marks omitted).  There is nothing in the trial record to suggest that the Individual Defendants acted in an "intentionally deceptive or intentional and unjust" way.  Despite Plaintiff's unsupported assertions, far from lining their pockets, the Individual Defendants presented unrebutted evidence that they never received a salary at any time, (Tr. 529:6-7), and each invested more than $1 million into the company, (Tr. 204:12-15, 545:12-20).  Most notably, Roer holds a promissory note from the company for all the personal money he put into the company, but he has not received any of the $1.5 million plus interest he is owed on that note.  (Tr. 777:5-7, 782:21-783:18.)  The Individual Defendants consistently testified that they transferred monies from the corporate accounts to their personal accounts only to reimburse themselves for business expenses that they put on their personal cards.  (*See, e.g.*, Tr. 221:4-12, 225:25-226:16, 726:9-17.)  The vast majority of the corporate expenses discussed at trial were reasonable business expenses—whether for supplies, (*see* Tr. 401:18-402:9), food and refreshments for clients or investors, (*see* Tr. 241:5-16), or for business meetings at restaurants, (*see* Tr. 465:10-20), where Defendants often held meetings because they did not have enough money for office space, (*see* Tr. 387:1-6).  Even where Defendants were unable to remember exactly what the charges were for, they consistently testified that they did not use corporate monies for personal purposes.

26

SPA-27

As noted *supra*, Plaintiff has pointed to a handful of expenses that likely fall on the

wrong side of the line between business and personal—such as multiple massages in a single

week with potential clients, (Tr. 391:17-392:20, 400:5-401:14), or movies and shopping to thank

their personal assistant because they could not afford to pay her a salary, (*see* Tr. 379:10-

381:23).  However, these expenses are a mere drop in the bucket as compared to the millions of

dollars the Individual Defendants put into the company and the fact that they did not receive

salaries for years.  I also credit the Defendants' testimony concerning their desire to grow the

business, and that testimony is consistent with Defendants' use of substantial sums of their own

money to fund and prop up the business.

While I find that Defendants are liable for breach of contract and guaranty, "a simple

breach of contract, without more, does not constitute a fraud or wrong warranting the piercing of

the corporate veil." *Skanska USA Bldg. Inc. v. Atlantic Yards B2 Owner, LLC*, 40 N.Y.S.3d 46,

54 (1st Dep't 2016).  Although I found *supra* that Defendants are also liable for constructive

fraudulent conveyance, Plaintiff has not cited—and I have not found—any authority suggesting

that this finding of liability requires me to permit Plaintiff to pierce the corporate veil in this

case.  Instead, I see no evidence that Defendants "used [their] control to . . . place assets beyond

the reach of creditors or otherwise avoid obligations." *Hamlen v. Gateway Energy Servs. Corp.*,

No. 16 Civ. 3526 (VB)(JCM), 2017 WL 6398729, at *10 (S.D.N.Y. Dec. 8, 2017).  The trial

record reveals that Individual Defendants disregarded corporate formalities and comingled funds

not because they were trying to enrich themselves at Plaintiff's expense, but because they were

completely in over their heads having imprudently taken Joey New York, Inc. public and then

found themselves desperately trying to salvage a capital-intensive and failing company.  Today,

the Individual Defendants—Roer in particular—are financially ruined.  (*See* Tr. 292:2-20 (Roer

testifying that he is "out of money," had to give up his apartment and car, and has no computer),

293:9-294:5 (Roer testifying that he has been forced to sell his clothing, jewelry, artwork, and

wedding band because his Social Security payments are "not enough to support [him] at all"),

479:8-17 (Joey Chancis testifying about her financial situation).)  Therefore, I see no reason to

exercise my equitable authority to permit Plaintiff to pierce the corporate veil here, where there

is no evidence of any intentionally deceptive or intentional and unjust behavior at issue.

### E.   *Remedies*

#### 1.  **Constructive Fraudulent Conveyance**

While I have granted judgment for Plaintiff as to liability for breach of contract, breach of

guaranty, and constructive fraudulent conveyance, I find that Plaintiff is entitled only to

contractual damages and not damages related to its fraudulent conveyance claim.  I make this

determination for two reasons.  First, "[a] plaintiff seeking compensation for the same injury

under different legal theories is of course only entitled to one recovery."  *Indu Craft v. Bank of*

*Baroda*, 47 F.3d 490, 497 (2d Cir. 1995); *see also Martilet Mgmt. Servs., Inc. v. Bailey*, No. 12

Civ. 6691(PAC), 2013 WL 5420966, at *5 (S.D.N.Y. Sept. 27, 2013) (finding that "[t]he Court

need not address" plaintiff's fraud claim "because Plaintiff has prevailed on its contract claim for

the same relief.").  "In such cases where a Plaintiff is seeking compensation for the same injury

under multiple theories, the proper measure of damages is the one that represents the greater

recovery."  *CAMOFI Master LDC v. Riptide Worldwide, Inc.*, No. 10 Civ. 4020(CM)(JLC), 2012

WL 6766767, at *13 (S.D.N.Y. Dec. 17, 2012) (internal quotation marks omitted).  Here, I find

that Plaintiff is entitled to $151,418.50 plus prejudgment interest in damages for its contractual

claims, *see infra*, but Plaintiff fails to put forth a recovery estimate for its fraud claims, (*see* Doc.

215 ¶ 623).  Therefore, I find that Plaintiff's breach of contract damages would provide the

SPA-29

greater recovery, meaning that Plaintiff should recover only for that claim.  Plaintiff provides no

authority for its argument that its damages should be "additive" across multiple claims.  (*See*

Doc. 216, at 21.)

Second, I find that Plaintiff cannot recover for fraudulent conveyance because it failed to

establish at trial the amount of damages.  Plaintiff appear to argue that it is entitled to recovery

for both fraudulent conveyance and breach of contract damages because the method of

calculating damages for the two claims is different.  (*See* Doc. 215 ¶¶ 623–629.)  Even if this

were true, Plaintiff failed to prove at trial, or make clear in post-trial briefing, the amount of

damages to which Plaintiff is entitled on its fraudulent conveyance claims.  As noted *supra*, the

parties stipulated to the admissibility of the financial records evidencing hundreds of

withdrawals, transfers, and other financial transactions that Defendants made after the Notes

went into effect.  (*See* Doc. 60 ¶¶ 56–619.)  At trial, and in its post-trial briefing, Plaintiff failed

to establish which of these hundreds of transactions constitute fraudulent conveyances and,

accordingly, failed to quantify the damages Plaintiff is owed.  As such, "Plaintiff[] [has] not met

[its] evidentiary burden to prove the amount of unlawfully conveyed property with reasonable

certainty so as to permit the Court to award damages."  *CAMOFI Master LDC*, 2012 WL

6766767, at *15.  Although the Court in *CAMOFI* ordered plaintiff to submit "a more detailed

evidentiary showing of damages specifically attributable to fraud and fraudulent conveyance,"

that case was at the default judgment stage.  *See id.*  At this point, Plaintiff is not entitled to

submit such evidence, because Plaintiff had a clear opportunity to do so at the bench trial in this

case.

### 2.  Contractual Damages

I find that Plaintiff is entitled to $151,418.50 for its contractual claims, plus prejudgment

interest accruing at 24% per year from July 26, 2017, the date after Defendants defaulted.

"Under New York law, damages for breach of contract should put the plaintiff in the same

economic position he would have occupied had the breaching party performed the contract." *LG*

*Capital Funding, LLC v. Cardiogenics Holdings, Inc.*, 787 F. App'x 2, 3 (2d Cir. 2019) (quoting

*Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003)); *see also Indu Craft*, 47

F.3d at 495 ("[T]he general rule for measuring damages for breach of contract has long been

settled.  It is the amount necessary to put the plaintiff in the same economic position he would

have been in had the defendant fulfilled his contract.").  Under the Notes, Defendants owed a

total of $241,600—$90,000 on the First Note and $151,600 on the Second Note.  (*See* Doc. 60-1;

Doc. 60-3.)  By Plaintiff's own calculation, it converted a total of $90,181.50 of that principal

into shares of Joey New York, Inc. common stock after the July 25, 2017 default date—

$82,507.50 on the First Note and $7,674 on the Second Note.  (*See* Doc. 180-2; Tr. 37:1-6,

39:20-23; Doc. 60-1 ¶ 3.16 (stating that, "so long as the Borrower remains in default," Plaintiff

has "the right at any time . . . to require the Borrower, upon written notice, to immediately issue,

in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to

the Default Amount divided by the Conversion Price then in effect.").)  The difference between

$241,600 (the total principal of the loans Plaintiff made to Defendants) and $90,181.50 (the

amount of the principal Plaintiff converted into shares post-default) is $151,418.50.  The contract

further provides that any unpaid principal shall accrue 24% interest per year, meaning that

Plaintiff is also owed prejudgment interest from July 26, 2017—the date of default—until the

date of judgment, at 24% per year.

After trial, I directed Plaintiff to address in its post-trial briefing whether it was "seeking

liquidated damages" and, if so, the amount it was seeking and the basis for that request.  (Doc.

191 ¶ 9.)  In response, Plaintiff answered that "[it] is not seeking liquidated damages."  (Doc.

216, at 28.)  By Plaintiff's own admission, then, Plaintiff should only be entitled to receive the

actual damages that I have just laid out related to its contractual claims.  However, Plaintiff's

proposed damages calculations would award Plaintiff $572,104.83—in large part because they

appear to take into account Articles 1.4(g) and 3.16 provided in the two Notes.  (*See* Doc. 180-2;

Doc. 215 ¶¶ 624–28.)

      I find that Articles 1.4(g) and 3.16 are both invalid liquidated damages provisions such

that Plaintiff cannot recover under those provisions.  "[A] liquidated damages provision is an

estimate made by the parties at the time they enter into their agreement, of the extent of the

injury that would be sustained as a result of breach of the agreement."  *U.S. Fid. & Guar. Co. v.*

*Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004) (internal quotation marks omitted).

"[C]ourts will uphold and enforce liquidated damages provisions where (1) actual damages are

difficult to determine and (2) the amount of damages awarded pursuant to the clause is not

clearly disproportionate to the potential loss."  *Adar Bays, LLC v. GeneSYS ID, Inc.*, 341 F.

Supp. 3d 339, 349 (S.D.N.Y. 2018) (citation omitted).

      As noted *supra*, Articles 1.2(c) and 1.4(g) require Defendants to provide Plaintiff with

$1,000 per day, plus interest, for each day that Defendants failed to timely deliver the common

stock to Plaintiff.  Article 1.4(g), on its face, refers to itself as a "liquidated damages provision"

(*see* Doc. 60-1 ¶ 1.4(g); Doc. 60-3 ¶ 1.4(g)), and attempts to set out a damages estimate in the

event that Defendants breached the contract and failed to deliver stock.  Courts in this Circuit

have routinely determined that these "daily payment provisions" constitute liquidated damages

provisions. *See, e.g.*, *LG Capital Funding, LLC v. 5Barz Int'l*, 307 F. Supp. 3d 84, 102

(E.D.N.Y. 2018); *Adar Bays, LLC v. 5Barz Int'l, Inc.*, No. 16 Civ. 6231 (NRB), 2018 WL

3962831, at *13–14 (S.D.N.Y. Aug. 16, 2018); *LG Capital Funding, LLC v. Coroware, Inc.*, No.

16 Civ. 2266 (AMD) (PK), 2017 WL 3973921, at *3 (E.D.N.Y. Sept. 8, 2017); *L & L Wings,*

*Inc. v. Marco-Destin, Inc.*, 756 F. Supp. 2d 359, 364 (S.D.N.Y. 2010); *Laurus Master Fund, Ltd.*

*v. Versacom Int'l, Inc.*, No. 02Civ.5340(LTS)(MHD, 2003 WL 21219791, at *5 (S.D.N.Y. May

21, 2003).  Courts have found that "actual damages for the failure to honor a notice of

conversion are not difficult to calculate," because courts can simply "subtract[] the contract

price—the price at which the plaintiff is entitled to convert shares under the Note—from the

market price of the shares on the date of the breach."  *Adar Bays*, 2018 WL 3962831, at *10

(internal quotation marks omitted); *see also LG Capital Funding, LLC  v. 5Barz Int'l*, 307 F.

Supp. 3d at 102 (similar).  Courts have also consistently found that daily fee provisions of

$250/day and $500/day—less than the $1,000/day provision provided for in Article 1.4(g)—are

"clearly disproportionate to the potential loss" that arises from Defendants failing to timely

deliver the shares.  *Id.*; *see also Adar Bays*, 2018 WL 3962831, at *13 ("[I]n this case, the

liquidated damages provision is *per se* disproportionate because it bears no relationship to actual

losses.") (citation omitted); *Coroware*, 2017 WL 3973921, at *3 ("The daily penalty functions as

just that—a penalty; the amount is not tethered to the plaintiff's actual losses, and serves only to

coerce contract performance.").  As such, "like other courts in this circuit," I "conclude[] that the

daily penalty provisions are unenforceable, and damages thereunder are denied."  *LG Capital*

*Funding, LLC Capital v. 5Barz Int'l*, 307 F. Supp. 3d at 102 (collecting cases).

   Article 3.16 provides detailed procedures for what happens when the borrowers default.

(Doc. 60-1 ¶ 3.16; Doc. 60-3 ¶ 3.16.)  When a default event occurs, the Notes require that:

> the Note shall become immediately due and payable and the Borrower shall pay to
> the Holder . . . an amount equal to the greater of (i) 150% times the sum of (w) the
> then outstanding principal amount of this Note plus (x) accrued and unpaid interest
> on the unpaid principal amount of this Note to the date of payment . . . plus (y)

> Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z)
> any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof.

(Doc. 60-1 ¶ 3.16; Doc. 60-3 ¶ 3.16.)  Like Article 1.4(g), Article 3.16 is a provision that

attempts to set out a formula for damages in the event that Defendants breached the contract.

Courts in this Circuit have determined that similar "multiplier provisions" requiring the defaulted

borrower to pay 150% or 200% of the amount owed constitute liquidated damages provisions.

*See LG Capital Funding, LLC v. One World Holding, Inc.*, No. 15-CV-698 (SJ)(JO), 2018 WL

3135848, at *13–14 (E.D.N.Y. June 27, 2018); *LG Capital Funding, LLC v. MineralRite Corp.*,

No. 16 Civ. 6158 (PKC) (VMS), 2017 WL 9250297, at *11 (E.D.N.Y. Dec. 1, 2017).  Here,

actual damages are not hard to calculate—as I have calculated *supra*, Plaintiff is entitled to the

difference between the total principal and the amount of the principal Plaintiff converted into

shares post-default plus prejudgment interest from the date of default.  Further, the liquidated

damages provision in Article 3.16 is grossly disproportionate, adding nearly $121,000 to the

principal amount owed to Plaintiff for the express purpose of "coerc[ing] contract performance"

from Defendants and penalizing them.  *Coroware*, 2017 WL 3973921, at *3.  Therefore, Plaintiff

is prohibited from recovering under Articles 1.4(g) and 3.6, because they are both improper

liquidated damages provisions.

  As final note concerning Plaintiff's contractual damages award, I find that the revenue

that Plaintiff earned on its post-default conversions of Joey New York, Inc. stock should not in

any way affect the damages analysis.  As noted *supra*, since entering into the agreements,

Plaintiff has earned net proceeds of $301,023.27 from its conversions of Joey New York, Inc.

stock since the default date.  This figure is greater than the $241,600 that Plaintiff loaned

Defendants pursuant to the two Notes.  Broadly speaking, this would appear to conflict with the

general principle that compensatory damages for breach of contract "cannot put the non-

breaching party in a better financial position than they would have occupied but for the breach,"

nor can they give the non-breaching party a "windfall." *State of N.Y. v. United Parcel Servs.*, 15-

cv-1136 (KBF), 2016 WL 4735368, at \*10 (S.D.N.Y. Sept. 10, 2016) (internal quotation marks

omitted).  Nevertheless, my calculation of actual damages has already taken into account the

$90,181.50 of the principal that Plaintiff converted into shares after the default date.  Given that

the Notes provide Plaintiff with an unqualified right to convert any shares up to the amount due,

(*see* Doc 60-1 ¶¶ 1.1, 3.16; Doc. 60-3 ¶¶ 1.1, 3.16), the profits that Plaintiff made from the shares

that they chose to convert are irrelevant to the expectation damages calculation, which is

designed to put Plaintiff in the same position as if the contract had been completed.

  As such, I find that Plaintiff is entitled to $151,418.50 in compensatory damages for its

contractual claims, plus prejudgment interest accruing at 24% per year from the date of default

up to the date of judgment.  (*See* Doc. 60-1, at 1; Doc. 60-3, at 1.)  Given that this damages

calculation constitutes the full balance of actual damages owed to Plaintiff, Plaintiff is not

permitted to convert any more shares after the date of this judgment.

### 3. Specific Performance

  Plaintiff argues that it is entitled to specific performance of the contract that would permit

it to "convert any damages pursuant to the Notes." (Doc. 215 ¶¶ 632–39.)  Plaintiff argues that

"given Defendants' insolvency," any damages judgment that failed to allow Plaintiff to convert

into shares would be "worthless." (*Id.* ¶ 639); *see also generally Alpha Capital Anstalt v.*

*Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 331 (S.D.N.Y. 2020) (noting that some courts have granted

"injunctive relief for non-delivery of convertible stock . . . where a defendant is insolvent or on

the brink of insolvency").  Specific performance is an "extraordinary equitable remedy," such

that "the party seeking relief must demonstrate that remedies at law are incomplete and

34

inadequate to accomplish substantial justice." *Lucente v. IBM*, 310 F.3d 243, 262 (2d Cir. 2002) (internal quotation marks omitted).  "[S]pecific performance is not appropriate where the claim involves publicly traded stock." *Id.* (citation omitted); *see also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 618 F. Supp. 2d 280, (S.D.N.Y. 2009) (same); *Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, Inc.*, No. 13 Civ. 3860 (CM), 2014 WL 12776748, at \*16 (S.D.N.Y. May 23, 2014) ("Where a plaintiff claims that a defendant breached a contract by failing to deliver warrants or publicly traded stock, money damages can adequately compensate the plaintiff for his loss.").  Here, Joey New York, Inc. is still a publicly traded stock, (Tr. 659:23-24), which bars specific performance.  Plaintiff does not explain why specific or injunctive relief would be an appropriate remedy in light of the fact that it does not contest that Joey New York, Inc. stock is still publicly traded, given that they made this same argument in this District two years ago and it failed for the same reason.  *See EMA Fin., LLC v. AIM Exploration, Inc.*, No. 18 Civ. 145 (ER), 2019 WL 689237, at \*13 (S.D.N.Y. Feb. 19, 2019).  Consequently, Plaintiff's request for specific performance is denied.

### 4. Punitive Damages

Plaintiff requests also that I award punitive damages because Defendants' "conduct against [Plaintiff] was intentional, egregious, wanton, malicious, fraudulent, [and] shocking to the conscience." (Doc. 215 ¶¶ 621, 630.)  Under New York law, "the standard for imposing punitive damages is a strict one and punitive damages will be awarded only in exceptional cases," where the conduct "manifest[s] spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wil[l]ful or wanton." *Marinaccio v. Town of Clarence*, 20 N.Y.3d 506, 511 (N.Y. 2013) (internal quotation marks omitted).

Plaintiff's punitive damages claim is meritless.  Plaintiff states that it is entitled to

punitive damages because of the conduct of all three Individual Defendants, but references only

the felony conviction of Richard Chancis.  (*See* Doc. 215 ¶¶ 621, 630.)  Plaintiff provides no

explanation for why Joey Chancis and Roer should be liable for punitive damages.  Regardless,

for the reasons detailed in my analysis of Plaintiff's piercing the corporate veil and fraudulent

inducement claims, I find that the record does not support a finding that Defendants behaved in a

way that was "intentional," "malicious," or "shocking to the conscience."

Plaintiff's claim for punitive damages is particularly unwarranted when considering

Plaintiff's own conduct in this matter.  At the time the parties entered into the agreements,

Plaintiff knew Joey New York, Inc. did not have a positive cash flow and was operating at a

significant net loss, (Doc. 209-1, at 11; Tr. 681:4-9), was indebted to at least one other creditor,

(*see* Doc. 180-19), and was therefore insolvent.  The terms of the Notes that Plaintiff negotiated

were extremely onerous on Defendants and unforgiving in the event of default.  Taking

advantage of the provisions in the Notes that allowed for it to convert shares at a discount at any

time, (*see* Doc. 60-1 ¶¶ 1.1, 1.2, 3.16; Doc. 60-3 ¶¶ 1.1, 1.2, 3.16), Plaintiff aggressively sold

shares of Joey New York, Inc. stock shortly after the company's default event, (*see* Doc. 207-1).

Not only did these conversions earn Plaintiff more than $300,000, (*see id.*)—considerably more

than the total amount they lent Defendants in the first place—it is also reasonable to infer they

also served to tank the price of Joey New York, Inc.'s stock, making it much harder for

Defendants to make the company profitable and repay the loans, (*see generally* Tr. 666:4-16).

*See also Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300, 313 (E.D.N.Y. 2014)

(describing forms of "revelations of predatory lending" such as "steering and targeting of loans

toward vulnerable groups," and "deceptive sales tactics, including false representations that

apparent problems or concerns would be healed later"). In other words, Plaintiff entered into the agreements at issue with its eyes more than wide open; indeed, an inference could be drawn that it knew exactly what consequence would be with regard to the Notes. Although it could be argued—and Plaintiff certainly would argue—that these terms were justified for the risk it was taking by entering into the agreements with Defendants, that does not mean it is also entitled to punitive damages. Therefore, it is clear that Plaintiff fails to provide any rationale for its claim for punitive damages.

### 5. Attorneys' Fees

In my September 22, 2019 order in this case, I granted Plaintiff's motion for summary judgment as to attorneys' fees, costs, and expenses related to its contractual claims. *EMA Fin., LLC*, 2019 WL 4600863, at *7. Plaintiff concedes that it did not set out proof for its claim for attorneys' fees at trial, (*see* Doc. 216, at 29), nor has it provided any documentation in support of its claim for attorneys' fees. In other words, I have "already determined defendant[s] [are] liable for fees, but . . . Plaintiff lacks sufficient information to render such an award on the current record." *LG Capital Funding, LLC v. 5Barz Int'l*, 307 F. Supp. 3d at 104. Plaintiff has not put forth "the amount of fees requested," "information regarding counsel's professional experience," or "contemporaneous billing records . . . [that] indicate the hourly rate billed and include information as to the work undertaken by counsel and the time spent on each task." *Id.* Absent any of this, I have "[n]one of the necessary information to determine a reasonable attorneys' fee." *Id.*

Plaintiff instead argues that it "was not required to prove its attorneys' fees at trial." (Doc. 216, at 29.) Plaintiff cites Federal Rule of Civil Procedure 54(d)(2)(B), which states that, "[u]nless a statute or court order provides otherwise," a motion for attorneys' fees must "be filed

no later than 14 days after entry of judgment." As Plaintiff acknowledges, (Doc. 216, at 29–30),

however, Rule 54 applies only to attorneys' fees that are "ancillary relief for which a party must

make a motion to the court in order to recover" after judgment, *Hanley v. Herrill Bowling Corp.*,

No. 94 Civ. 4611(RPP), 1996 WL 79324, at *2 (S.D.N.Y. Feb. 23, 1996). Rule 54 "does not

apply to fees recoverable as an element of damages pursuant to the terms of a contract."

*Compania Sud Americana de Vapores S.A. v. Glob. Terminal & Container Servs., LLC*, No. 09

Civ. 7890(PAC), 2013 WL 5754391, at *1 (S.D.N.Y. Oct. 23, 2013). When I granted Plaintiff

judgment as to costs, expenses, and attorneys' fees, I did so only with regard to those "incurred

by Plaintiff in collecting any amount under the notes or for breach of any of the agreements."

*EMA Fin., LLC*, 2019 WL 4600863, at *7. I found that Plaintiff was entitled to these fees

because the Notes state that "[i]f default is made in the payment of this Note, the Borrower shall

pay the Holder hereof costs of collection, including reasonable attorney's fees." (Doc. 60-1 ¶

4.5; Doc. 60-3 ¶ 4.5.) Therefore, the costs, expenses, and attorneys' fees related to the costs of

collection—i.e., the amounts for which I granted Plaintiff summary judgment—are not

"ancillary" to the Notes but instead recoverable based on the "terms" of the Notes themselves.

*Compania*, 2013 WL 5754391, at *1. Plaintiff was therefore required to prove the fees at trial as

an element of damages. *See Jones v. UNUM Life Ins. Co.*, 223 F.3d 130, 137 (2d Cir. 2000) (if

the "substantive law governing the action [i.e. contract law] provides for the recovery of such

fees as an element of damages to be proved at trial," claims for attorneys' fees may not be made

by motion pursuant to Rule 54); *Cumberland Farms, Inc. v. Lexico Enterprises, Inc.*, No. 10–cv–

4658 (ADS)(AKT), 2012 WL 526716, at *10 (E.D.N.Y. Feb. 16, 2012) (contractual recovery of

attorneys' fees "can only be recovered as an element of damages to be proved at trial" and Rule

54(d) is inapplicable); *Hanley,* 1996 WL 79324, at *2 ("Thus, attorneys' fees were recoverable

pursuant to 'the terms of a contract' to which Rule 54(d)(2)(B) does not apply." (citation

omitted)).  As such, I find that Rule 54 does not apply to these attorneys' fees, costs, and

expenses, and Plaintiff failed to prove and secure its award for these fees, cost, and expenses.

   However, Plaintiff also states that it is entitled to attorneys' fees for other purposes, such

as for trial, post-trial briefing, and a protective order.  (*See* Doc. 216, at 30.)  I find that these

potential attorneys' fees are ancillary to the Notes, and therefore Plaintiff may file a motion for

attorneys' fees within fourteen (14) days of judgment related to these fees alone.  Plaintiff is

warned that I will not consider any motion for fees related to costs of collection given that, as

noted *supra*, these are provided for by the Notes themselves and therefore do not qualify under

Rule 54(d)(2)(B).

### F.   *Broker-Dealer Affirmative Defense*

   On June 9, 2021, I denied Plaintiff's motion to prevent Defendants from asserting a

broker-dealer defense at trial and in their post-trial briefing on grounds that Defendants failed to

raise the defense in their answer or amended answer.  (Doc. 164.)  Plaintiff appears to invite me

to reconsider this ruling, arguing that Defendants have waived this argument.  (Doc. 216, at 46.)

I decline to do so.  As I stated in my June 9, 2021 ruling, I believe that Plaintiff cannot establish

any actual prejudice from Defendants raising this argument.  (*See* Doc. 164, at 5–6.)

   Defendants argue as an affirmative defense that the agreements between the parties at

issue here are void pursuant to section 29(b) of the Exchange Act, 15 U.S.C. § 78cc, because

Plaintiff was not registered as a broker-dealer.  (*See* Doc. 214, at 3.)  Defendants argue that

Plaintiff should be considered a "dealer" as contemplated under the statute, and therefore its

failure to register as a dealer renders these agreements unenforceable.  (*See id.* at 11–14.)

SPA-40

This argument is unconvincing in light of recent and very clear case law from this

District on this precise issue, which holds that absent language in the agreements requiring

Plaintiff to register as a broker-dealer, this affirmative defense cannot succeed.  *See Ema Fin.,*

*LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020) ("Vystar contends that in entering and

performing the contracts—in particular, the act of converting shares at a below-market rate and

subsequently selling the shares—Ema acted as a broker-dealer and because Ema is not registered

as a broker-dealer, Ema has violated the Exchange Act.  The flaw in Vystar's argument, however,

is that it does not identify a provision in the contracts that obligates Ema to act as a broker-

dealer."); *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, No. 17 Civ. 4006 (RJS), 2018

WL 6547160, at *15 (S.D.N.Y. Sept. 28, 2018) ("Although it is an open question on this record

whether LG should have registered as a 'dealer' with the SEC—and though LG may face

substantial exposure in a suit by the SEC if it should have registered but did not—the Court

concludes that even if LG should have registered, nothing in the Note or the SPA indicates that

those contracts 'could not have been legally performed' because LG failed to do so."); *Yi v. GTV*

*Media Grp. Inc.*, No. 21 CIV. 2669 (VM), 2021 WL 2535528, at *5 (S.D.N.Y. June 18, 2021)

(in order for a contract to be unlawful "based on the defendant's status as an unregistered broker-

dealer in violation of the Exchange Act, the contract . . . must require the defendant to register as

a broker-dealer.").  Put simply, to succeed on this affirmative defense "[i]n this District," it is

"essential" to identify a provision in the agreement requiring Plaintiff to register as a broker-

dealer.  *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020).

        Unable to identify a provision in any of the agreements between the parties that requires

Plaintiff to register as a broker-dealer, Defendants instead argue that I should ignore the clearly

established law in this District and adopt the approach taken by other circuits or district courts in

this Circuit.  However, given that there have been at least four decisions issued in this District in

fewer than three years on this very issue, I would need an extraordinary reason to depart from the

law of this District, and I find none here.  Therefore, I reject Defendants' broker-dealer

affirmative defense.

### G. *Ancillary Issues*

Finally, there are some miscellaneous issues that I must decide before entering judgment.

First, Plaintiff asks that I decline to consider any testimony from Defendants that was based on

documents that Defendants failed to produce, (*see* Doc. 216, at 15), including testimony about

personal loans Defendants made to the corporate entitles, (*see id.* at 20–21).  This weak argument

suggests that because I found that Defendants could not introduce several exhibits on the eve of

trial, any testimony on issues related those documents—including testimony related to Plaintiff's

loans to the company—should be inadmissible.  This is entirely without merit.  The Federal

Rules of Evidence allow the admission of fact testimony so long as the witness has personal

knowledge.  *See New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 423, 425

(S.D.N.Y. 2000) (citing Fed. R. Evid. 602).  Absent an argument that this testimony was

improper under the Best Evidence Rule, *see* Fed. R. Evid. 1002—an argument that Plaintiff does

not make and has no application here—there is no reason why a witness cannot testify as to

information within their personal knowledge, even if documentation related to that testimony is

not in the record.  Plaintiff alternatively argues that I should not credit Defendants' testimony

about their personal loans to the company because that testimony was "conclusory and self-

serving" and unsupported by documentary evidence.  (*See* Doc. 216, at 17–18.)  This argument,

which appears to go to the weight of the evidence as opposed to its admissibility, is also

misguided.  Defendants gave consistent testimony, under oath and penalty of perjury, as it

SPA-42

pertained to their personal loans to the company and their finances.  To an extent that testimony

was corroborated by certain public filings that referenced the existence of promissory notes to

Roer and Joey Chancis.  (Doc. 209-1, at 9.)  Having said that, I do agree with Plaintiff that this

testimony should be accorded less weight without additional supporting documentary evidence,

and I have factored that into my analysis.  However, Plaintiff does not account for the fact that it

has the burden to prove its affirmative case, and it failed to produce more than a shred of

evidence to suggest that the Individual Defendants acted in an effort to enrich themselves at

Plaintiff's expense.  Regardless, Plaintiff specifically asked me to ignore this evidence with

regard to its constructive fraudulent conveyance claim, (*see id.* at 17); I agree that this evidence

is not relevant to that claim and granted judgment to Plaintiff as to liability on this claim.

Relatedly, Plaintiff asks that I decline to consider the testimony of Joey Chancis because

of her purported reliance on notes during her testimony.  (*See id.* at 44.)  Plaintiff claims that

Joey Chancis referred to notes related to the documents that I excluded from trial and which she

failed to turn over to Plaintiff.  The authority that Plaintiff relies on, *Lava Trading, Inc. v.*

*Hartford Fire Insurance. Co.*, No. 03 Civ.7037 PKC MHD, 2005 WL 459267 (S.D.N.Y. Feb. 24,

2005), concerns materials that a party tried to introduce into the record as exhibits, not materials

that a party merely used as notes.  *Id.* at *15.  Given that I am "obligated to afford a special

solicitude to pro se litigants," who "deserve more lenient treatment than those represented by

counsel" because they "generally lack[] both legal training and experience," *Tracy v.*

*Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), I find that Joey Chancis's occasional reliance on

notes does not warrant the highly prejudicial step of striking her testimony.  Further, I add that

Joey Chancis used these notes only for the purpose of trying to refresh her own memory with

regard to certain charges or withdrawals that she made on corporate accounts.  (*See* Tr. 395:6-

42

396:24.)  This testimony was mostly useful for Plaintiff, which it cited itself in support of its

arguments for fraudulent conveyance and piercing the corporate veil.  Thus, I find that any

misconduct by Joey Chancis in relying on these notes was not just in good faith, but harmless.

Second, Plaintiff requests that I draw an adverse inference based on Defendants' failure

to produce documents related to their transfers.  (*See* Doc. 216, at 18).  An adverse inference is a

"severe sanction[]."  *De Vos v. Lee*, No. 07-CV-804 (JBW), 2008 WL 2946010, at *2 (E.D.N.Y.

July 29, 2008).  Adverse inferences are thus disfavored when parties have "pro se status," lack

"substantial experience litigating civil suits," and were unaware "that Plaintiff[] would file a

sanctions motion against [them] if [they] failed to comply with their discovery obligations."  *City

of Almaty, Kaz. V. Ablyazov*, No. 1:15-CV-05345 (AJN) (KHP), 2019 WL 3281326, at *7

(S.D.N.Y. July 3, 2019).  Plaintiff concedes, (*see* Doc. 216, at 19), that in order to secure an

adverse inference against Defendants, it is required to show "that the [Defendants] that failed to

timely produce the evidence had a culpable state of mind," *Scantibodies Laboratory, Inc. v.

Church & Dwight Co., Inc.*, No. 14cv2275 (JGK) (DF), 2016 WL 11271874, at *17 (S.D.N.Y.

Nov. 4, 2016) (internal quotation marks omitted), *report and recommendation adopted*, 2017

WL 605303 (S.D.N.Y. Feb. 15, 2017).  Plaintiff does not even try to argue that any of the

Individual Defendants had a culpable state of mind with regard to their non-disclosure of

documents.  As such, particularly given Defendants' pro se status, an adverse inference would be

inappropriate here.

Third, Plaintiff asks that I determine that it was improper to permit Defendants to issue

subpoenas during trial.  (*See* Doc. 216, at 33).  As I explained at trial, I believe that this trial

subpoena was necessary because no discovery was taken of Roer after he was added to the case,

and therefore he had no reason or opportunity to produce documentation that would substantiate

SPA-44

his testimony about his financial accounting.  (*See* Tr. 300:16-305:18.)  Nevertheless, as Plaintiff

will note, the only document produced in response to that trial subpoena on which I relied in this

Opinion & Order was a promissory note indicating that Roer is owed $1.5 million from Joey

New York, Inc. based on personal investments he made in the company.  (Tr. 777:5-7, 782:21-

783:18.)  This promissory note is entirely consistent with unrebutted trial testimony that Roer

invested about $1.5 million of his personal money into the company, and the public filings.  (Tr.

204:12-15, 776:10-15; Doc. 209-1, at 9.)  As such, even if this trial subpoena were improper, any

error was harmless because I barely relied on any materials produced in response to that

subpoena.  My decision in this Opinion & Order is supported even without considering any

materials produced in response to the trial subpoena at issue.

> **IV.    Conclusion**

Judgment is GRANTED in favor of Plaintiff as to breach of contract, breach of guaranty,

and constructive fraudulent conveyance.

Judgment is DENIED as to fraudulent inducement and actual fraudulent conveyance, and

Plaintiff is not permitted to pierce the corporate veil.

Plaintiff is awarded $151,418.50 for its contractual claims, plus prejudgment interest

accruing at 24% per year from July 26, 2017.  The Clerk's office is directed to enter judgment to

this effect.

Plaintiff's requests for specific performance and punitive damages are DENIED.

To the extent Plaintiff seeks to file a motion for costs, expenses, and attorneys' fees, it

must do so within fourteen (14) days of entry of judgment.  Plaintiff is not permitted to seek

costs, expenses, or attorneys' fees related to the costs of collection.

The Clerk of Court is directed to terminate any open motions, enter judgment in

SPA-45

accordance with this Opinion & Order, mail a copy of this Opinion & Order to pro se

Defendants, and close this case.

SO ORDERED.

Dated: February 1, 2022
        New York, New York

Vernon S. Broderick
United States District Judge

SPA-46

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
EMA FINANCIAL, LLC,

                              Plaintiff,                    17 **CIVIL** 9706 (VSB)

              -against-                                    **JUDGMENT**

JOEY NEW YORK INC., et al.,

                              Defendants.
-----------------------------------------------------------X

     It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated February 1, 2022, Judgment is GRANTED in favor

of Plaintiff as to breach of contract, breach of guaranty, and constructive fraudulent conveyance.

     Judgment is DENIED as to fraudulent inducement and actual fraudulent conveyance,

and Plaintiff is not permitted to pierce the corporate veil.

     Plaintiff is awarded $151,418.50 for its contractual claims, plus prejudgment interest

accruing at 24% per year from July 26, 2017.

     Plaintiff's requests for specific performance and punitive damages are DENIED.

     To the extent Plaintiff seeks to file a motion for costs, expenses, and attorneys' fees, it

must do so within fourteen (14) days of entry of judgment. Plaintiff is not permitted to seek

costs, expenses, or attorneys' fees related to the costs of collection; accordingly, this case is

closed.

**Dated:** New York, New York
              February 2, 2022

                                                  **RUBY J. KRAJICK**
                                        _____
                                                  **Clerk of Court**

                              **BY:** _____
                                                  **Deputy Clerk**