# 22-274(L)

## 22-402(XAP)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖ ◆ ◆ ❖

EMA FINANCIAL, LLC,

*Plaintiff-Counter-Defendant-Counter-Claimant-Appellee-Cross-Appellant,*

—against—

JOEY CHANCIS, a Citizen of Florida, RICHARD ROER, a Citizen of Florida,

*Defendants-Counter-Claimants-Counter-Defendants-Appellants-Cross-Appellees,*

RAR BEAUTY, LLC, a Florida Limited Liability Company, LABB, INC., a Florida Corporation, REFLEX PRODUCTIONS, INC., a Florida Corporation, RICHARD CHANCIS, a Citizen of Florida, JOEY NEW YORK, INC., a Nevada Corporation,

*Defendants-Counter-Claimants-Counter-Defendants.*

─────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-COUNTER-DEFENDANT-COUNTER-CLAIMANT-APPELLEE-CROSS-APPELLANT

JEFFREY FLEISCHMANN
LAW OFFICE OF
  JEFFREY FLEISCHMANN, P.C.
150 Broadway, Suite 900
New York, New York 10038
(646) 657-9623

*Attorneys for Plaintiff-Counter-Defendant-Counter-Claimant-Appellee-Cross-Appellant*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, EMA discloses and certifies that it is a private held limited liability company, that no publicly held corporation owns 10% or more of its stock, and that it has no affiliates and/or subsidiaries that are publicly held.

# **TABLE OF CONTENTS**

PAGE

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ..................... i

TABLE OF AUTHORITIES ..................................................... v

JURISDICTIONAL STATEMENT ............................................. 2

SUMMARY OF ARGUMENT .................................................. 3

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................... 10

STATEMENT OF STANDARD OF REVIEW ................................ 11

STATEMENT OF FACTS ....................................................... 12

      A. The Parties ........................................................ 12

      B. The Convertible Notes ............................................ 13

      C. The Breach of Notes............................................... 16

      D. EMA Commences this Action .................................... 16

      E. The District Court Grants Summary Judgment to EMA on Liability ............................................................ 17

      F. EMA Amends its Complaint...................................... 18

      G. The Default Judgment............................................. 18

      H. The Motion in Limine............................................. 19

      I. The Trial............................................................ 20

      J. The Judgment ...................................................... 20

      K. The Appeal and Cross-Appeal................................... 22

ARGUMENT ................................................................... 23

PAGE

I.    THE DISTRICT COURT SHOULD NOT HAVE ALLOWED CHANCIS AND ROER TO RAISE A RESCISSION DEFENSE AT TRIAL ............................... 23

II.    THE DISTRICT COURT CORRECTLY DENIED CHANCIS AND ROER'S RESCISSION DEFENSE .............. 24

A. Defendants did not establish that EMA violated Section 15(a) ................................................................. 26

i.    Chancis and Roer did not establish that EMA is a broker or dealer .............................................. 27

ii.    Chancis and Roer did not establish that they are in contractual privity with EMA ............................ 31

iii.    Even if the Notes Violated Section 15, Chancis and Roer did not establish that they are innocent parties or individuals who Section 29 is designed to protect ........................................................ 31

iv.    The conversions were not unlawful because the Notes do not require EMA to act as a broker-dealer ..... 32

III.    CHANCIS AND ROER ARE BARRED FROM RAISING A USURY DEFENSE ................................................. 34

IV.    THE DISTRICT COURT ERRED IN FINDING THAT EMA HAD FAILED TO ESTABLISH DAMAGES FOR DEFENDANT'S FRAUDULENT CONVEYANCES ............. 35

V.    THE DISTRICT COURT ERRED IN NOT AWARDING JUDGMENT FOR ACTUAL FRAUDULENT CONVEYANCE UNDER DCL § 276 ............................. 36

VI.    THE DISTRICT COURT ERRED IN DECLINING TO PIERCE THE CORPORATE VEIL ................................. 40

VII.    THE DISTRICT COURT ERRED IN NOT AWARDING BREACH OF CONTRACT ATTORNEY'S FEES ................ 44

PAGE

VIII.  THE DISTRICT COURT IMPROPERLY CALCULATED
       EMA'S BREACH OF CONTRACT DAMAGES .................. 45

CONCLUSION .................................................................. 46

# <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**Cases**

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
  37 N.Y.3d 320 (2021) ....................................................... 6

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
  962 F.3d 86 (2d Cir. 2020) .................................................. 3

*Aftokinito Props. v. Millbrook Ventures, LLC*,
  2010 D.N.H. 144 (D.N.H. 2010) ...................................... 25, 26

*Barton Group, Inc. v. NCR Corp.*,
  796 F. Supp. 2d 473 (S.D.N.Y. 2011) .................................... 23

*Berckeley Inv. Group, Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006) ......................................... 25, 26

*Blue Citi LLC. v. 5Barz Int'l Inc.*,
  802 F. App'x 28 (2d Cir. 2020) ........................................... 34

*Bode & Grenier, LLP v. Knight*,
  808 F.3d 852, 420 U.S. App. D.C. 313 (D.C. Cir. 2015) ............... 23

*Burberry Ltd. v. RTC Fashion Inc.*,
  2014 N.Y. Slip Op 31232[U] (N.Y. Co. 2014) .......................... 43

*Cadle Co. v. Newhouse*,
  2002 U.S. Dist. LEXIS 15173 (S.D.N.Y. Aug. 15, 2002) .............. 37

*Capital Asset Research Corp. v. Finnegan*,
  216 F.3d 1268 (11th Cir. 2000) .......................................... 44

*Chapel Invs., Inc. v. Cherubim Interests, Inc.*,
  177 F.Supp. 3d 981 (N.D. Tex. 2016) .................................... 28

*D'Mel & Assoc. v. Athco, Inc.*,
  105 AD3d 451 (1st Dep't 2013)........................................... 41

*Drasner v. Thomson McKinnon Sec, Inc.*,
  433 F. Supp. 485 (S.D.N.Y. 1977)................................... 26, 31

*EMA Fin., LLC v. Joey N.Y., Inc.*,
  2019 WL 4600863 (S.D.N.Y. Sept. 22, 2019) ........................... 2

PAGE(S)

*EMA Fin., LLC v. Joey N.Y., Inc.*,
  2022 WL 292920 (S.D.N.Y. Feb. 1, 2022) .................................. 2

*Evans v. Ottimo*,
  469 F.3d 278 (2d Cir. 2006) ............................................... 34

*Evans v. Syracuse City Sch. Dist.*,
  704 F.2d 44 (2d Cir. 1983) ............................................... 23

*Fequiere v. Tribeca Lending*,
  2016 U.S. Dist LEXIS 31783 (E.D.N.Y. Mar. 11, 2016) ............... 34

*Found. Ventures, LLC v. F2G, Ltd.*,
  2010 U.S. Dist. LEXIS 81293 (S.D.N.Y. Aug. 11, 2010) ...... 26, 31, 32

*GFL Advantage Fund, Ltd. v. Colkitt*,
  272 F.3d 189 (3d Cir. 2001) ............................................... 33

*Goodman v. Shearson Lehman Bros., Inc.*,
  698 F.Supp. 1078 (S.D.N.Y. 1988) ....................................... 24

*In re Gordon Wesley Sodorff, Jr.*,
  50 S.E.C. 1249, 1992 WL 224082 (Sept. 2, 1992) ...................... 28

*Gross v. Silverberg*,
  2011 U.S. Dist LEXIS 167330 (S.D. Fla Nov. 8, 2011) ................ 31

*Lehman Bros. Holdings, Inc. v. Gateway Funding Diversified Mtge.
Servs., L.P.*,
  2015 U.S. Dist LEXIS 143532 (E.D. Pa Oct. 22, 2015) ................ 44

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.*,
  2018 U.S. Dist LEXIS 202540 (S.D.N.Y. Sep. 28, 2018) .............. 32

*Machado v. A. Canterpass, LLC*,
  115 A.D.3d 652 (2d Dep't 2014).................................... 37, 39

*Mar. Midland Bank v. Murkoff*,
  120 A.D.2d 122 (2d Dep't 1986).......................................... 37

*Massachusetts Fin. Servs., Inc. v. Sec. Inv. Protection Corp.*,
  411 F.Supp. 411 (D Mass 1976)........................................... 27

*Medicine Shoppe Intl. v. Mitsopoulos*,
  2005 U.S. Dist LEXIS 62545 (E.D.N.Y. Dec. 28, 2005) ............... 31

PAGE(S)

*Miller v. Falco*,
170 A.D.3d 707 (2d Dep't 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Morris v. State Dept. of Taxation & Fin.*,
82 N.Y.2d 135 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
469 F.2d 1166 (8th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 31

*Palmerone v. Staples*,
195 A.D.3d 736 (2d Dept 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*,
794 F.Supp. 1265 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Royal Air Props., Inc. v. Smith*,
312 F.2d 210 (9th Cir.1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*SEC v. Premier Links, Inc.*,
2017 U.S. Dist LEXIS 151170 (E.D.N.Y. Sep. 14, 2017) . . . . . . . . . . . . . . 27

*Serzysko v. Chase Manhattan Bank*,
290 F.Supp. 74 (S.D.N.Y. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Shisgal v. Brown*,
21 A.D.3d 845 (1st Dept 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Slomiak v. Bear Stearns & Co.*,
597 F.Supp. 676 (S.D.N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Carlin*,
948 F.Supp. 271 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Vangas v. Montefiore Med. Ctr.*,
823 F.3d 174 (2d Cir.2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*WB Music Corp. v. RTV Commun. Group, Inc.*,
445 F.3d 538 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Weintraub v. Bd. of Educ.*,
593 F.3d 196 (2d Cir.2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re WorldCom, Inc.*,
401 BR 637 (Bankr S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

vii

PAGE(S)

## Statutes

15 U.S.C. §§ 78a et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 33

15 U.S.C. § 78c (a)(4), Section 3(a)(4) of the Exchange Act of 1934 . 27, 28

15 U.S.C. § 78c (a)(5), Section 3(a)(5) of the Exchange Act of 1934 . . . . . . 28

15 U.S.C. § 78c(a)(5)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

15 U.S.C. § 78cc, Section 29(b) of the Exchange Act of 1934 . . . . . . . . . . . . . . 3

15 U.S.C. § 78cc(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

15 U.S.C. § 78cc(b), Section 29 of the Exchange Act of 1934 . . . . . . . . . 26, 33

15 U.S.C. § 78cc(b), Section 29(b) of the Exchange Act of 1934 . . . . . . . . . . . 25

15 U.S.C. § 78o(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

15 U.S.C. § 78o(a), Section 15(a) of the Exchange
    Act of 1934. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 26, 27

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Debtor and Creditor Law § 276. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Debtor and Creditor Law § 276-a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 40

## Rules

Fed. R. Civ. P. 54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Fed. R. Civ. P. 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Rule 3a5-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## Other Authorities

*Burton Securities*, SEC No-Action Letter, 1977 SEC No-Act. LEXIS
    2871, 1977 WL 10680 (Dec. 5, 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Guide to Broker-Dealer Registration (April 2008),
    http://www.sec.gov/divisions/marketreg/bdguide.htm#II. . . . . . . . . . 29, 30

*National Council of Savings Institutions*, SEC No-Action Letter,
1986 SEC No-Act. LEXIS 2609, 1986 WL 67129 (July 27, 1986). . . . . . . . . . 29

Plaintiff-Appellee/Cross-Appellant EMA Financial LLC ("EMA") hereby submits the following brief in opposition to Defendant-Appellants/Cross-Appellees Joey Chancis ("Chancis") and Richard Roer's ("Roer" and together "Chancis and Roer") appeal, and in support of EMA's cross-appeal, from the Opinion and Order of the United States District Court, Southern District of New York, the Honorable Vernon S. Broderick (the "District Court") dated February 1, 2022, which granted in part and denied in part, judgment after trial to EMA; and (2) from those portions of the judgment entered by the District Court on February 2, 2022 which declined to grant EMA's requested relief; and (3) in support of EMA's cross-appeal from those parts of the June 9, 2021 Opinion and Order which denied EMA's motion in limine seeking to preclude defendants from raising a defense that EMA failed to register as a broker-dealer under the federal securities laws because that defense was waived as defendants never raised it in their amended answer and the case was on the eve of trial.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291. The District Court granted summary judgment against the corporate defendants and Joey Chancis for breach of contract, breach of guaranty, and attorney's fees on September 22, 2019, *EMA Fin., LLC v. Joey N.Y., Inc.*, 2019 WL 4600863 (S.D.N.Y. Sept. 22, 2019). On June 9, 2021, the District Court issued an Opinion and Order which denied EMA's motion in limine seeking to preclude defendants from raising a defense that EMA failed to register as a broker-dealer under the federal securities laws because that defense was waived as defendants never raised it in their amended answer and the case was on the eve of trial. (A-604). On February 1, 2021, after a bench trial, the District Court issued an Opinion and Order that found the newly-named individual defendants, including Roer, also liable for breach of contract and awarded damages to EMA, and found the individual defendants liable for constructive fraudulent conveyance, but otherwise denied EMA's claims. *EMA Fin., LLC v. Joey N.Y., Inc.*, 2022 WL 292920 (S.D.N.Y. Feb. 1, 2022). The district court entered judgment on February 2, 2022. (SA-1591). Chancis and Roer filed a notice of appeal on February 9, 2022. (A-1085). EMA filed a notice of cross-appeal on February 25, 2022. (SA-1642).

## SUMMARY OF ARGUMENT

Chancis and Roer, two of the defendants in this action, brought this appeal to review two limited and discrete issues: (1) whether the District Court erred in rejecting their rescission claim pursuant to 29(b) of the Exchange Act, 15 U.S.C. § 78cc, and (2) whether the District Court erred in rejecting their usury claim. The corporate defendants defaulted in this action and did not appeal. (A-502; SA-1575). The other individual defendant, Richard Chancis, likewise did not appeal.

In this action, EMA sought to enforce two convertible notes it issued to Joey New York Inc. ("Joey NY"). (SA-1). The Notes do note bear ordinary interest, only default interest. (A-75; A-119). Initially, EMA, inter alia, brought claims against Joey NY, the corporate defendants who had guaranteed the convertible notes, and Chancis, the owner of Joey NY, for breach of contract, breach of guaranty, contractual attorney's fees and fraud. (SA-1).

In opposing summary judgment, the corporate defendants and Chancis argued that, although the notes did not bear ordinary interest at all, the convertible notes were usurious, but did not bring an affirmative rescission claim or raise a rescission defense. (A-195). The District Court rejected their usury defense based on long-established case law holding that such convertible notes are not usurious,[1]

---

[1] *Adar Bays, LLC v. GeneSYS ID, Inc.*, 962 F.3d 86, 91 (2d Cir. 2020) ("The district courts of this Circuit have generally concluded that a conversion option at a discounted rate does not violate usury laws."); *Id.* at 90 ("The New York courts to

and awarded summary judgment against the corporate defendants and Chancis on
September 22, 2019. (A-296).

Thereafter, EMA amended its complaint to assert additional claims against
the corporate defendants and Chancis, and to add two additional individual
defendants, Roer, Chancis's father, and Richard Chancis, her ex-husband, all of
whom owned or otherwise served as directors or officers for Joey NY. (A-313).
The new claims included claims for fraudulent conveyance and for piercing the
corporate veil. (A-313). The amended answer[2] filed by Defendants contained no
affirmative defenses, except one statement that "As additional defenses,
Defendants re-allege, reassert, and restate, where applicable, the affirmative
defenses as set forth in Defendants' Answer to Plaintiffs' Complaint, to each and
every cause of action asserted in the Amended Complaint to which such defense
may be applicable." (SA-21).

After the close of discovery and just a few days before the initially
scheduled trial date of December 7, 2020, counsel for defendants sought to
withdraw from the representation, and her motion was granted by the District

---

have considered this issue have generally rejected the view that a conversion
option with a discounted rate should be treated as interest.").

[2] Although one of Defendants' arguments on appeal is based upon an affirmative
defense of usury, Defendants repeatedly cite to a version of the answer to the
amended complaint that was superseded by a later amended answer. The later
amended answer does not appear to be include in Defendants' appendix. Notably,
the later answer does not contain a specific usury defense. (SA-21)

4

Court five days before the scheduled trial, on December 2, 2020. (A-471).
Thereafter, the trial was adjourned as a result, and the corporate defendants were
held in default and a default judgment was entered against them on May 4, 2021.
(A-502).

Following the withdrawal of their counsel on the eve of trial, for the first
time, Defendants attempted to raise the rescission defense. (SA-485). As a result,
prior to trial, EMA filed a motion in limine seeking to bar Chancis and Roer from
raising a rescission defense, namely their claim that EMA was required to register
as a "broker-dealer" under 15 U.S.C. § 78o(a), and that its failure to do so entitled
Chancis and Roer to rescind EMA's contract with Joey NY under 15 U.S.C. §
78cc(b). (SA-670). Summary judgment on breach of contract and breach of
guaranty had already been awarded, the corporate defendants (the only party that
had standing to raise this defense) who entered the contract had all defaulted, and
this defense had never been raised or asserted by the Corporate Defendants, or in
Chancis and Roer's answer or as a counter-claim at any point during discovery. On
June 9, 2021, the District Court improperly denied that part of EMA's motion in
limine and allowed Chancis and Roer to assert a rescission defense at trial even
though Chancis had already lost on summary judgment, had no standing to raise
this defense, and even though discovery had concluded, and even though Chancis
and Roer never sought leave to amend their answer, and never raised this defense

as a counter-claim. EMA thus cross-appeals from the District Court's denial of the motion in limine. (A-604).

After trial, the District Court, however, properly rejected Chancis and Roer's rescission defense. (SA-1546). Chancis and Roer failed to establish that they had standing to seek to rescind contracts between the defaulted entity, Joey NY and EMA. Furthermore, they did not establish that EMA was a broker-dealer required to register under 15 U.S.C. § 78o(a). They also did not establish themselves as "innocent parties" entitled to rescission under 15 U.S.C. § 78cc(b). Finally, they did not establish that the convertible notes themselves required any registration even assuming for the sake of argument EMA was a broker-dealer within the meaning of 15 U.S.C. § 78o(a).

With respect to the other prong of their appeal, Chancis and Roer now argue that they may raise a usury defense following the Court of Appeals decision in *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 338 (2021), which held that convertible notes can be usurious and the issue of whether they are usurious is one of fact. *Id.* ("[T]he mere fact that a fixed-price future conversion option may be exercised at a future usurious rate does not render the loan usurious on its face . . . usurious intent in such situations is a question of fact, not a matter of law. However, neither does the contingent nature of the option's exercise remove the loan from the scrutiny of the usury law.").

6

Roer did not assert any usury defense in his answer or at trial and thus waived that defense. (While Chancis did raise that defense in opposition to summary judgment, it was not specifically raised in the amended answer.) (SA-21). Moreover, the corporate defendants default judgment bars both Chancis and Roer from asserting this defense since they controlled the corporate defendants and willfully caused them to default. Additionally, Chancis could have raised this change of law argument (which occurred prior to the District Court's Trial Decision and entry of Judgment) as a motion under Fed. R. Civ. P. 60, yet, did not do so.

EMA cross-appeals from the District Court's denial of EMA's claim for damages for constructive fraudulent conveyance under New York's Debtor-Creditor Law. The District Court incorrectly found that although EMA proven Defendants' constructive fraudulent conveyance, EMA had failed to identify which transactions were fraudulent even though EMA presented a detailed list of these transactions. (SA-1546). But EMA submitted in excess of 100 specific fraudulent conveyances, including specific dates, amounts, and account numbers in both its pretrial and posttrial filings and the District Court logically could not have found a constructive "conveyance" had EMA not identified the actual conveyances. (SA-524; A-915;926-1002).

The District Court also incorrectly denied EMA's claim for intentional fraudulent conveyance under DCL § 276. (SA-1546). EMA established each of the badges of fraud and the evidence overwhelmingly supported EMA's claim. (SA-1546). The District Court incorrectly found that EMA had failed to prove actual intent because it relied only on the badges of fraud to prove intent—the law is clear, however, that a party may prove intent through the "badges of fraud." Furthermore, the Court found that "the Individual Defendants confirmed that these transactions were not for anything of value or to discharge any antecedent debts of Joey New York, Inc," (SPA 18), and that their claims otherwise "fly in the face of the Individual Defendants' own testimony that they have not been repaid for any of their personal loans to, or investments in, the corporate entities." (SPA 17-18). Because EMA had established its DCL §276 claim, it was also entitled to attorney's fees under DCL § 276-a.

The District Court incorrectly calculated breach of contract damages because it failed to account for the market value of the shares on the dates when EMA attempted to convert those shares and subtract the contract price—the price at which the plaintiff is entitled to convert shares under the Note—from the market price of the shares on the date of the breach. (SA-1546). The District Court also should have allowed EMA to submit its contractual attorney's fees after trial, as liability for these fee's had already been adjudicated on summary judgment against

Chancis (and the corporate defendants on default), and the fees were being incurred on an ongoing basis during the trial. EMA could not present its fees during the trial because those fees were actively being incurred during the trial and it did not make sense to make EMA submit its fees twice—once during trial and once after, and the District Court erred in declining to award attorney's fees on this basis.

Finally, in the event this Court reverses the District Court's imposition of contract liability on Chancis and Roer (which neither has appealed), EMA appeals from the District Court's decision declining to pierce the corporate veil. The District Court acknowledged that "Plaintiff clearly has satisfied the first element of the piercing the corporate veil analysis." (SPA at 24). Indeed, it found that Joey NY "was inadequately capitalized," and that "this is almost a textbook case of corporate entities disregarding corporate formalities and intermingling funds;" defendants used corporate funds to "pay off personal credit cards." (*Id.* at 24-25). Defendants "freely mixed personal and corporate monies on a near-daily basis[,]" and "made, at a minimum, hundreds of withdrawals, transfers, and other financial transactions from their corporate accounts for which they barely provided documentation." (*Id.* at 25). Furthermore, the District Court expressly found that these defendants made fraudulent conveyances from an insolvent entity and thereby impaired and impeded EMA's ability to collect the debt. (SA-1547; SA-

9

1563-1564). This was clearly a wrong and an injustice that warranted piercing the corporate veil and the District Court erred in declining to pierce the corporate veil.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did the District Court correctly deny Appellants/cross-appellees' claim for rescission pursuant to 15 U.S.C. § 78cc(b)?

Yes.

2. Did the District Court correctly deny Appellants/cross-appellee's usury claim?

Yes.

3. Did the District Court correctly allow Joey Chancis and Richard Roer to raise a rescission defense at trial?

No.

4. Did the District Court correctly deny EMA's constructive fraudulent conveyance claims?

No.

4. Did the District Court correctly deny EMA's actual and intentional fraudulent conveyance claims?

No.

5. Did the District Court correctly deny EMA's piercing the corporate veil claim?

No.

6. Did the District Court correctly deny EMA's claim for contractual attorney's fees and DCL § 276-a attorney's fees?

No.

7. Did the District Court correctly calculate breach of contract damages?

No.

## STATEMENT OF STANDARD OF REVIEW

Issue No. 1: Following a bench trial, questions of law are reviewed <u>de novo</u> and factual determinations are reviewed for clear error. *Vangas v. Montefiore Med. Ctr.*, 823 F3d 174, 180 (2d Cir 2016).

Issue No. 2: Following a bench trial, questions of law are reviewed <u>de novo</u> and factual determinations are reviewed for clear error. *Vangas*, 823 F3d at 180. A decision on summary judgment is reviewed de novo. *Weintraub v. Bd. of Educ.*, 593 F3d 196, 200 (2d Cir 2010).

Issue No. 3: Following a bench trial, questions of law are reviewed <u>de novo</u> and factual determinations are reviewed for clear error. *Vangas*, 823 F3d at 180.

Issue No. 4: Following a bench trial, questions of law are reviewed <u>de novo</u> and factual determinations are reviewed for clear error. *Vangas*, 823 F3d at 180.

Issue No. 5: Following a bench trial, questions of law are reviewed de novo and factual determinations are reviewed for clear error. *Id.*

Issue No. 6: Following a bench trial, questions of law are reviewed de novo and factual determinations are reviewed for clear error. *Id.*

Issue No. 7: Following a bench trial, questions of law are reviewed de novo and factual determinations are reviewed for clear error. *Id.*

## STATEMENT OF FACTS

**A. The Parties**

Joey NY, a beauty product company, is a Nevada corporation with its principal place of business in Florida. (A-372). It was founded by Chancis in 1993 with her mother, Arlyne Roer ("Arlyne"). (SA-1549). It went public in or around 2014, and thereafter focused on providing Botox and other injectable treatments. (SA-1550).

Defendant RAR Beauty LLC ("RAR"), also a beauty product company, is a Florida corporation located in Florida that was founded by Chancis's father, Roer and her mother, Arlyne. (SA-1550). Defendant Reflex Productions, Inc. ("Reflex"), a Florida corporation was a division of RAR. (SA-1550).

In or about 2016, Joey NY acquired RAR and another company, Labb Inc., a Florida corporation. (SA-1551).

Richard Chancis, Chancis's ex-husband, began working for Joey NY in

2014 as a consultant, with a core role of raising capital for the corporate entities in

order to acquire beauty companies and open Botox labs, specifically in the state of

Florida. (SA-1550). As part of this expansion effort, Richard Chancis sought to

raise additional capital. (SA-1567).

EMA is a Delaware corporation with its principal place of business in New

York. (A-372). EMA lends money to microcap companies. (A-523).

In or about 2017, Richard Chancis sought funding from EMA to expand

Joey NY's Florida stores. (SA-1552).

### B. The Convertible Notes

On February 1, 2017, after arm's-length negotiations, Joey NY and

EMA executed a Securities Purchase Agreement, (the "First SPA"). (A-64; A-296;

SA-1552). The First SPA provided for the purchase of a Convertible Redeemable

Promissory Note from Joey NY to EMA, in the amount of $90,000.00 (the "First

Note"). (A-64; A-296; SA-1552). The First SPA also contained an unconditional

and unlimited guaranty, whereby RAR, LABB and Reflex agreed to guaranty

the payment and performance of the First Note (the "First Guaranty") (A-65).

On May 3, 2017, Joey NY and EMA executed an additional Securities

Purchase Agreement (the "Second SPA"). (A-65). The Second SPA provided for

the purchase of a Convertible Redeemable Promissory Note to EMA in the amount

13

of $151,600.00 (the "Second Note"). (A-65). The Second SPA also contained an

unconditional and unlimited guaranty, whereby RAR, LABB, and Reflex agreed to

guaranty the payment and performance of the Second Note (the "Second

Guaranty"). (A-66).

The First Note had a maturity date of February 1, 2018, with no ordinary

interest, and default interest at 24% per annum. The Second Note had a maturity

date of May 3, 2018, with no ordinary interest and default interest at 24% per

annum.

Section 1.1 of the First Note and the Second Note, (together, the

"Notes"), each provided a conversion right:

> Conversion Right. The Holder shall have the right, in its sole and
> absolute discretion, at any time from time to time, to convert all or
> any part of the outstanding amount due under this Note into fully paid
> and non-assessable shares of Common Stock, as such Common Stock
> exists on the Issue Date, or any shares of capital stock or other
> securities of the Borrower into which such Common Stock shall
> hereafter be changed or reclassified at the conversion price (the
> "Conversion Price") determined as provided herein (a "Conversion").

(A-66, Notes §1.1)

The Conversion Price was set forth in Section 1.2 of the Notes, and, with a

few limitations was defined as the "lower of: (i) the closing sale price of

the Common Stock on the Principal Market on the Trading Day immediately

preceding the Closing Date, and (ii) 65% of the average of the lowest two (2) sale

prices for the Common Stock on the Principal Market during the twenty (20)

consecutive Trading Days immediately preceding the Conversion Date or the closing bid price, whichever is lower . . . ." (A-66).

EMA was entitled to convert the Notes into shares of Joey NY stock by sending Joey NY a notice of conversion. (A-67, Notes § 1.4). Joey NY was required to hold a reserve of shares equal to five times the number of shares issuable upon conversion of each Note, and to issue irrevocable instructions to its Transfer Agent setting these shares aside. (A-66).

Section 5 of the First SPA and the Second SPA, (together, the "SPAs") required Joey NY to "issue irrevocable instructions to its transfer agents to issue certifications" in EMA's name, upon receipt of a notice of conversion from EMA. (A-66). Section 1.4(d) required Joey NY to absolutely and unconditionally deliver the stock within three business days of receipt of a notice of conversion. (A-67).

The Notes defined Joey NY's failure to issue shares upon conversion, failure to transfer or cause its transfer agent to transfer, or Joey NY's impeding conversion, as an event of default. Joey NY would further default if, among other things, any of its representations or warranties were false, it failed to comply with its SEC reporting obligations, entered receivership, liquidation, or bankruptcy, restated its financials, failed to maintain certain assets, was subject to money judgments, became delisted or ceased operations, or if it breached any material covenant that remained uncured after 7 days' notice. (A-68).

15

In the event of a default for failure to honor a notice of conversion, in addition to actual damages and the default damage calculation provisions of the Notes, EMA was entitled to $1000.00 per day "for each day beyond the Deadline that the Borrower fails to deliver the common stock." (A-67).

## C. The Breach of Notes

On July 25, 2017 Joey NY became delinquent with its SEC filings, thereby defaulting under the SPAs and Notes. (A-69). On October 20, 2017, and November 14, 2017, EMA submitted a notice of conversion which Joey NY failed to honor. (A-69).

## D. EMA Commences this Action

On December 11, 2017, EMA commenced this action against Joey NY, RAR, LABB, Reflex and Chancis. EMA sought specific performance of its conversion rights (count one), damages for breach of contract (count two), a permanent injunction (count three), damages for breach of guaranty (count four), fraudulent inducement (count five), and costs, expenses, and attorney's fees (count six). (SA-1).

On January 3, 2018, Chancis and the corporate defendants answered, and filed a counterclaim, and amended their answer and counterclaim on February 11, 2018. (A-42).

16

**E. The District Court Grants Summary Judgment to EMA on Liability**

EMA moved for summary judgment on May 8, 2018, seeking summary judgment on its breach of contract, breach of guaranty, and attorney's fees causes of actions, and the dismissal of defendants' counter-claim and affirmative defenses. (A-63). Chancis and the corporate defendants argued that the Notes violated New York's usury laws and that EMA had fraudulently induced Joey NY into entering in the Notes. (A-195).

On September 9, 2019, the District Court granted summary judgment as to liability on the breach of contract, breach of guaranty, and attorney's fees claims. (A-296). The District Court rejected Chancis and the corporate defendants' usury defense finding that both that the Note's conversion option was not usurious, and that, in any case, they had not tendered any evidence to meet their burden on summary judgment to show a disputed issue of fact as to usury. (A-296). The District Court further found that they conceded liability under the personal guaranties and their liability for attorney's fees by failing to address EMA's arguments. (A-296). The District Court dismissed their counter-claim for fraudulent inducement because they failed to plead their claim with particularity, but denied without prejudice EMA's motion to strike all of their affirmative defenses. (A-296).

### F.  EMA Amends its Complaint

On March 5, 2020, EMA filed an amended complaint adding Richard

Chancis and Roer as defendants and included additional claims for constructive

fraudulent conveyance under New York's Debtor-Credit Laws (counts seven-nine),

intentional fraudulent conveyance under those laws and attorney's fees (count ten-

eleven), and piercing the corporate veil against the individual defendants (count

twelve). (A-313). Defendants answered on May 20, 2020 and amended their

answer on May 22, 2020. (SA-21). The amended answer did not include any

affirmative defenses, other than to state that "As additional defenses, Defendants

re-allege, reassert, and restate, where applicable, the affirmative defenses as set

forth in Defendants' Answer to Plaintiffs' Complaint, to each and every cause of

action asserted in the Amended Complaint to which such defense may be

applicable." (SA-21).

### G. The Default Judgment

On November 27, 2020, just days before the scheduled trial date of

December 7, 2020 Defendants' counsel moved to withdraw, which motion was

granted by the District Court on December 2, 2020. (A-471). Joey Chancis

appeared pro se on December 7, 2020 and purported to interpose a new answer on

December 3, 2020, while Roer appeared pro se on December 7, 2020, and

purported to file a counter-claim with Joey Chancis on December 8, 2020, which

they purported to amend on December 10, 2020. (A-476). Notably, this was done without leave of Court or consent of Plaintiff. The Court rejected these filings and denied Defendants leave to amend their pleadings. (SA-627).

On February 19, 2021, EMA moved to hold Richard Chancis and the corporate defendants in default for failing to appear. (SA-644).

On May 4, 2021, the District Court ordered that "default judgment will be entered as to liability against the corporate defendants . . . if an attorney does not file a notice of appearance on or before May 7, 2021. . . . Richard Chancis may represent himself pro se in this litigation." (A-502).

On May 4, 2021, the District Court entered a default judgment as to the corporate defendants. (A-502).

**H. The Motion in Limine**

On June 1, 2021, EMA filed a motion in limine seeking to preclude any defense that EMA failed to register as a broker-dealer under the federal securities laws because that defense was waived as defendants never raised it in their amended answer or at any point during the discovery process, Chancis had already lost on summary judgment, and the case was on the eve of trial. (SA-670).

On June 9, 2021, the District Court denied EMA's motion on the grounds that "Plaintiff has had fair notice Defendant's argument for at least two months

(see Doc. 131), and has demonstrated on several occasions that it is prepared to present its case as to why Defendants' argument is wrong." (A-604).

## I. The Trial

From June 14 through June 21, 2021, the District Court held a five-day bench trial. The witnesses were (1) Felicia Preston ("Preston"), Director of EMA, (2) Roer, (3) Joey Chancis, and (4) Richard Chancis. (SA-715; SA-891; SA-1053; SA-1227; SA-1415). A sixth and final day of trial was held on August 17, 2021. (SA-1474).

## J. The Judgment

On February 1, 2022, the District Court issued an Opinion and Order after trial, in which it entered judgment against the individual defendants as to breach of contract, breach of guaranty, and constructive fraudulent conveyance, but denied judgment for EMA's claims for fraudulent inducement, actual fraudulent conveyance, specific performance or piercing the corporate veil. (SA-1546).

The District Court found that EMA was entitled to an award of $151,418.50 in compensatory damages plus prejudgment interest at 24% from July 26, 2017. (SA-1547).

Although the District Court found that the individual defendants were liable for constructive fraudulent conveyance, it refused to award damages because it claimed "EMA does not identify which of the hundreds of transactions at issue it

20

believes are constructive fraudulent conveyances." (SA-1563). EMA did in fact identify, very specifically which transactions were constructive fraudulent conveyances including dates, amounts, and account numbers in both its pretrial and posttrial filings. (SA-524; A-915; A-926-1002).

The District Court denied EMA's intentional fraudulent conveyance claim because "Plaintiff relies only on badges of fraud and fails to point to any testimony indicating that any of the Defendants actually intended to defraud Plaintiff." (SA-1565).

In denying EMA's veil piercing claim, the District Court acknowledged that "this is almost a textbook case of corporate entities disregarding formalities and intermingling funds," with "the trial record [] replete with evidence that Defendants: (1) made, at a minimum, hundreds of withdrawals, transfers, and other financial transactions from their corporate accounts for which they have provided barely any documentation, (2) transferred large sums of money between their various corporate entities whenever they felt it necessary, and (3) transferred large sums of money to their personal accounts to pay off their personal credit cards[.]" (SA-1570). The District Court, however, found that "Plaintiff failed to establish that Defendants perpetrated a wrong or injustice in violation of the second element," namely that the defendants "acted in an intentionally deceptive or unjust way." (SA-1571).

21

With regard to contractual damages, the District Court failed to award basic contract damages for Defendants failure to honor the notices of conversion (SA-1578). Instead, the District Court simply took the amount left on the Note and added default interest.  The District Court also refused to award attorney's fees, finding that such fees could not be established post-trial, but had to be established at trial. (SA-1564).

The District Court entered judgment on February 2, 2022. (SA-1591).

## K. The Appeal and Cross-Appeal

On February 9, 2022, Chancis and Roer appealed from the Judgment. In their brief on appeal, Chancis and Roer appeal two discrete issues, namely whether the District Court erred in "rejecting" a usury defense, and whether the District Court erred in finding that EMA did not violate Section 15(a) of the Exchange Act in not registering as a broker-dealer. (A-1085). On February 25, 2022, EMA cross-appealed. (SA-1642).

## ARGUMENT

**I. THE DISTRICT COURT SHOULD NOT HAVE ALLOWED CHANCIS AND ROER TO RAISE A RESCISSION DEFENSE AT TRIAL**

Chancis and Roer did not raise their rescission claim as a cause of action or even as an affirmative defense, and thus waived it. *Barton Group, Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011) ("[A] defendant asserting an affirmative defense bears the burden of proof with respect to that defense.") (citation omitted).

The District Court nonetheless denied EMA's motion in limine seeking to bar Chancis and Roer from raising this defense at trial. This was highly prejudicial to EMA because EMA was only told on the eve of trial that Defendants could raise this defense, long after discovery had closed. *See Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir. 1983) (finding an abuse of discretion where the district court granted leave to amend to a defendant who failed to move to amend its answer until after two pre-trial conferences, and only six days before the scheduled trial date, despite having the necessary information for the amendment for two years prior to making the motion); *Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 860, 420 U.S. App. D.C. 313 (D.C. Cir. 2015) (describing a request to amend an answer "four years after litigation began, one year after

23

summary judgment motions were decided, eight months after filing an amended answer and only days before trial" as "the very picture of undue delay.").

Furthermore, Chancis lost on summary judgment and should not have been to interpose a defense to claims already adjudicated against her.

The District Court thus erred in allowing Chancis and Roer to raise this claim or defense at the last hour.

## II.  THE DISTRICT COURT CORRECTLY DENIED CHANCIS AND ROER'S RESCISSION DEFENSE

Although the District Court erred in allowing Chancis and Roer to raise a rescission defense, it correctly rejected this defense on the merits after trial.

15 U.S.C. § 78o(a), Section 15(a) of the Exchange Act of 1934, provides that "[i]t shall be unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section." There is, however, no private right of action to sue under Section 15(a). *Goodman v. Shearson Lehman Bros., Inc.*, 698 F Supp. 1078, 1086 (S.D.N.Y. 1988).

24

15 U.S.C. § 78cc(b), Section 29(b) of the Exchange Act, provides that

contracts made in violation of the Exchange Act or whose performance requires a

violation of the Exchange Act can be voidable:

> Every contract made in violation of any provisions of this title [15 U.S.C. §§ 78a et seq.] or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title [15 U.S.C. §§ 78a et seq.] or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule or regulation.

*Id.*

When seeking rescission for a violation of 15 U.S.C. § 78cc(b), "the

proponent must show that "(1) the contract involved a prohibited transaction; (2)

he is in contractual privity with [the party relying on the contract]; and (3) [he] is

in the class of persons that the securities acts were designed to protect." *Aftokinito

Props. v. Millbrook Ventures, LLC*, 2010 D.N.H. 144 (D.N.H. 2010) (quoting

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 205 (3d Cir. 2006). "Section

29(b) itself does not define a substantive violation of the securities laws; rather, it

is the vehicle through which private parties may rescind contracts that were made

or performed in violation of other substantive provisions." *Berckeley Inv. Group,*

*Ltd. v. Colkitt*, 455 F.3d 195, 205 (3d Cir. 2006) (citing *National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 206 n.4 (2d Cir. 1989).

"Although the word 'void' is contained in the statute, the Supreme Court has read Section 29(b) to be 'merely voidable at the option of the innocent party.'" *Id.* (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 387-88, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970). Section 29(b) may only be invoked by an "unwilling innocent party." *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 469 F.2d 1166, 1182 (8th Cir. 1972); *Drasner v. Thomson McKinnon Sec, Inc.*, 433 F. Supp. 485, 502 (S.D.N.Y. 1977); *Found. Ventures, LLC v. F2G, Ltd.*, 2010 U.S. Dist. LEXIS 81293, at \*20 (S.D.N.Y. Aug. 11, 2010).

A rescission claim under Section 29 has a three year statute of limitations, 15 U.S.C. § 78cc(b), and should be asserted as a cause of action. *Royal Air Props., Inc. v. Smith*, 312 F2d 210, 213 (9th Cir 1962) (Section 29 gives a right "to bring a suit to rescind."); 15 U.S.C. § 78cc(b) ("[N]o contract shall be deemed to be void by reason of this subsection . . . unless such action is brought within one year after the discovery that such sale or purchase involves such violation and within three years after such violation.").

## A. Defendants did not establish that EMA violated Section 15(a)

Chancis and Roer had the burden to establish a rescission claim. *Aftokinito Props. v. Millbrook Ventures, LLC*, 2010 DNH 144 (2010) ("Because an

agreement is voidable under § 78cc(b), rather than void ab initio, the defendants bear the burden of demonstrating that the Proposal should be voided, based on the factors cited above."). To establish a Section 15(a) violation, Chancis and Roer had to establish that EMA is a broker or dealer and that it used interstate commerce to purchase or sell a security. *SEC v. Premier Links, Inc.*, 2017 US Dist LEXIS 151170, at *18 (E.D.N.Y. Sep. 14, 2017) ("Under that section, it is unlawful for (i) an unregistered (ii) broker or dealer (iii) to make use of the mails or any means or instrumentality of interstate commerce (iv) to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security.") (citing *SEC v. Gibraltar Glob. Sec., Inc.*, 2016 U.S. Dist. LEXIS 3610, 2016 WL 153090, at *2 (S.D.N.Y. Jan. 12, 2016). (*SEC v Premier Links, Inc.*, 2017 US Dist LEXIS 151170, at *18-19 (E.D.N.Y. Sep. 14, 2017).

### i. *Chancis and Roer did not establish that EMA is a broker or dealer*

Chancis and Roer did not establish that EMA is a broker or dealer. "The terms 'broker' and 'dealer' are words of art, with a specific meaning both in the industry and to those members of Congress intimately involved in the drafting of securities legislation." *Massachusetts Fin. Servs., Inc. v. Sec. Inv. Protection Corp.*, 411 F Supp 411, 415 (D Mass 1976). Section 3(a)(4) of the 1934 Act, 15 U.S.C. § 78c (a)(4) defines a broker as "any person engaged in the business of effecting transactions in securities for the account of others, but does not include a

bank." *Id.* Section 3(a)(5) of the 1934 Act, 15 U.S.C. § 78c (a)(5) defines a dealer as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise, but does not include a bank, or any person insofar as he buys or sells securities for his own account either individually or in some fiduciary capacity, but not as a part of a regular business." Conversely, "a person that buys or sells securities . . . for such person's own account, either individually or in a fiduciary capacity, but not as part of their regular business" is *not* a dealer under the Act. 15 U.S.C. § 78c(a)(5)(B).

"Dealers do not include persons, 'who buy and sell securities for their own account as ordinary traders.'" *Chapel Invs., Inc. v. Cherubim Interests, Inc.*, 177 F Supp 3d 981, 990 (N.D. Tex. 2016) (quoting *In re Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992 WL 224082, at \*5 (Sept. 2, 1992). The SEC has offered guidance to delineate between those that qualify as dealers and those that do not, and are instead defined as traders. A "trader" is a party that buys and sells securities for its own accounts, but does not fall within the definition of a dealer and is not required to register with the SEC. *See, e.g.*, *Gordon Wesley Sodorff, Jr.*, Admin. File Proc. No. 3-7390, 1992 SEC LEXIS 2190, 1992 WL 224082, at \*5 (Sept. 2, 1992) (dealer means buying and selling regularly in the service of others, rather than self-interestedly for "one's own account"); *Burton Securities*, SEC No-Action Letter, 1977 SEC No-Act. LEXIS 2871, 1977 WL 10680, at \*1 (Dec. 5,

28

1977) ("[A] person who buys and sells securities for his own account in the capacity of a 'trader' or individual investor is generally not considered to be" required to register as a dealer); *National Council of Savings Institutions*, SEC No-Action Letter, 1986 SEC No-Act. LEXIS 2609, 1986 WL 67129, at *2 (July 27, 1986) (describing factors that make someone a 'trader' rather than a dealer); Guide to Broker-Dealer Registration (April 2008), http://www.sec.gov/divisions/marketreg/bdguide.htm#II (factors to be considered in determining "who is a dealer").

A number of factors are considered when determining whether a party is a dealer or a trader. First, a dealer buys and sells securities as a part of regular business. *National Council of Savings Institutions*, SEC No-Action Letter, 1986 SEC No-Act. LEXIS 2609, 1986 WL 67129, at *2. Second, a dealer contemporaneously and continuously buys and sells securities on the market. *Id.* at 4. Third, a dealer handles other people's money or securities and invests on their behalf. *Id.* Fourth, a dealer makes a market in securities. *Id.* at 2. Fifth, a dealer buys and sells securities on behalf of a regular clientele. *Id.* at 10. Sixth, a dealer renders investment advice or individuals employ the party to earn a return on their behalf. *Id.* at 11. Without meeting any of these criteria, the statute does not require registration as a dealer.

Indeed, in 2002, the SEC proposed codification thereof, stating:

As developed over the years, the dealer/trader distinction recognizes that dealers normally have a regular clientele, hold themselves out as buying or selling securities at a regular place of business, have a regular turnover of business (or participate in the distribution of new issues), and generally transact a substantial portion of their business with investors (or, in the case of dealers who are market makers, principally trade with other professionals). In contrast, traders have a less regular volume, do not handle others' money or securities, do not make a market, and do not furnish dealer-type services such as rendering investment advice, extending or arranging for credit, or lending securities.

*Id.*[3]

Chancis and Roer did not establish at trial that EMA is a dealer within the meaning of the statute. In asserting a rescission claim, it was their burden to establish that EMA is a dealer subject to the registration requirements of this statute. Their failure to do so justified the District Court's denial of this defense.

---

[3] On March 28, 2022, the SEC proposed to change the definition. Proposed Rule 3a5-4 sets forth three different qualitative tests for establishing whether a person's activities are "part of a regular business" of routinely providing liquidity:

- "Routinely making roughly comparable purchases and sales of the same or substantially similar securities in a day;"
- "Routinely expressing trading interests that are at or near the best available prices on both sides of the market and that are communicated and represented in a way that makes them accessible to other market participants;" or
- "Earning revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trade interests."

### ii.     *Chancis and Roer did not establish that they are in contractual privity with EMA*

Chancis and Roer were not parties to the Notes. They were not in contractual privity with EMA and thus lack standing to raise a rescission claim. *Medicine Shoppe Intl. v. Mitsopoulos*, 2005 US Dist LEXIS 62545, at \*15-16 (E.D.N.Y. Dec. 28, 2005) ("Since the defendants indisputably were not parties to the agreements, they lack standing to seek relief as to those agreements. I recommend that that portion of defendants' tenth counterclaim for rescission and reformation be dismissed as to the License Agreement and the Security Agreement."); *Gross v. Silverberg*, 2011 US Dist LEXIS 167330, at \*27 (S.D. Fla Nov. 8, 2011) ("Generally, only the named parties in a contract are considered to be in contractual privity").

### iii.     *Even if the Notes Violated Section 15, Chancis and Roer did not establish that they are innocent parties or individuals who Section 29 is designed to protect*

Joey NY, the borrower—and a publicly traded company—was not, and did not establish, that it was "an unwilling innocent party" whom the statute was designed to protect. On the contrary, it knowingly borrowed money and issued these notes to EMA in exchange for those funds and cannot invoke the benefits of this statute. *Naftalin*, 469 F.2d 1166 at 1182. *Drasner*, 433 F. Supp. 485 at 502; *Found. Ventures*, 2010 U.S. Dist. LEXIS 81293, at \*20. A "sophisticated investor" is "an accomplice to the defendant's violation and [will be] denied the right to

31

rescind the contract under section 29(b)." *Serzysko v. Chase Manhattan Bank*, 290

F Supp 74, 86 (S.D.N.Y. 1968).

> iv. **The conversions were not unlawful because the Notes do not require EMA to act as a broker-dealer**

The Notes themselves do not require EMA to act as a broker dealer because

they do not require EMA to convert shares. No court in the Southern District has

ever held that a convertible note can be rescinded simply because the party who

entered the convertible note did not register as a broker-dealer. This is because

"under § 29(b) of the Exchange Act, only unlawful *contracts* may be rescinded, not

unlawful *transactions* made pursuant to lawful contracts." *Pompano-Windy City*

*Partners, Ltd. v. Bear Stearns & Co.*, 794 F Supp 1265, 1288 (S.D.N.Y. 1992)

(quoting *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y 1981)) (emphasis

supplied by court); *Slomiak v. Bear Stearns & Co.*, 597 F Supp 676, 682 (S.D.N.Y.

1984). Where the Note does not by its terms require the holder to act as a broker-

dealer, there is no claim for rescission. *LG Capital Funding, LLC v. ExeLED*

*Holdings, Inc.*, 2018 US Dist LEXIS 202540, at *15-16 (S.D.N.Y. Sep. 28, 2018)

("[E]ven if LG should have registered, nothing in the Note or the SPA indicates

that those contracts 'could not have been legally performed' because LG failed to

do so. . . . neither the Note nor the SPA require LG to take any action that would

violate this statute" and "the Court can only conclude that the Contracts were still

capable of performance even if LG failed to register as a dealer."); *Found.*

*Ventures, LLC v F2G, Ltd.*, 2010 US Dist LEXIS 81293, at \*20 (S.D.N.Y. Aug. 11, 2010) ("Nfusz has not identified any provision in the Warrant Agreements that requires EMA to register as a broker. In this District, such a link is essential.").

Section 29 provides that the unlawful contract must itself either be a violation of the Exchange Act or involve a violation of the Exchange Act. *Id.* ("Every contract made in violation of any provisions of this title (15 USCS §§ 78a et seq.) or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of" the Exchange Act.). Here, as courts have repeatedly found, the contract must itself be incapable of being performed in a lawful manner to be subject to rescission. These Notes were capable of being performed in a lawful manner—since nothing in the Notes required conversion—and thus the District Court correctly did not invoke Section 29.[4]

---

[4] While Defendants argue that the Notes themselves are securities, they did not raise this argument at trial. *WB Music Corp. v. RTV Commun. Group, Inc.*, 445 F.3d 538, 541 (2d Cir. 2006) ("We need not decide today the vitality of the overlapping-copyrights doctrine because the defendants did not raise this argument and have thus waived it.") (citations omitted). This argument is also unavailing because the alleged failure to register is collateral to the contract and would not entitle Chancis and Roer to rescind the Notes. *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F3d 189, 200-202 (3d Cir 2001).

### III. CHANCIS AND ROER ARE BARRED FROM RAISING A USURY DEFENSE

Although the Notes are interest free except for cases of default, Chancis and Roer argue that they are usurious.

The corporate defendants waived the usury defense by defaulting and their default bars Chancis and Roer from raising this defense now under preclusion doctrines. Usury is a waivable defense. *Blue Citi LLC. v. 5Barz Int'l Inc.*, 802 F. App'x 28, 30 (2d Cir. 2020) (citations omitted).

"We apply the preclusion law of New York. Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Evans v. Ottimo*, 469 F3d 278, 281-282 (2d Cir 2006) (citations omitted). "[C]ollateral estoppel may be properly applied to default judgments where the party against whom preclusion is sought appears in the prior action, yet willfully and deliberately refuses to participate in those litigation proceedings, or abandons them, despite a full and fair opportunity to do so." *Miller v. Falco*, 170 A.D.3d 707, 709 (2d Dep't 2019) (citations omitted). Parties in privity with the defaulting party may be bound under the doctrine. *Fequiere v. Tribeca Lending*, 2016 US Dist LEXIS 31783, at *19

34

(E.D.N.Y. Mar. 11, 2016) (citations omitted); *In re WorldCom, Inc.*, 401 BR 637, 651 (Bankr S.D.N.Y. 2009) (successor of property interests is a party in privity.).

In this case, Chancis and Roer controlled and directed the corporate defendants, and indeed did not contest their personal liability for the corporate contracts,[5] and, despite numerous opportunities to retain counsel, purposefully allowed the corporate defendants to default. Such a willful default constitutes a decision on the merits for estoppel purposes, and bars Chancis and Roer, as parties in privity with the corporate defendants, from asserting a usury defense the corporate defendants themselves lost.

## IV. THE DISTRICT COURT ERRED IN FINDING THAT EMA HAD FAILED TO ESTABLISH DAMAGES FOR DEFENDANT'S FRAUDULENT CONVEYANCES

The District Court correctly granted judgment to EMA for the individual defendants' constructive fraudulent conveyances under New York's Debtor-Creditor Laws but then improperly declined to identify the transactions it found to be fraudulent conveyances, claiming that EMA "does not identify which of the hundreds of transactions at issue it believes are constructive fraudulent conveyances." (SA-1546). EMA submitted a detailed list of in excess of 100

---

[5] The District Court found that the individual defendants were liable for breach of contract because they failed to contest their personal liability for the corporate contracts. The individual defendants have not appealed this part of the decision.

transactions which violated the debtor-creditor laws which the District Court evaluated for purposes of assessing liability, but then simply ignored for purposes of awarding damages. (SA-524; A-915; A-926-1002). The District Court erred in ignoring EMA's submission.[6]

## V. THE DISTRICT COURT ERRED IN NOT AWARDING JUDGMENT FOR ACTUAL FRAUDULENT CONVEYANCE UNDER DCL § 276

The District Court erred in not awarding judgment for actual fraudulent conveyance under N.Y. D.C.L. § 276. That section provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." *Id.*

"Under section 276, intent need not be shown by direct evidence and is normally inferred from the circumstances surrounding the transfer." *United States v. Carlin*, 948 F Supp 271, 277 (S.D.N.Y. 1996). "Because of the inherent difficulties in proving fraudulent intent, however, such intent may be inferred from the existence of certain 'badges of fraud.' Among these 'badges' are: 1) inadequacy of consideration received in the allegedly fraudulent conveyance; 2) a close relationship between the transferor and the transferee; 3) the transferor's

---

[6] Because the District Court declined to award fraudulent conveyance damages, it improperly limited EMA's damages to breach of contract damages.

36

insolvency as a result of the conveyance; 4) a questionable transfer not in the ordinary course of business; and 5) retention of control of the property by the transferor after the conveyance." *Cadle Co. v. Newhouse*, 2002 U.S. Dist. LEXIS 15173, at *14-15 (S.D.N.Y. Aug. 15, 2002) (citations omitted). This is because "fraudulent intent, by its very nature, is rarely susceptible to direct proof and must be established by inference from the circumstances surrounding the allegedly fraudulent act." *Mar. Midland Bank v. Murkoff*, 120 A.D.2d 122, 128 (2d Dep't 1986).

Courts will award judgment under this statute where a plaintiff has established the badges of fraud. *See e.g.*, *Machado v. A. Canterpass, LLC*, 115 A.D.3d 652, 654 (2d Dep't 2014) ("[W]e find sufficient 'badges of fraud' to support petitioner's first cause of action for fraudulent conveyance under Debtor and Creditor Law § 276.").

The District Court expressly found that EMA had established at least "some of the badges of fraud" including a "close relationship between the parties" and "inadequate capitalization at the time of the transfers." (SA-1564). The District Court, in other portions of the Decision, found that these transfers were also without fair consideration, (SPA 17), were questionable, (SPA 17) (noting that defendants used corporate monies to pay for movies and shopping for their personal assistant, celebratory dinners, and hair appointments), and that defendants

37

were aware that they could not pay the debt they owed to EMA. (SPA 18).

Furthermore, the District Court expressly found that "(1) Plaintiff established that

money was transferred out of the corporate accounts and into the Individual

Defendants' personal accounts, and (2) the Individual Defendants confirmed that

these transactions were not for anything of value or to discharge any antecedent

debts of Joey New York, Inc." (SPA 18).

Nonetheless, the District Court erroneously found that EMA had failed to

prove actual intent by only relying on the badges of fraud and that "the record

evidence and testimony . . . show that Individual Defendants never received any

salary, each invested more than $1 million in the company, and overwhelmingly

made these transfers and withdrawals in order to pay company expenses. Even

where the Individual Defendants transferred money from the corporate account to

their personal accounts, they did so to reimburse those personal accounts after they

were used for business expenses." (SA-1546).

Indeed, the District Court further erred by effectively reopening discovery in

the middle of trial and allow in the Individual Defendants to testify based off of

documents and notes that were not produced in discovery or even at trial, and

which were precluded under the District Court's own decision on the motion in

limine. (SA-638; SA-1588). The District Court then proceeded to rely on the

discovery produced in response to a subpoena issued <u>in the midst of trial</u> for the

proposition that the "Individual Defendants never received any salary, each invested more than $1 million in the company, and overwhelmingly made these transfers and withdrawals in order to pay company expenses. Even where the Individual Defendants transferred money from the corporate account to their personal accounts, they did so to reimburse those personal accounts after they were used for business expenses"—even though the discovery ultimately produced in response to the mid-trial subpoenas did not support this assertion. (SA-1546). To the extent such documents had existed, they should have been turned over in discovery, and were not, which should have precluded their use at trial as prejudicial (in accordance with elementary case law and the District Court's own decision in response to the motion in limine.) (A-604).

The District Court erred in finding that EMA's overwhelming proof of the badges of fraud did not establish a DCL § 276 claim as the law is clear that such badges of fraud constitute proof of actual intent. *Machado*, 115 A.D.3d at 654. Furthermore, the District Court expressly found in other portions of the Opinion and Order that "the Individual Defendants confirmed that these transactions were not for anything of value or to discharge any antecedent debts of Joey New York, Inc," (SPA 18), and that their claims otherwise "fly in the face of the Individual

Defendants' own testimony that they have not been repaid for any of their personal loans to, or investments in, the corporate entities." (SPA 17-18).[7]

The District Court should have entered judgment for intentional fraudulent conveyance and for attorney's fees under DCL § 276-a, which allows attorney's fees when a party violates DCL § 276.

## VI. THE DISTRICT COURT ERRED IN DECLINING TO PIERCE THE CORPORATE VEIL

Should this Court reverse the District Court's findings imposing contract liability on Chancis and Roer (and it should not do so because Chancis and Roer have not appealed this decision), EMA appeals from the District Court's finding that EMA did not established adequate grounds to pierce the corporate veil. "[P]iercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Morris v. State Dept. of Taxation & Fin.*, 82 NY2d 135, 141-142 [1993]) (citations omitted). "Factors to be considered

---

[7] The District Court's further erred in relying on the individual defendant's purported equity investment and lack of a salary—each of which was unsupported by documents which, had they existed, should have been turned over in discovery—in order to absolve them of fraudulent conveyances to prevent collection of debts by creditors. The fact that defendants made equity investments or did not take salaries does not entitle them to fraudulently convey assets to the detriment of creditors.

in determining whether the owner has abused the privilege of doing business in the corporate form include whether there was a failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use." *D'Mel & Assoc. v. Athco, Inc.*, 105 AD3d 451, 452 (1st Dep't 2013) (citations omitted).

In addition, "some showing of a wrongful or unjust act toward plaintiff is required. The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Morris v State Dept. of Taxation & Fin.*, 82 NY2d 135, 141-142 (1993) (citations omitted).

The District Court acknowledged that "Plaintiff clearly has satisfied the first element of the piercing the corporate veil analysis." (SPA at 24). Indeed, it found that Joey NY "was inadequately capitalized," and that "this is almost a textbook case of corporate entities disregarding corporate formalities and intermingling funds;" defendants used corporate funds to "pay off personal credit cards." (*Id.* at 24-25). Defendants "freely mixed personal and corporate monies on a near-daily basis[,]" and "made, at a minimum, hundreds of withdrawals, transfers, and other financial transactions from their corporate accounts for which they barely provided documentation." (*Id.* at 25).

Nonetheless, the District Court found that defendants did not "perpetrate a wrong or injustice" because defendants had not taken a salary, had invested money into their own company, and because defendants had claimed they put some of their business expenses on personal credit cards. (SA-1546). While the District Court acknowledged that defendants had used corporate funds to pay for massages and movies, "these expenses are a mere drop in the bucket as compared to the millions of dollars the Individual Defendants put into the company and the fact that they did not receive salaries for years." (SA-1546). The District Court expressly found in other portions of the Decision, however, that "the Individual Defendants confirmed that these transactions were not for anything of value or to discharge any antecedent debts of Joey New York, Inc," (SPA 18), and that their claims otherwise "fly in the face of the Individual Defendants' own testimony that they have not been repaid for any of their personal loans to, or investments in, the corporate entities." (SPA 17-18).[8]

The District Court erred in rejecting the veil piercing claim. When a court finds both complete domination and wrongdoing, here fraudulent conveyances in

---

[8] The District Court's further erred in relying on the individual defendant's purported equity investment and decision not to take a salary—each of which was unsupported by documents which, had they existed, should have been turned over in discovery—in order to absolve them of fraudulent conveyances to prevent collection of debts by creditors.

violation of the DCL (and ipso facto finding that the corporation is or has become insolvent as a result and thus damaging to the creditor-plaintiff),[9] it should sustain a veil piercing claim. *Shisgal v. Brown*, 21 A.D.3d 845, 847 (1st Dept 2005) (sustaining veil piercing claim predicated on domination and fraudulent conveyance claim); *Burberry Ltd. v. RTC Fashion Inc.*, 2014 NY Slip Op 31232[U], *6 (N.Y. Co. 2014) (piercing the corporate veil where party "completely dominated and controlled the corporation, and abused the corporate form to advance his own personal interests . . . " including by rendering company insolvent through fraudulent conveyances.)(citations omitted); *Palmerone v. Staples*, 195 A.D.3d 736, 739 (2d Dept 2021) (piercing corporate veil based on fraudulent conveyance).

Here, the District Court expressly found that Chancis and Roer made fraudulent conveyances from an insolvent entity and thereby impaired and impeded EMA's ability to collect the debt. This is clearly a wrong and an injustice that warranted piercing the corporate veil.

---

[9] Indeed, there is a presumption of such insolvency. *Palmerone v Staples*, 195 AD3d 736, 738 (2d Dep't 2021)

## VII. THE DISTRICT COURT ERRED IN NOT AWARDING BREACH OF CONTRACT ATTORNEY'S FEES

The District Court correctly entered judgment on liability for attorney's fees but refused to award any damages for fees incurred pre-trial, contending that EMA's evidence was improperly presented post-trial via a Fed. R. Civ. P. 54 motion. (SA-1563). Fed. R. Civ. P. 54 provides that "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." "Rule 54 itself does not preclude a post-trial motion for attorneys' fees[,]" where the claim is based on contract and "several circuit courts have interpreted this language to permit a claim for contractual attorneys' fees to be pursued in a Rule 54 motion." *Lehman Bros. Holdings, Inc. v. Gateway Funding Diversified Mtge. Servs., L.P.*, 2015 US Dist LEXIS 143532, at *7-8, n 4 (E.D. Pa Oct. 22, 2015) (citing *Richardson v Wells Fargo Bank, N.A.*, 740 F3d 1035, 1039 (5th Cir. 2014) and *Capital Asset Research Corp. v. Finnegan*, 216 F3d 1268, 1270 (11th Cir. 2000).

Furthermore, "New York law does not require Lehman to prove its attorneys' fees claim at trial, and Lehman's request for attorneys' fees is timely." *Lehman Bros. Holdings, Inc. v Gateway Funding Diversified Mtge. Servs., L.P.*, 2015 US Dist LEXIS 143532, at *6-7 (E.D. Pa. Oct. 22, 2015) (citations omitted).

44

In other words, EMA properly brought its claim for liability for attorney's fees as part of the plenary proceeding. EMA, however, could not present its particular attorney's fees during trial because they were still being incurred during the trial. Thus, only after the case concluded, could EMA present its attorney's fees for its total attorney's fees incurred during the litigation. It properly did so via motion after the trial concluded and should not have had to do so twice—once during trial, and once after, as the District Court ruled.

## VIII. THE DISTRICT COURT IMPROPERLY CALCULATED EMA'S BREACH OF CONTRACT DAMAGES

The District Court failed to assess breach of contract damages correctly. The District Court correctly noted that the proper measure of damages requires the court to "subtract[] the contract price—the price at which the plaintiff is entitled to convert shares under the Note—from the market price of the shares on the date of the breach." (SA-1546). The District Court then failed to follow its own guidance; instead of subtracting the contract price from the market value of the shares on the date of the breach and then adding the remaining balance of the Notes plus default interest, the District Court awarded instead just the outstanding balance on the Notes together with default interest. The District Court should have awarded damages based on the market value of the shares on the date EMA sought to convert and was improperly refused.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Chancis and Roer's appeal

and grant EMA's cross-appeal.

Dated: July 25, 2022
New York, New York

**LAW OFFICE OF JEFFREY FLEISCHMANN P.C.**

By: <u>/s/ Jeffrey Fleischmann</u>
Jeffrey Fleischmann, Esq.
150 Broadway, Suite 900
New York, N.Y. 10038
Tel. (646) 657-9623
Fax (646) 351-0694
jf@lawjf.com

*Attorneys for Plaintiff-Counter-Defendant-Counter-Claimant-Appellee-Cross-Appellant*

46

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Local Rule 32.1(a)(4)(A) because it contains 10,297 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: July 25, 2022                          Respectfully submitted,


                              /s/ Jeffrey Fleischmann
                              Jeffrey Fleischmann, Esq.